# 24-384

---

## United States Court of Appeals
## For the Second Circuit

---

VARISCITE NY FOUR, LLC and VARISCITE NY FIVE, LLC,
*Plaintiffs-Appellants*,

v.

NEW YORK STATE CANNABIS CONTROL BOARD; NEW YORK STATE
OFFICE OF CANNABIS MANAGEMENT; TREMAINE WRIGHT, in her
official capacity; and CHRIS ALEXANDER, in his official capacity,
*Defendants-Respondents*.

---

On appeal from an Order of the United States District Court for the
Northern District of New York

---

## OPENING BRIEF OF APPELLANTS

---

Jeffrey M. Jensen
JEFFREY M. JENSEN, PC
9903 Santa Monica Blvd. #890
Beverly Hills, CA 90212
Tel: (310) 909-7043
jeff@jensen2.com
*Counsel for Plaintiffs-Appellants*

---

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Under Federal Rules of Appellate Procedure 26.1 and 28(a)(1), Appellant Variscite NY Four, LLC certifies that it has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Appellant Variscite NY Five, LLC certifies that it has no parent corporation and no publicly held corporation owns 10% or more of its stock.

TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................7

JURISDICTIONAL STATEMENT ...................................................10

STATEMENT OF ISSUES PRESENTED FOR REVIEW ...................10

STATEMENT OF THE CASE..........................................................11

    **A.**    The Adult Use Application Program Favors New York
Residents in Violation of the Dormant Commerce Clause................11

        1.    The Advantage of "Extra Priority" ...........................11

        2.    The Regulations for "Extra Priority" ........................13

        3.    Respondents' Mandatory Adult Use Application System
Favors New York Residents .....................................16

    B.    Appellants Satisfy All Requirements for "Extra Priority"
Except the Unconstitutional New York Preferences..........................19

    C.    Appellants Brought this Case with Remarkable Speed .....................20

        1.    Respondents Created the Adult Use Application Program
Abruptly and Without Warning ................................20

        2.    Appellants Scrambled to Apply and Bring this Litigation .......26

    D.    Procedural History........................................................29

SUMMARY OF THE ARGUMENT .................................................29

STANDARD OF REVIEW .............................................................31

ARGUMENT ...............................................................................31

I.    The Law for Preliminary Injunctions Against Constitutional Harms ..........31

II.    The District Court Erred in Concluding Appellants Did Not Show a
Likelihood of Success on the Merits ............................................32

III.     The District Court Erred in Finding Appellants Did Not Show Irreparable Harm................................................................................49

IV.      The District Court Erred in Finding the Balance of Equities and the Public Interest Favor Respondents ................................................59

V.       Standing ........................................................................................65

VI.      The Court Should Order an Injunction Forthwith with No Injunction Bond................................................................................................66

CONCLUSION ........................................................................................67

CERTIFICATE OF COMPLIANCE.......................................................68

CERTIFICATE OF SERVICE ................................................................69

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

28 U.S. Code § 1292(a)(1) ................................................................10

28 U.S.C. § 1331 ..............................................................................10

42 U.S.C. § 1983 ..............................................................................10

*Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935) ......................41

*Brinkmeyer v. Washington State Liquor & Cannabis Bd.*, No. C20-5661 BHS, 2023 WL 1798173 (W.D. Wash. Feb. 7, 2023) ....................................47

Cal. Bus. & Prof. Code § 26301 ......................................................42

*Donovan v. Bierwirth*, 680 F.2d 263 (2d Cir. 1982) .......................31

*Finch v. Treto*, 82 F.4th 572 (7th Cir. 2023) ..................................43

*Finch v. Treto*, No. 22 C 1508, 2022 WL 2073572 (N.D. Ill. June 9, 2022) .. 44, 52, 54

*Glob. Linguist Sols., LLC v. Abdelmeged*, 913 F.3d 921 (9th Cir. 2019) ..............33

*Gonzales v. Raich*, 545 U.S. 1 (2005) ............................................34

*Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630 (7th Cir. 2005) ............56

*Hsu By & Through Hsu v. Roslyn Union Free Sch. Dist. No. 3*, 85 F.3d 839 (2d Cir. 1996) ...........................................................................31

*Hughes v. Oklahoma*, 441 U.S. 322 (1979) ....................................41

*Lowe v. City of Detroit*, 544 F. Supp. 3d 804 (E.D. Mich. 2021) ...........................46

*Lowe v. City of Detroit*, 544 F. Supp. 3d 804, 816 (E.D. Mich. 2021) ...................55

*New England Power Co. v. New Hampshire*, 455 U.S. 331 (1982) ................. 38, 39

*New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483 (2d Cir. 2013). .............31

*Northbay Wellness Grp., Inc. v. Beyries*, 789 F.3d 956 (9th Cir. 2015) ................48

*Northeast Patients Group. v. United Cannabis Patients & Caregivers of Maine*, 45 F.4th 542 (1st Cir. 2022) ...................................................33

*NPG, LLC v. City of Portland, Maine*, No. 2:20-CV-00208-NT, 2020 WL 4741913 (D. Me. Aug. 14, 2020) .................................................. 42, 46

NY CANBS § 10(19) ...................................................... 62, 65

OR S.B. 582 (2019) ..........................................................................42

*Original Investments, LLC v. State of Oklahoma*, 542 F. Supp. 3d 1230 (W.D. Okla. 2021) ...................................................................47

*Padilla-Ramirez v. Bible*, 882 F.3d 826 (9th Cir. 2017) ................33

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984) ........................51

*Pro's Sports Bar & Grill, Inc. v. City of Country Club Hills*, 589 F.3d 865 (7th Cir. 2009) ...............................................................................56

*Prudential Ins. Co. v. Benjamin*, 328 U.S. 408 (1946) ...................38

*Quezada v. BP Prods. N. Am., Inc.*, No. 06 CV 5378 (SJ), 2006 WL 3837720 (E.D.N.Y. Dec. 1, 2006) ................................................................56

*Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597 (9th Cir. 1991) ................................................................56

Rev. Code WA § 43.06.495 ................................................................42

*S.-Cent. Timber*, 467 U.S. at 91-92 (1996) ................................................38

*Sporhase v. Nebraska, ex rel. Douglas*, 458 U.S. 941 (1982) ................................38

*Starlight Sugar, Inc. v. Soto*, 114 F.3d 330 (1st Cir. 1997) ................................56

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832 (9th Cir. 2001)...56

*Toigo v. Dep't of Health & Senior Servs.*, 549 F. Supp. 3d 985 (W.D. Mo. 2021) ........................................................................ 46, 60

*United States v. Anderson*, 46 F.4th 1000 (9th Cir. 2022), cert. denied, 143 S. Ct. 2625 (2023) ................................................................33

*United States v. Cuevas-Lopez*, 934 F.3d 1056 (9th Cir. 2019) ................................33

*Variscite NY One, Inc. v. New York*, 2022 WL 17257900 (N.D.N.Y. Nov. 10, 2022) ................................................................52

*Variscite NY One, Inc. v. New York*, 640 F. Supp. 3d 232 (N.D.N.Y. 2022), reconsideration denied, No. 122CV1013GLSDJS, 2023 WL 1420662 (N.D.N.Y. Jan. 31, 2023) ................................................................ 45, 65

## **INTRODUCTION**

Plaintiffs-Appellants Variscite NY Four, LLC and Variscite NY Five, LLC appeal the Northern District of New York's Order denying their Motion for a Preliminary Injunction to prevent Defendants-Respondents New York State Cannabis Control Board (the "Board"), New York State Office of Cannabis Management ("OCM"), Tremaine Wright (Chairwoman of the Board), and Chris Alexander (Executive Officer of OCM) from issuing adult use retail dispensary cannabis Licenses under their current unconstitutional adult use application program ("Adult Use Application Program") held from October 4, 2023 through December 18, 2023 or the earlier Conditional Adult-Use Retail Dispensary application program ("CAURD Application Program") held from August 25, 2022 through September 26, 2022.

The District Court denied Appellants' Motion for a TRO and Preliminary Injunction because the court concluded the dormant Commerce Clause does not apply to state cannabis license programs because the Controlled Substances Act makes cannabis illegal under federal law. ***Unless the Second Circuit reverses the Northern District of New York's Order, it will create a circuit split with the First Circuit, the only circuit to address the issue to date, which concluded the dormant Commerce Clause applies to state cannabis licenses notwithstanding the Controlled Substances Act. It will also create a conflict with the majority of***

***district court orders from around the country, including a 2022 order from the Northern District of New York that concluded the dormant Commerce Clause applies to cannabis licenses and granted a preliminary injunction against Respondents' CAURD Application Program***.

Although the Second Circuit reviews denials of preliminary injunctions for abuse of discretion, the District Court Order depends on a pure question of law the Second Circuit reviews de novo: does the dormant Commerce Clause apply to state cannabis licenses? Second Circuit precedent holds that a district court abuses its discretion where, as here, it denies a motion for preliminary injunction based on an error of law.

For clarity, this lawsuit is ***not*** about cannabis products crossing state lines. Appellants do not challenge any substantive law regarding the regulation of cannabis. Appellants do not challenge New York's laws or regulations regarding the handling, processing, tracking, taxing, etc. of cannabis. Rather, the only issue presented in this litigation is whether New York may favor its own residents over out-of-state residents in ***investing in the ownership*** of a state-licensed cannabis business.

The District Court also erred in its findings on the remaining injunction factors. As to irreparable harm, a plaintiff satisfies the irreparable harm factor if the plaintiff alleges a constitutional violation. The District Court acknowledged

8

that, but erroneously found Appellants did not show irreparable harm based on the court's erroneous conclusion that the dormant Commerce Clause does not apply to cannabis.

The District Court the made several clear errors of fact and law regarding the remaining injunction factors. As to irreparable harm, among many other errors, the District Court found that Appellants should have brought the litigation a year earlier in November 2022 when Respondents released **proposed** regulations for public comment. Appellants were not aware of the Regulations and the favoritism of New Yorkers until October 2023. In any event, precedent shows a prospective cannabis license applicant cannot challenge proposed regulations before they are final because a challenge lacks ripeness for standing. Respondents did not adopt the Regulations until September 2023.

As to the balance of hardships, the court based its conclusion almost entirely on harm to CAURD applicants, which cannot justify denying an injunction as to Adult Use Application Program Licenses. Moreover, the court's findings on the balance of harms were all clearly erroneous, as discussed below.

As to standing, Appellants have standing to challenge the Adult Use Application Program November Batch Licenses, because Respondents held only a single application program, and divided the applications into batches later.

As to CAURD, Appellants do not challenge the CAURD program. Appellants have standing to seek an injunction against Respondents issuing CAURD Licenses while this litigation is pending because the Cannabis Law requires Respondents to open the application program to all applicants "at the same time."

## JURISDICTIONAL STATEMENT

The Northern District of New York has jurisdiction under 28 U.S.C. § 1331 because Appellants brought claims under 42 U.S.C. § 1983 for violations of the United States Constitution.

The Second Circuit has jurisdiction to hear appeals of denials of preliminary injunctions under 28 U.S.C. § 1292(a)(1). The District Court issued the Order denying Appellants' Motion for TRO and Preliminary Injunction on February 2, 2024. Appellant timely appealed on February 11.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Did the District Court err in denying Appellants' Motion for a Preliminary Injunction to prevent Respondents from issuing New York State cannabis business licenses under an unconstitutional application program that excluded Appellants from having "extra priority" because the majority owners of Appellants have cannabis convictions from outside of New York (rather than the required New York cannabis conviction) and resided in communities

disproportionately impacted by cannabis enforcement outside of New York (rather than in New York)?

2.      Did the District Court err in concluding Appellants lack standing to seek an injunction against the November Batch of Adult Use Licenses and CAURD Licenses?

## STATEMENT OF THE CASE

Respondents' violation of Appellants' constitutional rights is knowing, voluntary, and continuing.  In violation of the dormant Commerce Clause, Respondents favor New York residents over out-of-state residents in granting Licenses in their Adult Use Application Program.

Respondents favor New York residents even though they were sued in 2022 under the dormant Commerce Clause for favoring New York residents in the CAURD Application Program and placed under a preliminary injunction by the Northern District of New York until the case settled in 2023.

### A.    The Adult Use Application Program Favors New York Residents in Violation of the Dormant Commerce Clause

#### 1.    *The Advantage of "Extra Priority"*

Applicants who qualify for "extra priority" in the Adult Use Application Program receive three numbers in the application lotteries and, consequently, three times the likelihood of being selected for a License.

Respondents accepted applications for the Adult Use Application Program from October 4, 2023 through December 18, 2023. (Order, SA10.) Respondents divided the applications into two batches: one for applicants who leased/owned property for their dispensary and applied by November 17 (the "November Batch"), and one for applicants who had not yet leased/owned property for their dispensary or who applied with property after November 17 (the "December Batch"). (*Id.*)

Respondents will issue Licenses in numerical order based on a "queue" for each batch. (*Id.*, SA11.) The order of the queue for each batch is determined by a lottery for each batch. (*Id.*) After the District Court denied Appellants' Motion for a Temporary Restraining Order, Respondents held the lottery for each batch and assigned the queue orders.[1]

---

[1] The Second Circuit may take judicial notice of State of New York government websites. *Rynasko v. New York Univ.*, 63 F.4th 186, 191 n.4 (2d Cir. 2023).

The two queues can be found on Respondents' website:

https://cannabis.ny.gov/system/files/documents/2024/02/retail-and-microbusiness-non-provisional-queue-oct-nov-2023-revised-01-29-24.pdf (November Batch);

https://cannabis.ny.gov/system/files/documents/2024/03/official-queue-au-december-retailmicro_1.pdf (December Batch).

As discussed below, Respondents assigned one number in the lottery to each applicant, except Respondents assigned three numbers in the lottery to applicants who met Respondents' unconstitutional requirements for "extra priority."

Respondents placed an unknown number of applications into the November Batch and 2,853 applications into the December Batch. (*Id*.) Accounting for the three numbers allotted to extra priority applicants, the November queue contains 2,232 numbers and the December queue contains 4,558 numbers. (*See* footnote 1.)

Respondents will issue Licenses to the first 250 applicants in the November Batch queue and the first 450 applicants in the December Batch queue. (Order, SA11; Transcript, JA708.)

Thus, applicants who qualify for extra priority and were assigned three numbers in the lottery had three times the likelihood of being drawn within the first 250 (November Batch) or 450 (December Batch) numbers in the queue and receiving Licenses.

2. ***The Regulations for "Extra Priority"***

Respondents' requirements for "extra priority" violate the dormant Commerce Clause by favoring New York applicants over out-of-state applicants. To receive extra priority, an applicant must be at least 51% owned by an individual who meets three requirements: (1) lived in a Community Disproportionately Impacted by the enforcement of cannabis laws for five or seven (as applicable)

13

years; (2) has an income less than 80% of the median income in the county in which the individual lives; and (3) was convicted of a cannabis crime in New York. The first and third elements violate the dormant Commerce Clause.

The Regulations permit Respondents to prioritize "applicants [who] are eligible for extra priority as defined in section 121.1 of this Title …" 9 NYCRR 120.7(c)(3). An applicant is eligible for extra priority if the applicant is at least 51% owned by an individual who meets the three elements for extra priority:

> A person who demonstrates that they are [1] ***an individual from a community disproportionately impacted by the enforcement of cannabis prohibition*** may receive extra priority if: [2] (i) they have an income lower than eighty percent (80%) of the median income of the county in which the applicant resides; and [3] (ii) ***was convicted of a marihuana-related offense*** prior to the effective date of the Marihuana Regulation and Taxation Act, or had a parent, guardian, child, spouse, or dependent, or was a dependent of an individual who, prior to the effective date of the Marihuana Regulation and Taxation Act, was convicted of a marihuana-related offense.

9 NYCRR 121.1(k) (emphasis added).

***Cannabis conviction***. The definition of marihuana-related offense does not on its face indicate the conviction must be from New York. As discussed below,

14

however, Respondents' mandatory Application System clarifies that the conviction must be from New York.

Moreover, Appellants learned during this litigation that marihuana-related offense is a defined term. The Regulations do not capitalize "marihuana-related offense," and Appellants had no reason to suspect it is a defined term. During this litigation, however, Appellants learned the Regulations define "marihuana-related offense" to include only convictions under New York law. *See* 9 NYCRR § 118.1(a)(64).

***Community Disproportionately Impacted***. An individual is from a Community Disproportionately Impacted by the enforcement of cannabis laws if they lived in such a community for five of the first eighteen years of their life or seven years of their life. 9 NYCRR 121.1(d)(2).

Under Section 121.1(k)(3), "[a]n applicant seeking to qualify for extra priority shall provide proof of residency, income, and conviction, as prescribed by the Board." 9 NYCRR 121.1(k)(3). As discussed below, Respondents required applicants to submit their proof through the Application System, and the acceptable proof favors New York applicants over out-of-state applicants in violation of the dormant Commerce Clause.

### 3. *Respondents' Mandatory Adult Use Application System Favors New York Residents*

Respondents required applicants to submit their applications and supporting documents through Defendants' New York Business Express application website the ("Application System"). (Sample Application, JA124 ("All applications must be submitted online through New York Business Express (NYBE).").)

Respondents prepared a mockup of the Application System on or after September 7, 2023. (*Id.*) Appellants do not know the date Respondents first released the mockup to the public. Appellants estimate their minority owner first learned about the mockup in October 2023. (Jensen Aff., JA565.)

**Cannabis conviction.** The Application System clarifies that a qualifying cannabis conviction must be under New York law. (*Id.*, JA157 ("have been convicted of a marihuana-related offense *in New York State* before March 31, 2021…") (emphasis added).

**Community Disproportionately Impacted**. The Regulations do not require the Community Disproportionately Impacted to be in New York. Respondents, however, discriminate against out-of-state applicants by not providing enough information for an applicant to have an area outside of New York designated as a Community Disproportionately Impacted without professional assistance.

For New York addresses, Respondents published an interactive map on their website that allowed applicants to enter their addresses to determine if they were

16

within Communities Disproportionately Impacted.  (Map, JA287.)  Respondents'

map does not work for non-New York addresses.  (*Id*.)  Other jurisdictions, such as

Nevada, provide a website to check if an addresses anywhere in the country

qualifies for priority in their cannabis program.  (Nevada Instructions, JA304.)

Likewise, Respondents do not provide enough information for out-of-state

applicants to determine if their out-of-state addresses qualify as Communities

Disproportionately Impacted.  Respondents published a Frequently Asked

Questions document that states, "***you must establish*** the census tract you resided in

out of state was disproportionately impacted under prohibition as compared to the

rest of your state by demonstrating that ***the local arrest rate substantially exceeded***

***the state's arrest rate***."  (FAQ, JA370 (emphasis added).)

The FAQ document provides no definition for "substantially exceeded" so

that out of state applicants can determine if their addresses qualify.  Similarly, the

FAQ instructs applicants to "use decennial census population data and the number

of arrests within your census tract during requisite time periods (1980–1985, 1986–

1995, 1996–2005, 2006–2015, and 2016–2021) to establish arrest rates for each

time period."  It does not, however, provide applicants information about where to

obtain the decennial census population data, or how to obtain the relevant

information from that data.

17

Even ignoring the ambiguities in Respondents' instructions for proving an out-of-state address is in a Community Disproportionately Impacted, Respondents' requirements for a Community Disproportionately Impacted discriminate against certain states. Respondents consider data through the year 2021. But Colorado and Washington decriminalized recreational cannabis in 2012, and thus residents of those states have nine fewer years of arrest data for proving a Community Disproportionately Impacted.

The Application System further shows that Respondents favor New York residents based on the verification documents the Application System accepts. The Application System provides a list of documents acceptable to prove residence in a Community Disproportionately Impacted. (Document List, JA 212.) An applicant may submit a "NYS Driver License," "NYS Non-Driver," "IDNYC Card," or a "NYS Learner Permit issued by NYS DMV," but an applicant cannot submit a driver's license or identification card from another state. (*Id*.) An applicant may submit an "[e]mployment offer or notice of pay that shows an employer provided housing located in NYS, including seasonal housing," but may not submit documentation of employer-provided housing outside of New York. (*Id*.) An applicant may provide a "Jury Summons, Court Order, or other document from a court within NYS," but may not submit equivalent documents from outside of New York. (*Id*.) An applicant may submit a "[l]etter from a charitable organization

18

registered with the NYS Attorney General that provided services to the applicant in the ordinary court attesting to the applicant's NYS residence," but may not provide a letter from a charitable organization not registered in New York or that provided housing to the applicant's majority owner outside of New York. (*Id.*) An applicant may also provide a "[d]ocument addressed to the applicant by a local government in NYS, NYS government agency, or the federal government," but the applicant may not submit documents from other state governments. (*Id.*)

**B.** **Appellants Satisfy All Requirements for "Extra Priority" Except the Unconstitutional New York Preferences**

Variscite Four applied for a License in the Adult Use Application Program. (Jensen Aff., JA112.) Variscite Four satisfies every requirement for "extra priority" except the unconstitutional preferences for New York residents. Variscite Four is 51% owned by an individual who was convicted of a cannabis crime under California law rather than New York law. (*Id.*) He has an income lower than 80% of the median income of Los Angeles County, where he resides. (*Id.*) He lived in an area designated as a community disproportionately impacted by the City of Los Angeles for the Los Angeles cannabis social equity application program. (*Id.*)

Variscite Five applied for a License in the application program. (*Id.*, JA113.) Variscite Five satisfies every requirement for inclusion in the "Extra Priority" batch for application review, except the unconstitutional preferences for New York residents. (*Id.*) Variscite Five is 51% owned by an individual who was convicted

19

of a cannabis crime under California law rather than New York law. (*Id.*) He has an income lower than 80% of the median income of Los Angeles County, where he resides. (*Id.*) He lived in an area designated as a community disproportionately impacted by the City of Los Angeles for the Los Angeles cannabis social equity application program. (*Id.*)

    **C.**    <u>**Appellants Brought this Case with Remarkable Speed**</u>

        **1.**    <u>***Respondents Created the Adult Use Application Program Abruptly and Without Warning***</u>

    ***Respondents created the Adult Use Application Program abruptly and unexpectedly in September 2023 in response to a state court preliminary injunction against their 2022 CAURD Application Program***.

    Respondents' previous cannabis application program from 2022—the CAURD Application Program—was the subject of two lawsuits that resulted in preliminary injunctions. First, in September 2022, an out-of-state company sued in the Northern District under the dormant Commerce Clause. *Variscite NY One, Inc. v. New York*, 640 F. Supp. 3d 232 (N.D.N.Y. 2022), reconsideration denied, No. 122CV1013GLSDJS, 2023 WL 1420662 (N.D.N.Y. Jan. 31, 2023). The plaintiff alleged the CAURD Application Program favored New York applicants over out-of-state applicants by requiring applicants to have a conviction for a cannabis crime in New York and a "significant New York presence," such as a bank account in the state. The Northern District of New York issued a preliminary injunction in

November 2022 and the case settled in May 2023 while the preliminary injunction was in place.

Second, in August 2023, individuals who did not meet the requirements to participate in the CAURD Application Program sued in Albany County Supreme Court under the New York Constitution separation of powers doctrine. *Fiore v. New York State Cannabis Control Board*, No. 907282-23 (Sup. Ct., Albany Cnty., 2023). ***Even though the plaintiffs never applied in the CAURD Application Program, and the plaintiffs brought the litigation eleven months after the program closed (the application period ran from August 25 to September 25, 2022) and after the top 463 CAURD applicants had been selected for licensure, the state court issued a preliminary injunction***.

The plaintiffs alleged Respondents exceeded the enabling statute in creating the CAURD Application Program. Under the enabling statute, "the initial adult-use cannabis retail dispensary license application period ***shall be opened for all applicants at the same time***." NY CANBS § 10(19) (emphasis added). The plaintiffs alleged Respondents exceeded their authority by creating the CAURD Application Program, which was open only to applicants who were 51% owned by an individual who (1) was convicted of a cannabis crime and (2) owned a profitable business for at least two years. The plaintiffs—who were not convicted of cannabis crimes and did not own profitable businesses for at least two years—

alleged Respondents should have accepted applications from all applicants at the same time, including from the plaintiffs.

The court issued a preliminary injunction on August 18, 2023. (Settlement, JA214.) In the preliminary injunction, the court allowed Respondents to provide a list of CAURD Application Program applicants who met all requirements for licensure before the plaintiffs filed the complaint, and those applicants would be exempt from the preliminary injunction. *See* Amended Preliminary Injunction.[2]

On August 23, Respondents provided a list of 30 applicants (out of the 463 winning applicants selected in the CAURD Application Program) who met all requirements for licensure before the plaintiffs filed the complaint. *Id.* On August 30, the court found that Respondents misrepresented the readiness of the 30 applicants. *Id.* Thus, the court declined to exempt any applicants from the preliminary injunction. *Id.* Instead, the court determined that for any applicant Respondents believed should be exempt from the preliminary injunction, Respondents would have to "certify, under oath and on an applicant-by-applicant and requirement-by-requirement basis" that the applicant had met the standard. *Id.*

---

[2] The case is not available on Westlaw, but as noted in footnote 1, the Court may take judicial notice of government websites. The Amended Preliminary Injunction is available on the Supreme Court website https://iapps.courts.state.ny.us/fbem/DocumentDisplayServlet?documentId=7XSIy73My1ufJtwl5XIX6Q==&system=prod.

Thus, on August 30, Respondents found themselves painted into a corner by their unconstitutional CAURD Application Program. ***Respondents knew the court was likely to convert the preliminary injunction into a permanent injunction at the end of the case because Respondents had not opened the cannabis applications to all applicants at the same time, as required by the enabling statute.***

Respondents faced public criticism from the 463 applicants selected for licensure in the CAURD Application Program. Many news outlets, both mainstream and cannabis industry specific, reported on the frustration directed at Respondents from the public and industry persons. At Respondents' September 12, 2023 Board meeting—where they adopted the Adult Use Application Program Regulations as discussed below—Respondents faced two hours of harsh criticism from industry persons due to the injunction and delays.[3]

***Thus, at the September 12, 2023 Board meeting, Respondents adopted the Adult Use Application Program Regulations to comply with the enabling statute by giving all applicants the opportunity to apply at the same time.*** Respondents

---

[3] Respondents' official video of the meeting is *available at* https://youtu.be/dJ6AknB1P6U?si=MNo6qP9wKY1HzbEk. Respondents acknowledge they removed some public criticism from the video. https://www.ganjapreneur.com/new-york-regulators-remove-video-of-meeting-where-community-is-critical-of-adult-use-rollout/.

announced the Adult Use Application Program to the public the same day.  (Press Release, JA516.)  The application window would open less than a month later and run from October 4 through December 4. (*Id*.)

***Respondents' quick turnaround for the Adult Use Application Program was intentional, and it was designed to benefit the applicants in Respondents' unconstitutional CAURD Application Program.***  Respondents suggested that CAURD applicants reapply in the Adult Use Application Program "[d]ue to the pending litigation challenging the validity of the CAURD program."  (FAQ, JA237.)

Respondents knew the 463 selected CAURD applicants were actively looking for properties for their dispensaries, and some already leased/bought properties.  Thus, Respondents divided the Adult Use Application Program into two batches, the November Batch for applicants who already leased/owned property and applied between October 4 and November 3, and the December batch for applicants who had not already leased/owned property and applied between October 4 and December 4.

Respondents designed the November 3 deadline for applicants with properties to freeze out non-CAURD applicants.  By statute, cannabis dispensary applicants must notify the municipality where their dispensaries are to be located 30 days before submitting the application.  NY CANBS § 76(1).  Thus, applicants

who wanted to participate in the November Batch had to submit their proposed dispensary addresses to the municipalities by October 4, 2023. ***That left prospective applicants three weeks from the September 12 adoption of the Regulations to lease/buy properties and submit them to the municipalities.***

Respondents greatly restrict the properties that can qualify for cannabis dispensaries, including zoning restrictions and buffer zones. *See, e.g.*, 9 NYCRR 119.1. Thus, it was very difficult for prospective applicants to obtain properties.

Respondents knew, however, the 462 selected CAURD applicants were already searching for properties, and some already leased/owned properties. (Decl. Kagia, JA395-96.) Thus, the November Batch deadline allowed Respondents to favor CAURD applicants—many of whom could supply addresses by October 4—over other prospective applicants—most of whom could not supply addresses by October 4—notwithstanding the unconstitutionality of the CAURD Application Program.

***In fact, Respondents opened the application program so abruptly and the deadlines were so onerous that Respondents extended the deadlines in response to public backlash.*** The final deadlines were November 17 and December 18. (Email Announcement, JA521.)

As further evidence that Respondents designed the Adult Use Application Program to benefit the CAURD applicants, the Application System required Adult

25

Use applicants to state whether they were prior CAURD applicants and provide their CAURD application number. (Sample Application, JA141.)

On November 24, after the Adult Use Application Program deadline, Respondents settled the *Fiore* lawsuit by "agree[ing] that Defendants shall not issue any new or additional provisional CAURD licenses until April 1, 2024, in order to dedicate OCM's application and licensing resources in the next coming months to the current application and licensing window for adult use licenses…" (Settlement Agreement, JA219.)

***The November Batch Deadline also burdened out-of-state applicants over New Yorkers in violation of the dormant Commerce Clause.*** The three-week deadline to identify, lease, and submit properties to municipalities placed a higher burden on out-of-state persons than New York residents.

### 2. ***Appellants Scrambled to Apply and Bring this Litigation***

Appellants incorporated, applied, and sued with remarkable speed. Although Respondents released the Regulations on September 12, 2023, Appellants' minority owner did not know the Adult Use Application Program favored New Yorkers at that time. (Jensen Aff., JA564-65.) The elements for extra priority do not state that Respondents will favor Communities Disproportionately Impacted within New York, or that the marihuana-related conviction must be under New York law:

26

A person who demonstrates that they are [1] ***an individual from a community disproportionately impacted by the enforcement of cannabis prohibition*** may receive extra priority if: [2] (i) they have an income lower than eighty percent (80%) of the median income of the county in which the applicant resides; and [3] (ii) ***was convicted of a marihuana-related offense*** prior to the effective date of the Marihuana Regulation and Taxation Act, or had a parent, guardian, child, spouse, or dependent, or was a dependent of an individual who, prior to the effective date of the Marihuana Regulation and Taxation Act, was convicted of a marihuana-related offense.

9 NYCRR 121.1(k) (emphasis added).

Importantly, Appellants' minority owner is also the minority owner of the plaintiff in *Variscite NY One, Inc. v. New York*, 640 F. Supp. 3d 232 (N.D.N.Y. 2022), which resulted in a preliminary injunction against Respondents for violating the dormant Commerce Clause with the CAURD Application Program and concluded with a settlement. ***Thus, Appellants' minority owner had every reason to believe Respondents would not favor New Yorkers in future cannabis license application programs***. (Jensen Aff., JA563.)

Appellants' minority owner discovered the favoritism of New Yorkers in the Adult Use Application Program when he reviewed the Application System mockup

27

in October 2023. (Jensen Aff., JA564-65.) The mockup states the cannabis conviction must be under New York law and states that residence in a Community Disproportionately Impacted must be proven with documentation that favors New York. (*Id*.; *see also* discussion above part A.3.)

Even when Appellants' minority owner learned of the dormant Commerce Clause violation in October, he had no standing to sue at that time. Appellants' minority owner was not convicted of a cannabis crime (in New York or elsewhere) and did not live in a Community Disproportionately Impacted for the required years (in New York or elsewhere).

Appellants had standing to sue in December 2023 when the 51% owners became shareholders. Both Appellants incorporated on November 30, 2023. (Articles, JA679-82.) Appellants' 51% owners were not the original intended owners. (Dec. Jensen, JA566.) Each Appellant was unable to proceed with its original intended 51% owner, and Appellants first contacted the current 51% owners on December 4 and 11. (*Id*.) The 51% owners became shareholders on December 7 and 11. (*Id*.) Neither 51% owner was aware of the Adult Use Application Program before December 4 and 11. (Decl. Palmore, JA684; Decl. Kinsey, JA685.)

*With the 51% owners on board on December 4 and 11, Appellants raced to submit their applications before the December 18 deadline.*

***Appellants then raced to bring this lawsuit on December 18, before the application deadline.*** The District Court granted lead counsel's request for pro hac vice on December 21. Counsel served the Moton for TRO and Preliminary Injunction papers on defense counsel that same day so defense counsel would have time to prepare before Appellants filed them. (Dec. Jensen, JA119.) After giving defense counsel one week to prepare their opposition (and to not interfere with defense counsel's holiday), Appellants filed the Moton for TRO and Preliminary Injunction on December 28.

### D. **Procedural History**

Appellants filed the Moton for TRO and Preliminary Injunction on December 28, 2023. The District Court heard oral argument on January 26, 2024. The District Court denied the Motion on February 2. Appellants filed the notice of appeal on February 11.

## SUMMARY OF THE ARGUMENT

The District Court erred in concluding the dormant Commerce Clause does not apply to state cannabis licenses. The dormant Commerce Clause applies to all interstate markets unless Congress is "unmistakably clear" that it has exempted a market. The Supreme Court held in *Gonzales v. Raich* that an interstate market for cannabis exists, notwithstanding that the cannabis market is illegal. The First Circuit, the only circuit to examine the issue, held that the Controlled Substances

29

Act does not contain a clear exemption for cannabis from the dormant Commerce Clause, and therefore the dormant Commerce Clause applies to cannabis licenses. The majority of district courts also held that the dormant Commerce Clause applies to cannabis, including a 2022 case in the Northern District of New York that enjoined the CAURD Application Program.

The District Court concluded Appellants failed to show the other injunction factors based on the District Court's conclusion the dormant Commerce Clause does not apply to cannabis. The District Court rejected Appellants' other independent and adequate showings on the other injunction factors based on clear errors of fact and law, as discussed below.

As to standing, Appellants have standing to challenge the Adult Use Application Program November Batch Licenses, because Respondents held only a single application program, and divided the applications into batches later.

As to CAURD, Appellants do not challenge the CAURD program. Appellants have standing to seek an injunction against Respondents issuing CAURD Licenses while this litigation is pending because the Cannabis Law requires Respondents to open the application program to all applicants "at the same time."

## STANDARD OF REVIEW

The Second Circuit court reviews a district court's decision to grant or deny a preliminary injunction for abuse of discretion. *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013). ***A district court abuses its discretion if it rests its decision on an incorrect legal standard***. *Id*.

Here, the District Court's analysis of each preliminary injunction factor was based on the district court's error of law in concluding the dormant Commerce Clause does not apply to cannabis licenses. As that conclusion of law is a question of first impression reviewed de novo, the district court's denial of the preliminary injunction is reviewed de novo.

Moreover, where the facts are not in dispute and the quarrel is over a question of law, a Circuit Court should perform a plenary review of a denial of a preliminary injunction and not decide the appeal based on the standard of review. *Hsu By & Through Hsu v. Roslyn Union Free Sch. Dist. No. 3*, 85 F.3d 839, 852 (2d Cir. 1996) (citing *Donovan v. Bierwirth*, 680 F.2d 263, 270 (2d Cir. 1982)).

## ARGUMENT

### I.   The Law for Preliminary Injunctions Against Constitutional Harms

To obtain a preliminary injunction, a plaintiff must establish: (1) a likelihood of success on the merits, or a sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor; (2) a likelihood of irreparable harm without an injunction;

(3) the balance of hardships tips in the plaintiff's favor; and (4) the public interest would not be disserved by an injunction. *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015).

Where, as here, the government is a party to the suit, the final two factors merge. *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58-59 (2d Cir. 2020).

## II.   The District Court Erred in Concluding Appellants Did Not Show a Likelihood of Success on the Merits

A district court abuses its discretion if it denies a preliminary injunction based on incorrect legal standard. *Walsh*, 733 F.3d at 486. Here, the District Court concluded that Appellants did not show a likelihood of success on the merits because the court concluded the dormant Commerce Clause does not apply to cannabis licenses because the Controlled Substances Act makes cannabis federally illegal. (Order, SA21-26.) The District Court is incorrect and must be reversed.

The District Court followed the dissent in the First Circuit in concluding that applying the dormant Commerce Clause to state cannabis licenses would encourage out-of-state participation in the state cannabis market, which is contrary to the purpose of the Controlled Substances Act. (*Id.*, SA26.)[4]

---

[4] The District Court noted in footnote 26 that two district courts within the Ninth Circuit abstained from hearing dormant Commerce Clause challenges to cannabis licensing programs because of the Controlled Substances Act. The Ninth Circuit

32

The District Court's conclusion conflicts with the only circuit court to address the issue, the First Circuit, and the majority of district court decisions from around the country. A circuit should avoid creating a circuit split. *United States v. Anderson*, 46 F.4th 1000, 1005 (9th Cir. 2022), cert. denied, 143 S. Ct. 2625 (2023); *Glob. Linguist Sols., LLC v. Abdelmeged*, 913 F.3d 921, 923 (9th Cir. 2019); *United States v. Cuevas-Lopez*, 934 F.3d 1056, 1067 (9th Cir. 2019); *Padilla-Ramirez v. Bible*, 882 F.3d 826, 836 (9th Cir. 2017); *United States v. Chavez-Vernaza*, 844 F.2d 1368, 1374 (9th Cir. 1987).

***First Circuit***. The First Circuit held that the dormant Commerce Clause applies to cannabis licenses in *Northeast Patients Group. v. United Cannabis Patients & Caregivers of Maine*, 45 F.4th 542 (1st Cir. 2022). There, a Maine law required all officers or directors of a medical marijuana dispensary (directors and officers were defined to include owners) to be residents of Maine. *Id*. at 544. The district court granted a permanent injunction against the law. *Id*. at 545.

The state appealed, arguing that the dormant Commerce Clause does not apply to cannabis licenses because participating in the cannabis market is federally illegal under the Controlled Substances Act. *Id*. at 546. The state brought three variations of this argument.

---

has since reversed one of those cases directly and the other indirectly. *See Peridot Tree, Inc. v. City of Sacramento*, 94 F.4th 916 (9th Cir. 2024).

*First*, Maine argued there cannot be an interstate market in a good that is federally illegal. *Id*. at 547. The First Circuit noted it is clear an interstate market for cannabis exists, and the Supreme Court even made a finding to that effect in *Gonzales v. Raich*, 545 U.S. 1, 22 (2005). In fact, Maine's prohibition on out-of-state persons owning Maine cannabis businesses "reflects the reality that the [interstate cannabis] market continues to operate." *Ne. Patients Grp.*, 45 F.4th 547.

Moreover, Maine actively encouraged out-of-state persons to participate in the interstate medical cannabis market as customers, because Maine allowed medical cannabis patients from other states to purchase cannabis while in Maine if those patients had prescriptions from the other states.

*As applied to this case, New York goes further in encouraging the interstate (and international) market in cannabis.* New York does not require a visitor to New York to have a cannabis prescription from another U.S. state to purchase cannabis. Instead, New York permits anyone to purchase cannabis if they have identification showing they are 21 years or older issued by any state, U.S. territory, or Canada, or a passport issued by any country. Cannabis Law § 85.

*Second*, Maine argued the dormant Commerce Clause does not apply to cannabis because Congress exercised its affirmative Commerce Clause power to regulate cannabis via the Controlled Substances Act. *Id*. at 548. That question is

not whether the Controlled Substances Act preempts a state residency requirement for cannabis, but rather whether a state residency requirement violates the dormant Commerce Clause by burdening interstate commerce. *Id*.

"This distinction [between federal preemption and the dormant Commerce Clause] matters because preemption by a federal statute and prohibition by the dormant Commerce Clause are distinct rather than coterminous means by which federal law may limit state lawmaking that substantially burdens interstate commerce. Thus, the negative implication of the commerce power may pose an independent bar to a state regulation of an interstate commercial market even when Congress chooses to exercise its affirmative commerce power with respect to that same market without also preempting that state regulation." *Id*.

The First Circuit then reviewed Supreme Court and First Circuit precedents to support their conclusion that a state law can violate the dormant Commerce Clause even if the federal government has acted in an area but the federal statute does not preempt the state law. *Id*. at 548-49.

In light of that, the First Circuit rejected the state's argument that the dormant Commerce Clause is a nullity with respect to medical marijuana because Congress affirmatively exercised its Commerce Clause power to regulate under the Controlled Substances Act. *Id*. at 548. The First Circuit stated, "we are not persuaded." *Id*.

As additional support, the First Circuit noted that Congress enacted the Rohrabacher-Farr Amendment after Congress passed the Controlled Substances Act. *Id*. at 549. That Amendment prohibits the Department of Justice from using any funds to prevent states from implementing laws for medical marijuana. "This congressional action in the wake of the CSA reflects that Congress contemplates both that an interstate market in medical marijuana may exist that is free from federal criminal enforcement and that, if so, this interstate market may be subject to state regulation." *Id*. at 549.

In this case, as applied to adult use cannabis, Congress's questioning and approval of Merrick Garland as Attorney General shows that Congress contemplates an interstate market in adult use cannabis free from federal criminal enforcement. During that confirmation process, the Attorney General assured Congress that the Department of Justice would not prosecute people who comply with state cannabis programs:

> 46. The Justice Department, as part of the federal government, must enforce federal laws. An area where this has led to confusion is the enforcement of federal law in states where marijuana has been legalized. As you are aware, marijuana is a Schedule I drug under the Controlled Substances Act.

a. Under your leadership, how will you navigate the Justice Department's enforcement of federal law in states where marijuana has been legalized?

RESPONSE: As I suggested at my hearing, I do not think it the best use of the Department's limited resources to pursue prosecutions of those who are complying with the laws in states that have legalized and are effectively regulating marijuana. I do think we need to be sure, for example, that there are no end runs around the state laws by criminal enterprises, and that access is prohibited to minors.

b. What do you see the role of the Justice Department to be in the changing landscape of marijuana legalization, decriminalization, and recreational use?

RESPONSE: The Department of Justice has not historically devoted resources to prosecuting individuals for simple possession of marijuana. As I suggested at my hearing, I do not think it the best use of the Department's limited resources to pursue prosecutions of those who are complying with the laws in states that have legalized and are effectively regulating marijuana. I do think we need to be sure, for example, that there are no end runs around the state laws by criminal enterprises, and that access is prohibited to minors.

Responses to Questions for the Record to Judge Merrick Garland, Nominee to be

United States Attorney General, Question 46.[5]

 **Third**, Maine argued that Congress consented to state attempts to burden the

interstate market in cannabis by enacting the Controlled Substances Act.  *Id*. at

550.  The First Circuit concluded that while Congress has the power to consent to

state burdens on interstate commerce, Congress did not do so through the

Controlled Substances Act.  *Id*. at 551.

 The First Circuit noted that "[o]rdinarily, ***Congress must 'expressly state'***

***an intent*** to obviate the dormant Commerce Clause's limitation on protectionist

state regulation." *Id*. (emphasis added) (citing *Sporhase v. Nebraska, ex rel.*

*Douglas*, 458 U.S. 941, 960 (1982); *New England Power Co. v. New Hampshire*,

455 U.S. 331, 343 (1982); *Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 427

(1946).  The usual requirement that Congress must be "unmistakably clear" about

its "intent and policy to sustain state legislation from attack under the Commerce

Clause" "is mandated by the policies underlying dormant Commerce Clause

doctrine." *Id*. (cleaned up) (citing *S.-Cent. Timber*, 467 U.S. at 91-92 (1996);

*Sporhase v. Nebraska, ex rel. Douglas*, 458 U.S. 941, 960 (1982); *New England*

---

[5] A*vailable at*
https://www.judiciary.senate.gov/imo/media/doc/QFR%20Responses%202-
281.pdf

*Power Co. v. New Hampshire*, 455 U.S. 331, 343 (1982)). The Controlled Substances Act, however, does not condone state discrimination against out-of-state business interests in cannabis. *Ne. Patients Grp.*, 45 F.4th at 554.

The dissent in the First Circuit (and the District Court in this case) concluded the dormant Commerce Clause does not apply to cannabis licenses. The dissent concluded the dormant Commerce Clause's purpose is to preserve a national market for competition undisturbed by preferential advantages conferred by a state upon its residents. *Id*. at 558. Because cannabis is federally illegal, the dissent reasoned, the dormant Commerce Clause does not protect a national market for cannabis.

**The majority in the First Circuit correctly concluded that the dissent's interpretation would require a reversal of the standard presumption that state protectionism is not permitted absent congressional approval.** "[W]e would have to do more than abandon the ordinary rule that Congress does not mean to consent to such measures unless it does so in unmistakably clear terms. We would have to adopt the presumption that Congress does mean to consent to such measures whenever it makes participation in an interstate market a crime." *Id*. at 554.

The majority also pointed out that a protectionist cannabis licensing program does nothing to advance the goal of the Controlled Substances Act. Rather than

39

prevent any cannabis from being sold, residency requirements just ensure the profits from cannabis sales are retained by state residents:

> [I]t can hardly be said that a state effort to protect a market in medical marijuana from out-of-state competition necessarily advances Congress's evident goal in the CSA of preventing entry into that market. Such protectionism does, of course, stop out-of-staters from entering the market. But, it does so only by simultaneously insulating in-state actors who do choose to enter that market from competition. It thus threatens, in the way that protectionist measures necessarily do, to encourage precisely what the CSA seeks to stop—trade by in-staters in the relevant market. ***Indeed, if that were not Maine's aim in imposing the residency requirement, then why would Maine not have simply prohibited dispensaries altogether, rather than protected those run by Mainers from outside competition? For these reasons, we conclude that, while Maine's residency requirement does limit some actors from trading in medical marijuana, it does so in a way that, due to its protectionist nature, in no sense "aid[s]" the policy expressed by Congress in the CSA***.

*Id*. at 554-55.  Thus, the protectionist cannabis license programs do nothing to aid the federal government, and instead protect state monopolies.

***Purpose of the dormant Commerce Clause***. Additionally, though not addressed by the First Circuit, the purpose of the dormant Commerce Clause is not solely to preserve competition in the national markets. Rather, the primary purpose of the dormant Commerce Clause is to prevent trade wars between the states. *See Baldwin v. G.A.F. Seelig, Inc*., 294 U.S. 511, 522 (1935) ("We are reminded in the opinion below that a chief occasion of the commerce clauses was 'the mutual jealousies and aggressions of the States, taking form in customs barriers and other economic retaliation.'").

In fact, the Commerce Clause (and the dormant aspect thereto) was a principal reason the Framers called for the Constitutional Convention.

> The few simple words of the Commerce Clause—"The Congress shall have Power… To regulate Commerce… among the several States…"—reflected a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation.

*Hughes v. Oklahoma*, 441 U.S. 322, 325 (1979).

As to cannabis, state trade wars are already sprouting. States have passed or proposed legislation allowing the governors to enter into interstate trade agreements on a state-by-state basis. *See* Rev. Code WA § 43.06.495; Cal. Bus. & Prof. Code §26301; OR S.B. 582 (2019); AZ H.B. 2770 (2024). (No such agreements have been executed to date, to the best of Appellant's knowledge.)

***Medical cannabis***. The District of Washington, in the Order, attempted to distinguish the First Circuit case because it involved only medical cannabis. (Opp'n at 19 n.4.) ***But the First Circuit case related only to medical cannabis because Maine's attorney general concluded that any litigation attempting to defend Maine's residency requirement for adult use cannabis licenses would be futile, and Maine chose to voluntarily abandon the law***.

Maine had a residency requirement for adult use cannabis licenses. *NPG, LLC v. City of Portland, Maine*, No. 2:20-CV-00208-NT, 2020 WL 4741913, at *2 (D. Me. Aug. 14, 2020). When faced with a dormant Commerce Clause lawsuit, the State of Maine abandoned the law rather than fight a losing battle on the advice of its attorney general. *Id*. The Maine Office of Marijuana Policy published the statement:

> At its core, the lawsuit alleged that the residency requirement found in the [Marijuana Legalization Act] is a violation of the dormant Commerce Clause of the United States Constitution by

explicitly and purposefully favoring Maine residents over

nonresidents. [¶] On Monday, the [Office of the Attorney General]

and counsel for [the plaintiffs] filed a joint stipulation of dismissal in

federal court acknowledging that the State of Maine was unlikely to

prevail in a legal challenge to the adult use residency requirement and

stating that the relevant sections of state law and administrative

regulation would no longer be enforced.

State of Maine, *State of Maine Will Not Enforce Marijuana Residency*

*Requirement*.[6]

   ***Seventh Circuit***. The Seventh Circuit ruled on an appeal of the denial of a

preliminary injunction, thereby indicating that the dormant Commerce Clause

applies to cannabis.  *Finch v. Treto*, 82 F.4th 572, 575 (7th Cir. 2023).  The court

affirmed a denial of a preliminary injunction on complicated facts far removed

from this case, including that the plaintiffs never even applied in the Illinois license

application program (one of the two plaintiffs would not even state whether he was

aware of the application program before it ended) and they brought their suit nearly

two years after the state selected the applicants for licensing.

---

[6] Available at
https://www.maine.gov/dafs/omp/news-events/news/aump-lawsuit-residency-
requirement.

In *Finch*, Illinois took applications for cannabis licenses until January 2020. In September 2020, the state announced that there were more applications with perfect scores than there were available licenses, so the state would hold lotteries to select among the perfect-scoring applicants. *Id*. The state held the lotteries in July and August 2020 and announced the winners in September 2020. *Id*. at *5.

The plaintiffs filed the lawsuit in March 2022. *Id*. at *6. Notably, Illinois would not have rejected the plaintiffs' applications if the plaintiffs had applied. Rather than barring out-of-state applicants (like Washington does), Illinois accepted applications from anyone, and just gave additional points to local residents. *Id*. at *3. Thus, nothing prevented the plaintiffs from submitting timely applications.

The court concluded the plaintiffs had standing to challenge the program notwithstanding that they had never even applied for licenses and brought their lawsuit two years after applicants were chosen. *Id*. at *9. The court, however, denied a preliminary injunction based on the unique facts of the case.

The Seventh Circuit affirmed the denial of the preliminary injunction based on a combination of factors. The plaintiffs waited to bring the lawsuit until more than two years after the license application program closed and the winners had been chosen and tie-breaking lotteries were held; state court judges had ruled in multiple state-court cases brought by participants in the licensing program and

44

lotteries, and a the preliminary injunction would have upended those state court decisions; and because the plaintiffs had not applied for licenses, the court could not even determine for which geographic area of the state the plaintiffs should have been considered. *Id*. at 17-20. The court concluded that "although no single argument by the [defendants] is conclusive on its own, together the arguments show why equitable relief (here, an injunction) is unwarranted." *Id*. at *8.

Here, by contrast, Appellants applied in the Adult Use Application Program and brought this lawsuit before the application period even closed. Respondents had not held the lotteries at the time, much less issued Licenses. To Appellants' knowledge, Respondents have not issued ***any*** of the 450 December Batch Licenses and have not issued all of the 250 November Batch Licenses.

***District Courts***. The Northern District of New York issued a preliminary injunction against the State of New York's application program. *Variscite NY One, Inc. v. New York*, 640 F. Supp. 3d 232 (N.D.N.Y. 2022), reconsideration denied, No. 122CV1013GLSDJS, 2023 WL 1420662 (N.D.N.Y. Jan. 31, 2023). The court concluded that Respondents favored New York applicants by requiring a cannabis conviction from New York and a "Significant presence in New York," such as a bank account in the state. *Id*. at 241. The state appealed to the Second Circuit. While the appeal was pending, the state moved in the Second Circuit for a stay of the preliminary injunction or in the alternative a narrowing of the

45

preliminary injunction. The Second Circuit denied the state's request for a stay and instead left the preliminary injunction in place, and merely narrowed the preliminary injunction to cover only the geographic area of New York where the plaintiff could be eligible for a license. (Second Circuit Order, JA121.) The case then settled.

Other district courts have held that the dormant Commerce Clause applies to cannabis licensing programs. *See NPG, LLC v. City of Portland, Maine*, No. 2:20-CV-00208-NT, 2020 WL 4741913, at *6 (D. Me. Aug. 14, 2020) ("The City portrays the Controlled Substances Act as a form of congressional consent. But the Act nowhere says that states may enact laws that give preference to in-state economic interests. In other words, although the Controlled Substances Act criminalizes marijuana, it does not affirmatively grant states the power to 'burden interstate commerce 'in a manner which would otherwise not be permissible.'") (internal citations omitted); *Toigo v. Dep't of Health & Senior Servs.*, 549 F. Supp. 3d 985, 992 (W.D. Mo. 2021); *Lowe v. City of Detroit*, 544 F. Supp. 3d 804, 815 (E.D. Mich. 2021).

*Minority jurisdiction*. The Western District of Washington held in two cases that the dormant Commerce Clause does not apply to cannabis licenses. One case is currently on appeal. *See Peridot Tree WA Inc. v. Washington State Liquor &*

46

*Cannabis Control Bd.*, No. 3:23-CV-06111-TMC, 2024 WL 69733, at *1 (W.D. Wash. Jan. 5, 2024).

In the other case, *Brinkmeyer v. Washington State Liquor & Cannabis Bd.*, No. C20-5661 BHS, 2023 WL 1798173 (W.D. Wash. Feb. 7, 2023), the court stated: "Although Washington's 'legalization' of cannabis certainly does not align with Congress's intent, the residency requirements do. The residency requirements attempt to prevent any interstate commerce in cannabis and to prevent cannabis from Washington from moving into states where it remains illegal, like Idaho." *Id.* at *12.

That statement has no application to this case because Appellants do not challenge any prohibition on cannabis crossing state lines. Appellants challenge only the unconstitutional favoritism of New Yorkers in the Adult Use Application Program.[7]

The District of Oklahoma refused to apply the dormant Commerce Clause to cannabis licenses in *Original Investments, LLC v. State of Oklahoma*, 542 F. Supp. 3d 1230, 1233 (W.D. Okla. 2021). The court refused to enjoin residency

---

[7] The Order quotes *Brinkmeyer* for the proposition that a person does not have a federal property right to cannabis while it remains federally illegal or a federal right to participate in a federally illegal market. (Order, SA25.) Property rights are irrelevant to this action, as Appellants did not bring a due process claim of denial of a property right. Rather, Appellants assert their right under the dormant Commerce Clause to participate in Washington's licensing program.

requirements because the court concluded that would be using the court's equitable powers to facilitate a violation of the Controlled Substances Act by helping an out-of-state person obtain an Oklahoma cannabis license. *Id*.

The court's analysis of equity is incorrect. For example, a party is not subject to the unclean hands defense merely because it engaged in wrongful activity. Rather, the court must balance the wrongful conduct of both parties. *Northbay Wellness Grp., Inc. v. Beyries*, 789 F.3d 956, 960 (9th Cir. 2015) ("The bankruptcy court failed to conduct the required balancing, instead concluding solely from the fact that Northbay had engaged in wrongful activity that the doctrine of unclean hands applied. In so doing, the bankruptcy court made an error of law, and thus abused its discretion.").

In light of the balancing test, "the application of this doctrine [does not] make equitable sense in a [cannabis licensing] case like this one, where the plaintiff seeks to participate in a state-sanctioned (but federally illegal) market and the defendant has allegedly engaged in a constitutional violation in organizing that market. If the 'unclean hands' notion has any purchase here, both parties have 'unclean hands' in that they are engaging with the business of distributing a controlled substance, ***but only one party has soiled the federal Constitution***." *Finch*, 606 F. Supp. 3d at 833–34 (citation omitted) (emphasis added).

48

Likewise, a request for an injunction is not subject to an illegality defense. "[E]njoining the licenses awarded under the [cannabis license] lotteries or enjoining the Department from using discriminatory criteria in its licensing scheme would not compel any party to violate federal law, award any illegally derived profits, or entangle this court in the production, sale, or distribution of cannabis. It would prevent [state government] from discriminating against nonresidents in awarding conditional dispensary licenses, only after which would the state award such a license and then regulate cannabis-related conduct." *Finch,* 606 F. Supp. 3d at 833–34.

Furthermore, under the District of Oklahoma's position that it will not use its equitable powers to enjoin a constitutional violation because cannabis is federally illegal, it makes no difference whether the constitutional right is under the dormant Commerce Clause or the right to be free of racial or sexual discrimination.

## III. The District Court Erred in Finding Appellants Did Not Show Irreparable Harm

A district court abuses its discretion if it denies a preliminary injunction based on an incorrect legal standard. *Walsh*, 733 F.3d at 486. Here, the District Court applied the wrong legal standard in concluding Appellants did not show the irreparable harm of a constitutional violation.

A plaintiff's mere allegation of a constitutional violation creates a presumption of irreparable harm. *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir.

49

1996) ("The district court therefore properly relied on the presumption of irreparable injury that flows from a violation of constitutional rights. In any event, it is the ***alleged*** violation of a constitutional right that triggers a finding of irreparable harm.") (emphasis in original); *Connecticut Dep't of Env't Prot. v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004) ("[T]he very nature of [the plaintiff's] allegations satisfies the requirement that it show irreparable injury.") (quotation marks omitted); *Statharos v. New York City Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999) ("Because plaintiffs allege deprivation of a constitutional right, no separate showing of irreparable harm is necessary.").

The District Court did not dispute that a constitutional violation is an irreparable harm. (Order, SA28.) Instead, the District Court concluded that Appellants had not shown a constitutional violation because the dormant Commerce Clause does not apply to cannabis. (*Id.*) For the reasons above, the dormant Commerce Clause applies to cannabis and Appellants have shown irreparable harm.

The District Court also committed clear error in rejecting Appellants' multiple independent and adequate irreparable harms.

A district court also abuses its discretion if it bases its decision on a clearly erroneous assessment of the facts. *Id.* "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence

50

is left with the definite and firm conviction that a mistake has been committed."
*Id*.

Appellants showed irreparable harm from multiple additional independent and adequate reasons. ***First***, Appellants will be left without a remedy if Respondents issue all Licenses while this case is pending. States, unlike cities, enjoy immunity under the Eleventh Amendment from claims for damages. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102-03 (1984). If a state selects licensees through an unconstitutional program, an excluded applicant's only remedy is to sue the state official in his/her official capacity for an injunction to prevent the official from issuing the licenses. *See id.*

Thus, if the Second Circuit does not reverse the District Court and remand with instructions to issue a preliminary injunction, Respondents will issue all the licenses while the case is proceeding. Appellants will be left without a remedy for the constitutional violation against it because Appellants cannot recover monetary damages from Respondents and Respondents will argue the Court should not claw back Licenses at the end of the case as a matter of equity because the Licenses will have been issued too long ago to recall.

In fact, Respondents used that strategy last year in response to the CAURD injunction in the *Variscite One* case. In *Variscite One*, the district court enjoined Respondents from issuing licenses for the geographic area of the state where the

51

applicant applied. 2022 WL 17257900. Respondents then raced to issue all available licenses for the thirteen non-enjoined geographic areas of the state before another applicant could sue for an injunction against one of those areas.

During the injunction, Respondents even doubled the number of Licenses they would grant from 150 to 300, and then expanded it again to 463. (Decl. Kagia, JA395; Respondents' Memo, JA432.) Respondents did this to issue Licenses before another excluded applicant could obtain an injunction for another geographic area.

Simiarly, in the Seventh Circuit, the Northern District of Illinois denied the plaintiffs a preliminary injunction, as discussed above, in *Finch*, 2022 WL 2073572. The plaintiffs appealed, but by the time the Seventh Circuit ruled, the government had issued the licenses. Thus, the Seventh Circuit concluded the appeal was moot. *Finch v. Treto*, 82 F.4th 572, 575 (7th Cir. 2023) ("The district judge's denial of the motion for a preliminary injunction cleared the way for the Department to issue the 2021 licenses, and it did so. That action largely moots this appeal.")

*Finch*, however, differs from the instant case in an important way. The *Finch* plaintiffs did not apply in the Illinois application program and they did not bring their litigation until roughly two years after the application program had closed and the winning applicants had been selected. The plaintiffs also waited

until several state court lawsuits concerning the application program had been resolved. In light of these facts, the Second Circuit concluded that it would be inequitable to recall licenses the state issued after the district court denied the plaintiff's motion for preliminary injunction. *Finch*, 82 F.4th at 575 ("To the extent that some form of relief unwinding the licenses remains possible, the judge weighed the equities and held that the plaintiffs waited far too long to challenge the residency provisions. By March 2022 when they filed this suit, the 2021 licenses had already been allocated on a conditional basis.").

Here, Appellants filed the litigation with remarkable speed. *See* above Statement of Case Part C.

**Second**, Appellant will suffer irreparable harm by being excluded from the New York cannabis market. Respondents will issue 450 Licenses in the December Batch. However, Respondents (like most jurisdictions) will likely expand the number of licenses issued after the initial round. For example, in the CAURD Application Program, Respondents stated they would issue 150 Licenses, but later doubled it to 300 Licenses, and then expanded it again to 463 Licenses. (Decl. Kagia, JA395; Respondents' Memo, JA432.)

After the District Court denied the TRO, Respondents held the lotteries and assigned queue numbers. Respondents assigned three numbers to Appellants as though they qualified for extra priority. Variscite Four received queue numbers

816, 2121, and 3812 and Variscite Five received queue numbers 949, 2153, and 4147.  (Decl. Bryon, JA528.)  Thus, Variscite Four will qualify if Respondents only double the Licenses, and Variscite Five will qualify if Respondents expand it slightly more.

However, Respondents will revoke the low-number lottery draws: "when [Appellants] application is reviewed and it's discovered that they don't actually qualify, they'll certainly fall out of the race, but that doesn't preclude them from being reviewed later on down the line as, for example, a normal priority applicant." (Transcript, JA704.)

If Respondents revoke Appellants' low number draws, Appellants will be excluded from the New York cannabis market.  Nothing Respondents have done to date indicates they will expand the Licenses to 4147 to cover Appellants' low number draws.

A reduced chance of receiving a cannabis license is an irreparable harm.  *See Finch*, 2022 WL 2073572, at *16 ("If the court declined to grant injunctive relief as to the 2021 lotteries, it would allow the Department to proceed with issuing the first 185 licenses. Once those 185 licenses are issued, Appellants' chances of obtaining their own licenses will be statistically narrowed, as the total number of licenses is capped at 500 by statute. In short, the court concludes Appellants have satisfied the irreparable-harm requirement."); *Lowe v. City of Detroit*, 544 F. Supp.

3d 804, 816 (E.D. Mich. 2021) ("[P]laintiff has demonstrated that she will suffer irreparable injury absent an injunction, as she would, at best, be significantly disadvantaged in applying for a recreational marijuana retail license (assuming fifty percent of the licenses are reserved for legacy applicants) and, at worst, be entirely eliminated from consideration for such a license (if all of the licenses are awarded to legacy applicants).").

In light of the above, the Court committed clear by finding that Appellants had not shown irreparable harm under this independent and adequate basis because "the Applications will be returned to the normal pool for another opportunity to be reviewed under [a] different set of criteria applicable for the other prioritized groups or as a non-prioritized applicant, and therefore Plaintiffs could still receive a license as "part of another prioritized group, or non-prioritized group." (Order, SA29 (quotation marks omitted).

***Third***, even if Appellant could somehow later enter the market, the delay in entering the market causes irreparable harm. All advantages to early entrants in the market, such as access to customers who have not developed loyalty to other businesses, will have been claimed. *See, NPG, LLC v. City of Portland, Maine*, No. 2:20-CV-00208-NT, 2020 WL 4741913, at *11 (D. Me. Aug. 14, 2020) ("I agree that the unique context of this new market suggests that the timing of a ruling in the Plaintiffs' favor is particularly important. The Plaintiffs are not seeking to

enter an established [cannabis] market, where the significance of any further delay
of their participation is likely diminished. Rather, the Plaintiffs are seeking to be in
the first wave of [cannabis] licensees as a new market launches and are hoping to
attract customers who have not yet developed allegiances."); *Quezada v. BP Prods.
N. Am., Inc*., No. 06 CV 5378 (SJ), 2006 WL 3837720 (E.D.N.Y. Dec. 1, 2006)
(temporary inability to sell goods is irreparable harm of loss of good will);
*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co*., 240 F.3d 832, 841 (9th Cir.
2001) ("Evidence of threatened loss of prospective customers or goodwill certainly
supports a finding of the possibility of irreparable harm."); *Rent-A-Ctr., Inc. v.
Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)
("[I]ntangible injuries, such as damage to ongoing recruitment efforts and
goodwill, qualify as irreparable harm."); *Starlight Sugar, Inc. v. Soto*, 114 F.3d
330, 332 (1st Cir. 1997) ("While it is true that injunctive relief is generally
inappropriate where money damages can make a plaintiff whole, we have
recognized that the loss of a unique or fleeting business opportunity can constitute
irreparable injury."); *Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632
(7th Cir. 2005) ("[I]t is precisely the difficulty of pinning down what business has
been or will be lost that makes an injury 'irreparable.'"); and *Pro's Sports Bar &
Grill, Inc. v. City of Country Club Hills*, 589 F.3d 865, 872–73 (7th Cir. 2009)
("The district court concluded that the harm to Pro's was irreparable because it was

56

difficult to ascertain the specific amount of revenue being lost, and because damages might come too late to adequately compensate the plaintiff's business.").

The District Court committed clear error by finding Appellants had not shown irreparable harm under this alternative and adequate basis because Respondents already issued 70 Licenses under the CAURD program. The District Court reasoned that these 70 Licenses for the entire State of New York removed any first-mover advantages for Appellants.

The 70 CAURD licenses for the entire State of New York are insufficient to nullify first-mover advantage for Appellants. To put 70 licenses into perspective, the City of Los Angeles (not Los Angele County) issued 356 storefront dispensary licenses to their social equity applicants, many additional licenses to existing medical dispensaries, additional delivery-only licenses, and plans to issue more. California, where dispensaries are prohibited in much of the state, has 2,076 licensed storefronts, delivery-only dispensaries, and microbusiness.[8] New York has approximately 2,000 illegal dispensaries the state is shutting down.[9]

---

[8] Department of Cannabis Control, https://cannabis.ca.gov/resources/data-dashboard/license-report/.

[9] New York Times, https://www.nytimes.com/2024/03/22/nyregion/nyc-cannabis-dispensary-legal.html#:~:text=Cooking-,New%20York%27s%20Marijuana%20Scorecard%3A%2085%20Legal%20Shops%2C%202%2C000%20Illegal%20Ones,rollout%20three%20years%20after%20legalization.

Respondents expect to open 1,000 licensed dispensaries in 2024 alone. (Order, SA32.) The 70 statewide licensed dispensaries will not affect Appellants' first-mover advantages.

*No delay*. The District Court stated—in an error of both fact and law—that Appellants delayed in bringing this action. The court erred as a matter of fact, as Appellants brough this case with remarkable speed, as discussed at length above. *See* above Statement of Case Part C. Appellants did not have standing to bring this lawsuit until December 2023. *Id*.

The court also erred as a matter of law by stating Appellants "delayed bringing this action for more than one year after the publication of the New York marihuana-related conviction requirement" because "[i]n November 2022, the OCM 'released for public comment its draft of the proposed adult-use regulations…'" (Order, SA29-30 & footnote 33.)

The court is incorrect because Appellants did not know about the proposed regulations in November 2022, or about the Adult Use Program at all until October 2023. (Jensen Aff., JA565.)

More importantly, even if Appellants had known about the proposed regulations in November 2022, a legal challenge was not ripe until the Regulations became final in September 2023. *See Finch,* 82 F.4th at 579 (affirming district court denial of dormant Commerce Clause challenge to ***proposed*** regulations for

lack of ripeness because regulations were not final). Furthermore, the unconstitutional nature of the Adult Use Program was not clear until Respondents published the sample application and revealed their intent to favor state residents over out-of-state residents.

Furthermore, the District Court's conclusion that Appellants should have sued over the proposed regulations in November 2022 contradicts the District Court's conclusion regarding standing. As discussed below, the District Court concluded that Appellants lack standing to challenge the November Batch because the application window closed November 17, 2023 but Appellants incorporated on November 30. (Order, SA19.) Appellants' 51% owners, who create Appellants' standing, became shareholders in December 2023. *See* above Statement of Case Part C. If Appellants lacked standing to sue in November 2023, then they lacked standing to sue in November 2022.

## IV. **The District Court Erred in Finding the Balance of Equities and the Public Interest Favor Respondents**

Where the government is a party to the suit, the final two factors—balance of equities and the public interest—merge. *Dep't of Homeland*, 969 F.3d at 58-59.

The balance of harms favors plaintiffs subject to a constitutional violation. *Mitchell v. Cuomo*, 748 F.2d 804, 808 (2d Cir. 1984) ("Faced with such a conflict between the state's financial and administrative concerns on the one hand, and the risk of substantial constitutional harm to plaintiffs on the other, we have little

59

difficulty concluding that the district judge did not err in finding that the balance of hardships tips decidedly in plaintiffs' favor.")

The same rule applies to challenges to cannabis license programs. "[T]he public interest is best served by enjoining the enforcement of [a cannabis licensing] ordinance that is likely unconstitutional." *Lowe v. City of Detroit*, 544 F. Supp. 3d 804, 816 (E.D. Mich. 2021). The public interest is further served by protection of interstate participation in investment in cannabis businesses. *See Toigo v. Dep't of Health & Senior Servs.*, 549 F. Supp. 3d 985, 996 (W.D. Mo. 2021) ("The public interest is best served by the protection of [an applicant's] constitutional right to fully participate in the medical marijuana business in Missouri on the same footing as a Missouri resident, a right that is likely being violated by the State's durational residency requirement.").

Here, the District Court committed an error of law by concluding the public interest favors Respondents because the dormant Commerce Clause does not apply to cannabis. (Order, SA32 (citing a Central District of California case that was reversed indirectly by *Peridot Tree* 94 F.4th 916 and the dissenting opinion in the First Circuit).) Appellants' constitutional harm alone is sufficient to prevail on the balance of equities, and the District Court's Order must be reversed by failing to apply the dormant Commerce Clause to cannabis. *Mitchell*, 748 F.2d at 808.

The District Court committed several additional clear errors of law and fact. *First*, the court relied primarily on harm to applicants selected under the CAURD Application Program. (Order, SA31.) Some of those selected CAURD applicants invested money in opening their dispensaries. (*Id.*)

The court committed clear error by denying a preliminary injunction as to the Adult Use Application Program based on potential harms to applicants selected in the CAURD application Program. Even if the court's analysis of CAURD applicant harms was correct (which it was not as discussed below) the court should have denied the preliminary injunction only as to CAURD applicants.

Indeed, the court should not have considered harm to CAURD applicants at all, since the court concluded Appellants lack standing to enjoin the CAURD program. Thus, the court denied an injunction as to the December Batch Adult Use Application Program, where the court agreed Appellants have standing, because of the CAURD applicants, but concluded Appellants lack standing to even move to enjoin the CAURD Licenses.

*Second*, the District Court committed clear error in analyzing the CAURD applicants' harms. Appellants did not ask the court to enjoin CAURD applicants whose dispensaries were open when Appellants filed the Complaint. (Order footnote 12, SA08.) As to the other CAURD applicants, Respondents were enjoined from issuing CAURD Licenses to much of the state under the *Variscite*

61

*One* injunction, and enjoined from issuing any CAURD Licenses under the *Fiore* injunction. *See* above Statement of Case Part C. *Fiore* settled by Respondents agreeing to not issue new CARD licenses until April 2024. (Settlement Agreement, JA219.)

Thus, the potential harm to CAURD Applicants was minimal because Appellants did not ask the Court to strike the CAURD Application Program. Rather, Appellants asked only that the Court enjoin Respondents from issuing additional CAURD Licenses until Respondents also issue the Adult Use Application Program Licenses, as required by NY CANBS § 10(19) ("opened for all applicants at the same time"). The 463 selected CAURD applicants (minus the 70+ applicants already open), who were already under an injunction when Appellants filed the Complaint, would only continue to be under an injunction until this case is resolved.

***Third***, the District Court committed clear error in analyzing the Adult Use Application Program applicants. The court stated an injunction "would harm the approximately 7,000 applicants who applied to the program…" But only 450 applicants will be selected in the December Batch. (An additional 250 applicants will be selected from the November Batch, but that is irrelevant under the District Court's conclusion that Appellants lacked standing to challenge the November

Batch.) An injunction makes no difference to the 6,550 Adult Use applicants not affected by it.

**Fourth**, the District Court committed clear erred by assuming applicants and landlords would be harmed by an injunction. Appellants brought this case before the December Batch application window even closed. No applicants were selected, and applicants in that batch were not required to obtain property or invest any money besides the $1,000 application fee (which was reduced to $500 for 55% of the applicants because they qualified for "social equity"). (Decl. Kagia, JA401.)

As to landlords, Appellants' review of the record did not show any evidence that any December Batch applicant leased property. Such an assumption makes no sense, as December Batch Applicants were not required to have property to apply. Leasing property before Respondents selected winning applicants would not make sense. Such an assumption is clear error.

If an applicant spent money on a property before obtaining a license, that applicant accepted that risk. *See Lowe v. City of Detroit*, 544 F. Supp. 3d 804, 816 (E.D. Mich. 2021) ("The [non-party applicants'] amicus brief and attached affidavits demonstrate that [non-party applicants] and their financial support networks may be economically harmed if the Detroit recreational marijuana licensure scheme is enjoined. However, any such economic harm would be the result of these applicants investing money before obtaining a license, which they

did at their own risk. Moreover, the public interest is best served by enjoining the enforcement of an ordinance that is likely unconstitutional.").

Even if applicants spent unnecesary money, to permit Respondents to violate Appellants' constitutional rights because Respondents induced other people to spend money in anticipation of a license those applicants have not yet received is to permit Respondents to buy a constitutional violation—and with other peoples' money.

**Fifth**, the District Court committed clear error in concluding cannabis growers will be harmed by an injunction against the dispensaries. First, the court acknowledged that 70 CAURD dispensaries are already open and Appellants do not seek to enjoin already opened dispensaries. Second, the court concluded Appellants lacked standing to seek an injunction against the CAURD Licenses or the November Batch Licenses. Thus, an injunction would apply to only 450 Licenses from the December Batch, unless the Circuit reverses the standing conclusion. Third, while the prior injunctions were in place, Respondents allowed growers to sell directly to the public (rather than through dispensaries) though "grower showcases," which Respondents could reopen.[10]

---

[10] *See* Respondents' website.
https://cannabis.ny.gov/system/files/documents/2023/07/ocm-cgs_diagrams.pdf.

**Sixth**, the District Court committed clear error of law and fact in analogizing this case to *Finch v. Treto*, 606 F. Supp. 3d 811 (N.D. Ill. 2022). Appellants discuss *Finch* above in Argument Part II, but Appellants ask the Circuit to read *Finch* and see the stark differences between that case this case. Among other things, Appellants applied in the Adult Use Application Program, they brought this case before the application window even closed, and there are no prior lawsuits against the Adult Use Application Program. In *Finch*, the plaintiffs never applied for licenses, they showed up two years after licenses were issued to challenge the program, and by then the program had been litigated in multiple resolved state and federal lawsuits.

## V.  <u>Standing</u>

The District Court erred in concluding that Appellants lack standing to challenge the November Batch of Licenses. Respondents held only a single Adult Use Application Program, and divided the applications into batches later. Appellants applied in the program, and have standing to challenge all of it.

The District Court concluded that Appellants lacked standing to challenge the Regulations as to the November Batch because Appellants incorporated on November 30, 2023 (after the November Batch application deadline of November 17). The District Court also stated, however, that Appellants delayed by not suing over the proposed regulations in November 2022. (Order footnote 33, SA30.) If

Appellants had standing to sue over proposed regulations in November 2022 (notwithstanding that they incorporated a year later), then they had standing to sue over the final regulations for the November Batch (notwithstanding that they incorporated two weeks after the application deadline). Moreover, a plaintiff can bring a lawsuit years later and even if the plaintiff did not apply in the program. *Finch v. Treto*, 606 F. Supp. 3d 811, 825 (N.D. Ill. 2022), aff'd in part, dismissed in part, 82 F.4th 572 (7th Cir. 2023).

The District Court erred in concluding that Appellants lacked standing to seek an injunction against the CAURD Application Program. Respondents must open the application period to all applicants at the same time. NY CANBS § 10(19). Appellants do not challenge the CAURD Application Program. However, because the law requires Respondents to open the applications to every one at the same time, Appellants seek to enjoin Respondents from issuing CAURD Licenses until this litigation is resolved and Respondents can issue Adult Use Licenses.

## VI.   <u>The Court Should Order an Injunction Forthwith with No Injunction Bond</u>

Where a plaintiff shows a likelihood of success in proving a constitutional violation, the Second Circuit should remand with instructions to enter a preliminary injunction "forthwith." *Walsh*, 733 F.3d at 489.

The Court should not require an injunction bond. Appellants are owned entirely by three individuals, two of whom are low-income individuals as required

66

by Defendants' Adult Use Application Program. (Jensen Aff., JA17). This litigation, which seeks to vindicate Plaintiffs' constitutional rights, is being funded entirely by one of Appellants' individual owners.

A court can determine that no injunction bond is required. *Corning Inc. v. PicVue Elecs.*, 365 F.3d 156, 158 (2d Cir. 2004); *JTH Tax v. Kukla*, No. 22-cv-01542, 2022 WL 1651074 (E.D.N.Y. Apr. 26, 2022). A court will waive the bond requirement where the plaintiff brings an action that promotes the public's interest, such as this action to enforce the dormant Commerce Clause. *Pharm. Soc. of New York v. N.Y. Dep't of Soc. Servs.*, 50 F.3d 1168, 1174 (2d Cir. 1995); *Hartford Courant Co., LLC v. Carroll*, 474 F. Supp. 3d 483, 508 (D. Conn. 2020); and *Libertarian Party of Connecticut v. Merrill*, No. 15-CV-1851 (JCH), 2016 WL 10405920, at *8 (D. Conn. Jan. 26, 2016).

## CONCLUSION

Appellants ask this Court to reverse the District Court and remand with instructions to grant a preliminary injunction.


DATED: April 8, 2024          JEFFREY M. JENSEN, PC


                              By: ___/s/ Jeffrey M. Jensen___
                                  Jeffrey M. Jensen
                                  Attorney for Plaintiff and Appellant

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies that, according to the word count provided by

Microsoft Word, the body of the foregoing brief contains 13,000 words, exclusive

of those parts excluded by Fed. R. App. P. 32(a)(7)(B)(iii), which is less than the

13,000 words permitted by Fed. R. App. P. 32(a)(7)(B).  The text of the brief is in

14-point Times New Roman, which is proportionately spaced.  *See* Fed. R. App. P.

32(a)(5)(6).


DATED: April 8, 2024        JEFFREY M. JENSEN, PC


By:      /s/ Jeffrey M. Jensen
Jeffrey M. Jensen
Attorney for Plaintiff and Appellant

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 8, 2023, I caused the foregoing document entitled **Opening Brief for Appellants** to be filed with the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system.

I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


DATED: April 8, 2024                    JEFFREY M. JENSEN, PC


                                        By: _____/s/ Jeffrey M. Jensen_____
                                            Jeffrey M. Jensen
                                            Attorney for Plaintiff and Appellant