# 24-384

## United States Court of Appeals
## for the Second Circuit

VARISCITE NY FOUR, LLC and VARISCITE NY FIVE, LLC,

*Plaintiffs-Appellants,*

v.

NEW YORK STATE CANNABIS CONTROL BOARD, NEW YORK STATE OFFICE OF
CANNABIS MANAGEMENT, TREMAINE WRIGHT, CHRIS ALEXANDER,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of New York

## BRIEF FOR APPELLEES

BARBARA D. UNDERWOOD
  *Solicitor General*
JEFFREY W. LANG
  *Deputy Solicitor General*
ALEXANDRIA TWINEM
  *Assistant Solicitor General*
    *of Counsel*

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Appellees
The Capitol
Albany, New York 12224
(518) 776-2042

Dated: July 8, 2024

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................iii

PRELIMINARY STATEMENT .......................................................1

ISSUES PRESENTED ...................................................................2

STATEMENT OF THE CASE .......................................................4

    A.   New York's Cannabis Law and Regulations ...........................4

    B.   New York's Adult-Use Licensing Program.............................7

    C.   Plaintiffs' License Applications ................................................8

    D.   OCM's Changes to Review of the November and
          December Queues ..................................................................9

    E.   Procedural Background ........................................................11

STANDARD OF REVIEW................................................................14

SUMMARY OF ARGUMENT .........................................................15

ARGUMENT ....................................................................................19

POINT I

  PLAINTIFFS FAILED TO DEMONSTRATE A LIKELIHOOD OF SUCCESS
  ON THEIR DORMANT COMMERCE CLAUSE CLAIM ..................................19

    A.   Threshold Issues of Justiciability Preclude Reaching the
          Merits of Plaintiffs' Claim ....................................................19

          1.   Plaintiffs Lack Standing to Enjoin Defendants'
               Award of CAURD Licenses and Adult-Use
               Dispensary Licenses to Applicants in the November
               Queue ..............................................................................20

**Page**

2. Plaintiffs' Claim to Enjoin Defendants from Awarding Licenses to Applicants on the December Queue is Not Ripe ............................................................ 24

B. The Dormant Commerce Clause Does Not Apply to Interstate Commerce of Products Like Cannabis That Congress Has Criminalized ........................................ 30

1. Congress did not intend for the interstate market in adult-use cannabis to enjoy the protections of the dormant Commerce Clause. ............................. 30

2. *NPG* is distinguishable. .................................... 35

3. *NPG* is wrongly decided. ................................... 38

4. Plaintiffs' remaining arguments are without merit. ...... 44

C. New York's Cannabis Licensing Comports with the Dormant Commerce Clause .................................... 46

1. New York Cannabis Conviction ....................... 49

2. Community Disproportionately Impacted ..................... 53

POINT II

PLAINTIFFS FAILED TO ESTABLISH THAT THEY WOULD SUFFER IRREPARABLE INJURY ABSENT A PRELIMINARY INJUNCTION ................ 57

POINT III

PLAINTIFFS FAILED TO ESTABLISH THAT THE BALANCE OF EQUITIES TIPS IN THEIR FAVOR ............................................ 65

CONCLUSION ......................................................... 72

CERTIFICATE OF COMPLIANCE

ii

# TABLE OF AUTHORITIES

**Cases**                                                           **Page(s)**

*California v. Zook,*
336 U.S. 725 (1949) ............................................................ 31, 45

*Citibank, N.A. v. Citytrust,*
756 F.2d 273 (2d Cir. 1985) .............................................. 61

*City of Philadelphia v. New Jersey,*
437 U.S. 617 (1978) ............................................................ 31, 48

*Dean Milk Co. v. City of Madison,*
340 U.S. 349 (1951) ............................................................ 41

*Finch v. Treto,*
82 F.4th 572 (7th Cir. 2023) ............................................. 46

*Gen. Motors Corp. v. Tracy,*
519 U.S. 278 (1997) ............................................................ 30-31

*Gonzales v. Raich,*
545 U.S. 1 (2005) ................................................................ 33

*Grand River Enter. Six Nations, Ltd. v. Pryor,*
425 F.3d 158 (2d Cir. 2005) .............................................. 48, 50, 57

*Guo v. U.S. Dep't of Justice,*
422 F.3d 61 (2d Cir. 2005) ................................................ 37

*Hirschfeld v. Bd. of Elections,*
984 F.2d 35 (2d Cir. 1994) ................................................ 61-62

*Hunt v. Wash. State Apple Advert. Comm'n,*
432 U.S. 333 (1977) ............................................................ 41

*JBR, Inc. v. Keurig Green Mountain, Inc.,*
618 F. App'x 31 (2d Cir. 2015) ......................................... 15, 51

*Kamerling v. Massanari,*
295 F.3d 206 (2d Cir. 2002) .............................................. 57

iii

**Cases**                                                      **Page(s)**

*Kane v. DeBlasio,*
19 F.4th 152 (2d Cir. 2021) ................................................................ 24

*Lowe v. City of Detroit,*
544 F. Supp. 3d 804 (E.D. Mich. 2021) ............................................ 51

*Mazurek v. Armstrong,*
520 U.S. 968 (1997) ................................................................... 15, 51

*Mendez v. Banks,*
65 F.4th 56 (2d Cir. 2023) ................................................................ 15

*Nat'l Org. for Marriage, Inc. v. Walsh,*
714 F.3d 682 (2d Cir. 2013) ..................................................... 24-25, 28

*Nat'l Park Hosp. Ass'n v. Dep't of Interior,*
538 U.S. 803 (2003) .......................................................................... 25

*Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville,*
508 U.S. 656 (1993) .................................................................... 21, 23

*Northeast Patients Group v. United Cannabis Patients & Caregivers of Maine,*
45 F.4th 542 (1st Cir. 2022) ............................... 12, 34-40, 50

*NPG, LLC v. City of Portland,*
2020 WL 4741913 (D. Me. Aug. 14, 2020) ........................................ 50

*N.Y. C.L. Union v. Grandeau,*
528 F.3d 122 (2d Cir. 2008) ............................................................. 25

*Oakland Trib., Inc. v. Chron. Pub. Co.,*
762 F.2d 1374 (9th Cir. 1985) .......................................................... 61

*Or. Waste Sys., Inc. v. Dep't of Envt'l Quality,*
511 U.S. 93 (1994) ............................................................................ 43

*Pic-A-State PA, Inc. v. Commonwealth,*
42 F.3d 175 (3d Cir. 1994) ............................................ 31, 34, 39, 45

iv

| Cases | Page(s) |
|---|---|

*Pike v. Bruce Church, Inc.*,
   397 U.S. 137 (1970)..................................................................48

*Prudential Insurance Co. v. Benjamin*,
   328 U.S. 408 (1946)..........................................................32, 45

*Slattery v. Hochul*,
   61 F.4th 278 (2d Cir. 2023)...................................................38

*Spokeo v. Robins*,
   578 U.S. 330 (2016).............................................................20-21

*Sporhase v. Nebraska ex rel. Douglas*,
   458 U.S. 941 (1982).........................................................31-32, 45

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas*,
   588 U.S. 504 (2019)...............................................................47

*Toigo v. Dep't of Health & Senior Servs.*,
   549 F. Supp. 3d 985 (W.D. Mo. 2021)..................................50

*Town of Southold v. Town of E. Hampton*,
   477 F.3d 38 (2d Cir. 2007) ...............................47-48, 53, 56

*United States v. O'Brien*,
   391 U.S. 367 (1968).................................................................38

*W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*,
   549 F.3d 100 (2d Cir. 2008) ...................................................20

*We The Patriots USA, Inc. v. Hochul*,
   17 F.4th 266 (2d Cir. 2021)....................................................58

*Winter v. NRDC, Inc.*,
   555 U.S. 7 (2008)..........................................................14-15, 65

*Wreal, LLC v. Amazon.com, Inc.*,
   840 F.3d 1244 (11th Cir. 2016).............................................61

| Constitutions | Page(s) |
|---|---|

U.S. Const.
art. I, § 8, cl. 3 .................................................................. 30

## Federal Statutes

21 U.S.C.
§ 812 ................................................................................ 33
§ 841 ................................................................................ 33

## State Statutes

New York Cannabis Law
§ 2 ................................................................. 1, 4, 49, 53
§ 3 ..................................................................................... 4
§§ 7-11 ............................................................................. 4
§ 10 ................................................................................. 22
§§ 61-89 ........................................................................... 4
§ 78 ................................................................................. 42
§ 87 ................................................................................... 5

## State Regulations

9 N.Y.C.R.R.
§ 116.1 ............................................................................. 6
§ 116.4 ........................................................................... 22
§ 118.1 ............................................................................. 6
§ 121.1 ........................................................................... 6-7
§§ 125.7-125.14 ............................................................. 42
§ 125.12 ......................................................................... 42
§§ 128.1-128.7 ............................................................... 42
§ 133.3 ........................................................................... 42

**Miscellaneous Authorities**                                    **Page(s)**

Cannabis Control Bd., No. 2024-75, *Resolution to Adopt and Approve the Supplemental Policy Guidance for the Review of the Adult-Use Applications from the October 2023 Application Window* (May 10, 2024), https://cannabis.ny.gov/system/files/documents/2024/05/ccb-resolution-2024-75.pdf ........................................................................ 9

Dep't of Justice, *Justice Department Submits Proposed Regulation to Reschedule Marijuana* (May 16, 2024), https://www.justice.gov/opa/pr/justice-department-submits-proposed-regulation-reschedule-marijuana ...................................... 33

*Dispensary Location Verification* (2024), https://cannabis.ny.gov/dispensary-location-verification ................... 60

Folley, Aris, *House GOP Strips Language Aimed at Protecting Banks from Cannabis Crackdowns*, The Hill (June 13, 2024), https://thehill.com/business/budget/4721100-house-gop-strips-language-aimed-at-protecting-banks-from-cannabis-crackdowns ....................................................................... 36

Gov. Kathy Hochul, *Governor Hochul Directs Operational Overhaul of the Office of Cannabis Management* (May 10, 2024), https://www.governor.ny.gov/news/video-audio-photos-rush-transcript-governor-hochul-directs-operational-overhaul-office ...................................................................... 10

Nat'l Conf. of State Legis., *State Medical Cannabis Laws* (June 4, 2024), https://www.ncsl.org/health/state-medical-cannabis-laws ............................................................................. 42

**Miscellaneous Authorities** **Page(s)**

Off. of Cannabis Mgmt., *Retail and Microbusiness Non-Provisional Adult-Use Application Queue: October 4, 2023-November 17, 2023 Application Window* (Jan. 29, 2024), https://cannabis.ny.gov/system/files/documents/2024/02/retail-and-microbusiness-non-provisional-queue-oct-nov-2023-revised-01-29-24.pdf ........................................................... 10

Off. of Cannabis Mgmt., *Supplemental Policy Guidance: Application Review for the Adult-Use Cannabis October 2023 Application Window* (May 10, 2024), https://cannabis.ny.gov/system/files/documents/2024/05/ocm-supplemental-policy-guidance.pdf .................................................. 10-11

Southall, Ashley, *What's in New York's Illicit Cannabis: Germs, Toxins and Metals* (Dec. 1, 2022), https://www.nytimes.com/2022/12/01/nyregion/cannabis-bacteria-pesticides-illegal-dispensary.html ....................................... 43

viii

## PRELIMINARY STATEMENT

New York enacted its Cannabis Law in response to findings that its existing laws criminalizing marihuana had "resulted in devastating collateral consequences including mass incarceration" and inhibited otherwise law-abiding individuals' "ability to access housing, employment opportunities, and other vital services." N.Y. Cannabis Law ("N.Y. Canbs.") § 2. The Cannabis Law eliminates state criminal penalties for the use of cannabis by adults; licenses businesses to grow, manufacture, and sell cannabis in the State; and specifies criteria for granting licenses for the sale of cannabis.

As is relevant here, the law and its implementing regulations grant "extra priority" in licensing to businesses owned by individuals who were personally affected by New York's criminalization of marihuana by virtue of the individual or a close family member having a marihuana conviction under New York law. To receive "extra priority," these individuals must also show that they resided for a certain period of time in a community that was disproportionately impacted by cannabis prohibition.

Plaintiffs Variscite NY Four, LLC and Variscite NY Five, LLC are license applicants whose majority owners were convicted of marihuana

offenses under California law. They argue that New York's requirements violate the dormant Commerce Clause by discriminating against out-of-state business interests. Plaintiffs moved for a preliminary injunction preventing defendants from issuing dispensary licenses during the pendency of their suit. The District Court for the Northern District of New York (Nardacci, J.) denied plaintiffs' motion.

The district court's decision should be affirmed. Plaintiffs failed to demonstrate that they satisfied any of the criteria for a preliminary injunction. And plaintiffs' brief on appeal does not suggest that the district court abused its discretion in reaching its decision.

## ISSUES PRESENTED

1.    Did plaintiffs fail to demonstrate that they were likely to succeed on their dormant Commerce Clause challenge, for any of the following reasons:

(a) as the district court concluded, plaintiffs lack standing to enjoin the award of licenses to i) applicants who applied for programs to which plaintiffs did not apply, and ii) applicants who are being processed in separate application pools from plaintiffs;

(b) plaintiffs' dormant Commerce Clause claim is not ripe with respect to the application pool to which plaintiffs applied because it is not currently known whether any licenses will be issued to these applicants, how many, or when;

(c) as the district court concluded, the protections of the dormant Commerce Clause do not apply to the interstate adult-use cannabis market because Congress has criminalized participation in that market; and

(d) New York's laws comport with the dormant Commerce Clause in any event.

2.      Did the district court act within its discretion in concluding that plaintiffs failed to demonstrate irreparable harm absent a preliminary injunction?

3.      Did the district court act within its discretion in determining that plaintiffs failed to establish that the balance of equities tips in their favor?

## STATEMENT OF THE CASE

**A.    New York's Cannabis Law and Regulations**

In 2021, the New York Legislature concluded that the State's exist-ing laws criminalizing marihuana had "not been beneficial to the welfare of the general public." N.Y. Canbs. § 2. The Legislature explained that New York's marihuana criminalization and enforcement had "resulted in devastating collateral consequences including mass incarceration and other complex generational trauma, that inhibit an otherwise law-abid-ing citizen's ability to access housing, employment opportunities, and other vital services." *Id.* To correct these effects, the Legislature passed the Marihuana Regulation and Taxation Act ("MRTA"), which enacted the State's Cannabis Law.

The Cannabis Law eliminates state criminal penalties for the use of cannabis by adults and regulates the growing, processing, distribution, and sale of cannabis within the State. N.Y. Canbs. §§ 3, 61-89. It also establishes the Cannabis Control Board ("Board") and Office of Cannabis Management ("OCM"), which are responsible for implementing and enforcing the Cannabis Law within the State. N.Y. Canbs. §§ 7-11. To achieve the Cannabis Law's restorative justice and social equity goals,

4

the law requires the Board and OCM to give "extra priority" in licensing to any applicant who (a) is a member of a community disproportionately impacted by cannabis prohibition ("CDI"), (b) has an income lower than 80% of the median income of the county in which the applicant resides, and (c) either was convicted of a marihuana-related offense prior to New York's decriminalization of cannabis or has a close relative who was convicted of a marihuana offense. N.Y. Canbs. § 87(3).

Consistent with the Cannabis Law's directive, OCM drafted proposed adult-use regulations that included a directive to give "extra priority" to applicants who satisfy Cannabis Law § 87(3)'s criteria, along with regulations defining relevant terms like "marihuana-related offense" and regulations outlining how OCM would determine what constitutes a CDI. (*See* JA 418.) OCM released the proposed regulations for public comment in November 2022. (JA 418.) In May 2023, OCM released revised adult-use regulations to the public. (JA 419.) And in September 2023, the Board adopted the revised regulations as final regulations governing adult-use licensing. (JA 419.)

The Board's regulations implement Cannabis Law § 87(3), giving extra priority in consideration for a license to a person who

5

"demonstrates that they are an individual from a community disproportionately impacted by the enforcement of cannabis prohibition" if (i) they have an income lower than 80% of the median income in the county in which they reside; and (ii) were convicted of a marihuana-related offense or have a parent, guardian, child, spouse, dependent, or caretaker who was convicted of a marihuana-related offense prior to the effective date of the MRTA. 9 N.Y.C.R.R. § 121.1(k). In turn, the Board's regulations define "marihuana-related offense" as offenses arising under certain chapters of New York's Penal Law that were repealed as part of the MRTA. *See* 9 N.Y.C.R.R. § 118.1(a)(64).[1] The regulations also set forth how OCM will determine whether a geographic area qualifies as a CDI, including by looking at the area's history of arrests, number of convictions, allocation of law enforcement resources, involvements of state child protective services, and deportation records for marihuana offenses. *See* 9 N.Y.C.R.R. § 121.1(e). The regulations define how median income will be determined, *id.* § 121.1(k)(2), and require an applicant to provide proof

_____

[1] This definition replicates an early definition, which was codified in 2022, used in the Board's regulations relating to conditional adult-use retail dispensary ("CAURD") licenses. 9 N.Y.C.R.R. § 116.1(q).

of residency, income, and conviction in a manner prescribed by the Board in order to receive extra priority, *id.* § 121.1(k)(3).

## B. New York's Adult-Use Licensing Program

In September 2023, OCM announced that the window for adult-use license applications would open on October 4, 2023, and provided further guidance on the process. (JA 338, 368-71, 419).

To expedite the process of retail dispensaries becoming operational and open to the public after significant delay stemming from other litigation, OCM split the adult-use applicant pool into two. (JA 310, 342.) Each pool would have a separate number of licenses available to applicants, and applicants would thus be competing for a license only against the other applicants in their pool. (*See* JA 342-43.) For applicants who already had proof of control over a proposed premises for their dispensary, the application window closed on November 17, 2023 ("November Applicants"). (JA 310, 342.) Applicants who did not already have control over a proposed location or who could not complete their application by the November deadline were placed in a separate pool ("December Applicants"). Their application window closed on December 18, 2023. (JA 310, 342.)

After each application window closed, OCM randomly ordered applications from that window into separate queues (the "November Queue" and "December Queue") using a random number generator. (*See* JA 310, 527-28.) Dispensary license applicants who selected that they were entitled to "extra priority" were entered three times in the random number generator, thereby increasing their chances of receiving a sufficiently high position in the queue to be awarded a license early in the process. (JA 310-11, 527-28.) At the time the adult-use application windows closed, OCM anticipated awarding 250 dispensary licenses to applicants in the November Queue and 450 dispensary licenses to applicants in the December Queue. (JA 311.)

## C.   Plaintiffs' License Applications

Plaintiffs Variscite NY Four, LLC and Variscite NY Five, LLC applied for adult-use retail dispensary licenses on December 18, 2023. (JA 112, 311.) Both businesses are majority owned by individuals who have marihuana convictions under California law. (JA 112-13.) Both businesses' majority owners lived for a number of years in CDIs in Los Angeles and so indicated on their applications. (JA 308-09, 325.) Both businesses applied for "extra priority" in licensure. (JA 308-09.)

8

Plaintiffs applied in the December application window, and they were thus randomly ordered on the December Queue. Because plaintiffs indicated that they were entitled to "extra priority," each application was awarded three numbers. Variscite Four's application appears at 816, 2121, and 3812 in the December Queue, and Variscite Five's application appears at 949, 2153, and 4147 in the December Queue. (JA 528.)

## D. OCM's Changes to Review of the November and December Queues

At its public meeting on May 10, 2024, the Board adopted a resolution instructing OCM to review *all* microbusiness and dispensary applicants on the November Queue and issue licenses to all qualified applicants.[2] This directive replaced OCM's previous announcement that the number of dispensary licenses available in the November Queue would be limited to 250. (JA 311.) Under this new directive, there is no limit on the number of licenses that will be awarded to applicants on the

---

[2] Cannabis Control Bd., No. 2024-75, *Resolution to Adopt and Approve the Supplemental Policy Guidance for the Review of the Adult-Use Applications from the October 2023 Application Window* (May 10, 2024), https://cannabis.ny.gov/system/files/documents/2024/05/ccb-resolution-2024-75.pdf.

November Queue.[3] At a press conference held the same day, Governor Hochul explained that the purpose of this change was to "unclog the licensing bottleneck and immediately review hundreds of applicants . . . . who [we]re required to apply with a lease, a paid for lease, are still paying rent, hoping their license comes through."[4]

In total, there are 1,799 applicants for microbusiness licenses and adult-use dispensary licenses on the November Queue.[5] In light of the exponential increase in the number of microbusiness and dispensary licenses that will be awarded from the November Queue, the Board rescinded its previous projection that 450 dispensary licenses would be available to applicants on the December Queue and announced that it

---

[3] Off. of Cannabis Mgmt., *Supplemental Policy Guidance: Application Review for the Adult-Use Cannabis October 2023 Application Window* (May 10, 2024), https://cannabis.ny.gov/system/files/documents/2024/05/ocm-supplemental-policy-guidance.pdf.

[4] Gov. Kathy Hochul, *Governor Hochul Directs Operational Overhaul of the Office of Cannabis Management* (May 10, 2024), https://www.governor.ny.gov/news/video-audio-photos-rush-transcript-governor-hochul-directs-operational-overhaul-office.

[5] *See* Off. of Cannabis Mgmt., *Retail and Microbusiness Non-Provisional Adult-Use Application Queue: October 4, 2023-November 17, 2023 Application Window* (Jan. 29, 2024), https://cannabis.ny.gov/system/files/documents/2024/02/retail-and-microbusiness-non-provisional-queue-oct-nov-2023-revised-01-29-24.pdf.

10

will "share additional information about the number of licenses it intends to issue from the December queue once review of the November queue is farther along."[6] Off. of Cannabis Mgmt., *Supplemental Policy Guidance*, *supra*, at 2. The Board may also adjust license targets based on "updated information about the cannabis supply-chain." *Id.* In light of the uncertainty applicants on the December Queue now face, OCM is offering a refund of the application fee to any December Queue applicant who wishes to withdraw its application. *Id.*

## E.  Procedural Background

Plaintiffs filed the present case in the District Court for the Northern District of New York on December 18, 2023. (JA 7, 14-24.) They subsequently moved for a temporary restraining order and preliminary injunction to stop defendants from issuing any adult-use cannabis retail dispensary licenses, as well any licenses issued for conditional adult-use retail dispensaries ("CAURD licenses") through a separate, earlier program. (JA 8, 112-20.)

_____

[6] This replaces the previous announcement that OCM and the Board anticipated awarding 450 adult-use dispensary licenses to applicants from the December Queue. (*See* JA 311.)

Following a hearing on plaintiffs' motion (JA 687-724), the district court issued a decision and order denying plaintiffs' motion. (SA 3-33.) It first concluded that plaintiffs lacked standing to seek injunctive relief, including a preliminary injunction, with respect to either the CAURD program or the November Queue of adult-use licenses because plaintiffs failed to demonstrate any injury related to those licenses. (SA 18-20). Namely, because plaintiffs did not apply for a CAURD license or during the November Application window, plaintiffs could not show that they suffered a cognizable injury as a result of awarding licenses to applicants in these licensing pools. (SA 19-20.)

The court next concluded that plaintiffs were unlikely to succeed on the merits of their challenge, and thus were not entitled to a preliminary injunction, because the dormant Commerce Clause does not apply to the cannabis industry. (SA 23-27.) The district court adopted the reasoning of Judge Gelpi's dissent from the First Circuit Court of Appeals' decision in *Northeast Patients Group v. United Cannabis Patients & Caregivers of Maine*, 45 F.4th 542 (1st Cir. 2022), along with the recent decisions of two district courts in Washington, to conclude that the dormant Commerce Clause's purpose of protecting a national market makes little sense when

12

Congress has expressly prohibited that national market through criminalization. (SA 23-26.) The court further concluded that, in light of the split decisions among district courts and the lack of applicable guidance from this Court or the U.S. Supreme Court, plaintiffs had at best shown "serious questions" on the merits rather than a clear likelihood of success. (SA 26-27.) Because the court concluded that the dormant Commerce Clause is inapplicable to cannabis, it did not reach defendants' alternative argument that New York's cannabis laws satisfy the dormant Commerce Clause.

The district court further concluded that plaintiffs failed to demonstrate that they would suffer irreparable injury absent a preliminary injunction. (SA 27-30.) The court reasoned that, although an ongoing constitutional violation may be deemed an irreparable injury, plaintiffs failed to demonstrate that such injury was likely because were not likely to succeed on the merits of their claim. (SA 27-28.) The court also concluded that plaintiffs' claims about lost opportunity to enter and succeed in the cannabis market were speculative and ignored the reality that there were already established cannabis businesses in the state. (SA 28-29.) Finally, the court discounted plaintiffs' claims of irreparable

injury in light of their unjustified delay in bringing litigation until the eve of defendants issuing adult-use cannabis licenses. (SA 29-30.)

Lastly, the district court determined that plaintiffs failed to demonstrate that the balance of hardships tips in their favor. The court recognized that third parties, including applicants, cannabis growers, property owners and landlords, and the general public would be injured by an injunction. As the court explained, applicants had invested significant resources in their businesses (including in many cases securing leases and hiring employees), growers were relying on an influx of dispensaries to purchase their already-grown cannabis crops, landlords were reliant on the leasing of over 1,000 new retail storefronts for dispensaries, and an influx in legal dispensaries would help displace the illicit dispensaries in the State and ensure safe products for the public. (SA 31-32.)

Plaintiffs timely appealed. (JA 530-31.)

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). The party seeking a preliminary injunction bears the burden of demonstrating that (1) it is likely to succeed on the merits; (2) it is likely to suffer

14

irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Id.* at 20. To meet this burden, a movant must make "*a clear showing*" that it is entitled to relief, which requires "substantial proof" higher than what is required on a motion for summary judgment. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original) (citation omitted); *JBR, Inc. v. Keurig Green Mountain, Inc.*, 618 F. App'x 31, 33 (2d Cir. 2015).

This Court reviews a district court's decision to deny a preliminary injunction for abuse of discretion, "examining the legal conclusions underpinning the decision *de novo* and the factual conclusions for clear error." *Mendez v. Banks*, 65 F.4th 56, 62 (2d Cir. 2023) (citation omitted).

## SUMMARY OF ARGUMENT

The district court did not abuse its discretion in declining to preliminarily enjoin the Board and OCM from issuing dispensary licenses during the pendency of plaintiffs' suit.

1. Plaintiffs failed to demonstrate a likelihood of success that would entitle them to preliminary relief for three reasons. First, threshold issues render plaintiffs' claim non-justiciable. As the district

15

court correctly determined, plaintiffs lack standing to enjoin issuance of licenses to CAURD applicants or adult-use applicants on the November Queue. Not having applied under the CAURD program or in the November application window, plaintiffs will not sustain injury from award of these licenses.

And plaintiffs' claim is not yet ripe with respect to enjoining the award of licenses to applicants on the December Queue. Because of changes in OCM's process for reviewing adult-use license applications that occurred after the district court's decision, it is currently unknown how many licenses will be available for applicants on the December Queue, if any become available at all. Accordingly, plaintiffs cannot demonstrate at this time that they will suffer an injury as a result of an alleged violation of the dormant Commerce Clause.

Second, plaintiffs failed to demonstrate a likelihood of success on the merits of their dormant Commerce Clause claim regarding any of the applicant pools. As the district court correctly concluded, the dormant Commerce Clause does not apply to interstate commerce that Congress has prohibited. The purpose of the dormant Commerce Clause is to protect the national market for goods and protect the ability of people to

participate in that market regardless of their state of residency. But when Congress made interstate commerce in cannabis illegal through passage of the Controlled Substances Act, Congress clearly stated its position: interstate commerce in adult-use cannabis is not entitled to protection, nor are individuals entitled to participate in a national adult-use cannabis market—whether on equal terms or unequal. That statement was sufficient to remove the adult-use cannabis industry from the domestic Commerce Clause's purview.

Third, the challenged licensing requirements satisfy the dormant Commerce Clause in any event. Although the district court did not reach this issue, it provides an alternative basis for affirmance. The requirements to receive "extra priority" for a license that an applicant have a prior conviction for a marihuana offense under New York law and have previously lived in a CDI do not favor in-state business interests on their face, in their purpose, or in effect. And to whatever extent the requirements burden interstate commerce, that burden does not clearly outweigh the local benefits of ameliorating the extensive harms caused by New York's criminalization of marihuana.

17

2.     The district court did not abuse its discretion in deciding that plaintiffs failed to demonstrate that they were likely to suffer irreparable injury absent a preliminary injunction. Because plaintiffs are unlikely to succeed on the merits of their constitutional challenge, they failed to demonstrate likely per se irreparable injury. Nor did plaintiffs demonstrate irreparable injury from being denied early entry to the New York cannabis market. There are more than 1,000 dispensaries that will be licensed and able to open before plaintiffs, and it is already too late for them to enjoy "early mover" advantages. Additionally, plaintiffs failed to demonstrate that not receiving a license now would exclude them from the cannabis industry permanently. And finally, even if plaintiffs had demonstrated irreparable injury, the district court did not abuse its discretion in nevertheless concluding that they were not entitled to a preliminary injunction because their own unreasonable delay in bringing suit until the eleventh hour was the cause of their injuries.

3.     The district court did not abuse its discretion in concluding that plaintiffs failed to demonstrate that the balance of equities tipped in their favor. Defendants proffered unrebutted evidence of the extensive, ongoing injuries that a preliminary injunction would cause to CAURD

18

and adult-use license applicants, cannabis growers in New York, cannabis employees, property owners and landlords, members of the public who use cannabis products, and the State itself. These injuries outweigh any putative injury to plaintiffs if a preliminary injunction is not granted.

## ARGUMENT

The district court properly declined to grant plaintiffs a preliminary injunction because they failed to demonstrate a likelihood of success on the merits, irreparable harm, or that the equities tip in their favor.

## POINT I

### PLAINTIFFS FAILED TO DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THEIR DORMANT COMMERCE CLAUSE CLAIM

### A. Threshold Issues of Justiciability Preclude Reaching the Merits of Plaintiffs' Claim

This Court need not—and, indeed, *should* not—reach the merits of plaintiffs' dormant Commerce Clause claim because the claim is not justiciable. With respect to plaintiffs' request to enjoin defendants from issuing licenses to CAURD applicants and applicants in the November Queue, plaintiffs lack standing. Plaintiffs did not apply in either window

19

and will not suffer a cognizable injury from award of licenses to applicants in separate, discrete pools. And with respect to plaintiffs' request to enjoin defendants from issuing licenses to applicants in the December Queue, plaintiffs' claim is not ripe because there is currently insufficient information known about whether and when licenses may be awarded to applicants.

### 1. Plaintiffs Lack Standing to Enjoin Defendants' Award of CAURD Licenses and Adult-Use Dispensary Licenses to Applicants in the November Queue

The district court did not abuse its discretion by concluding that plaintiffs lack standing to enjoin defendants from awarding CAURD licenses or licenses to applicants on the November Queue. To have standing, a plaintiff must demonstrate (1) an injury-in-fact, (2) a "fairly traceable" connection between that injury and the alleged actions of the defendant, and (3) a likelihood that the injury can be remedied by the requested relief. *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106-07 (2d Cir. 2008). Injury-in-fact is "[f]irst and foremost" among these requirements. *Spokeo v. Robins*, 578 U.S. 330, 338 (2016) (alteration in original) (citation omitted). An injury-in-fact is "an invasion

20

of a legally protected interest" and must be "actual or imminent, not conjectural or hypothetical." *Id.* at 339 (citation omitted). Plaintiffs failed to demonstrate that they would suffer any invasion of a legally protected interest as a result of defendants continuing to issue CAURD licenses and licenses to applicants in the November Queue.

With respect to CAURD licenses, it is undisputed that plaintiffs did not apply for these licenses, which were issued and awarded through a separate process from adult-use licenses. (JA 691-92.) Indeed, plaintiffs do not even allege in their complaint that any portion of the CAURD program violated the dormant Commerce Clause. Thus they cannot claim or demonstrate that they suffered the invasion of a legally protected interest as required for standing. *Spokeo*, 578 U.S. at 338.

Nor did plaintiffs demonstrate that they had standing because they were "able and ready" to apply for CAURD licenses but for defendants' allegedly unconstitutional conduct. *See Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993). Plaintiffs were not incorporated at the time CAURD license applications were accepted. (SA 19; JA 689.) And plaintiffs have never alleged that they satisfy the other criteria for CAURD licenses, including, for

21

instance, that the majority owners of the applying business have previously held an ownership in a profitable business for at least two years, *see* 9 N.Y.C.R.R. § 116.4(a)(2)(iii).

Plaintiffs' only argument for standing to enjoin CAURD licensing is that, under New York law, the application period for cannabis licenses must open to all applicants at the same time. (Br. 66.) But the relevant provision of state law requires only that the period to *apply* for a license *open* for all applicants at the same time. N.Y. Canbs. § 10(19). The law's mandate was satisfied when, on October 4, 2023, the application period for all adult-use licenses opened. (JA 310.) Nothing in the Cannabis Law requires that licenses be *awarded* at the same time. Nor is plaintiffs' bare one-sentence assertion that issuing CAURD licenses violates the law (Br. 66) sufficient to preserve that argument.

With respect to the November Queue, plaintiffs likewise failed to demonstrate an injury-in-fact from defendants awarding these licenses. Plaintiffs did not apply for adult-use dispensary licenses in the November Window. (JA 689-91.) Nor would plaintiffs have been qualified to do so. In addition to not being incorporated before the date the November Window closed (SA 19; JA 689), plaintiffs did not have proof that they

22

had control of proposed premises for their dispensaries' locations, as was required for consideration in the November Queue (SA 19). Accordingly, plaintiffs cannot demonstrate their readiness to apply for such licenses to confer standing. *City of Jacksonville*, 508 U.S. at 666. And it is undisputed that applications in the November Queue and December Queue are considered separately, with separate sets of licenses available to each group. (JA 310-11.) Accordingly, the way in which the November Queue was ordered for review and the awarding of licenses does not affect when or whether plaintiffs receive cannabis licenses on the separate December Queue.

Plaintiffs respond that because OCM "held only a single application program," i.e., the program under which all adult-use dispensary licenses are issued, they have standing to enjoin the awarding of licenses to applicants on the November Queue. (Br. 9, 30.) But that program is being administered separately for each distinct application pool, and plaintiffs have standing to seek equitable relief only as to the administration of the program in plaintiffs' application pool, which is the cause of their alleged injury. As noted above, plaintiffs did not participate in the November Queue and cannot claim injury from the award of licenses thereunder.

23

Indeed, even if plaintiffs *had* standing to enjoin the issuance of all adult-use dispensary licenses (which they do not), such relief, particularly *preliminary* injunctive relief, would nevertheless run afoul of the well-settled principle that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Kane v. DeBlasio*, 19 F.4th 152, 173 (2d Cir. 2021) (citation omitted).

The district court was thus correct that plaintiffs lack standing to temporarily enjoin defendants from issuing licenses to CAURD applicants or applicants on the November Queue.

### 2. Plaintiffs' Claim to Enjoin Defendants from Awarding Licenses to Applicants on the December Queue is Not Ripe

Due to changes to OCM's process for reviewing the November and December Queues and awarding licenses, which were made after the district court's decision below, plaintiffs' claim with respect to the December Queue is not presently ripe, and thus plaintiffs cannot presently demonstrate that they are likely to succeed on the merits. "To be justiciable, a cause of action must be ripe—it must present 'a real, substantial controversy, not a mere hypothetical question.'" *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) (citation

omitted). Ripeness is a question of timing. *Id.* The purpose of the ripeness doctrine is to prevent courts from prematurely adjudicating cases, thereby entangling themselves in abstract disagreements. *Id.*

The ripeness doctrine is drawn both from Article III of the Constitution and from prudential reasons to refuse to exercise jurisdiction. *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). Constitutional ripeness overlaps conceptually with standing and requires that a plaintiff's injury be actual or imminent, not hypothetical or conjectural. *Walsh*, 714 F.3d at 688-89 & n.5. Prudential ripeness concerns whether a case "will be *better* decided later." *Id.* at 688 (citation omitted). Prudential ripeness requires a court to "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding consideration." *N.Y. C.L. Union v. Grandeau*, 528 F.3d 122, 132 (2d Cir. 2008) (citation omitted). The "fitness" inquiry concerns "whether the issues sought to be adjudicated are contingent on future events or may never occur." *Id.* (citation omitted). The "hardship" inquiry concerns whether plaintiff will suffer an actual injury unless the case is adjudicated immediately. *Id.* at 134.

25

In the present case, plaintiffs' claim is neither constitutionally ripe nor prudentially ripe, and thus they cannot demonstrate at present that they are likely to succeed on the merits of their challenge. Specifically, it is presently unknown how many cannabis dispensary licenses will be available to applicants, including plaintiffs, who are on the December Queue. As a result, plaintiffs cannot demonstrate that they will be injured by defendants' use of the "extra priority" category. OCM will review the December Queue and award licenses after it has reviewed every application on the November Queue and awarded licenses to all qualified applicants. *See supra* pp. 9-11. This means that up to 1,799 microbusinesses and adult-use retail dispensaries will receive licenses before OCM begins reviewing applications from the December Queue. Accordingly, OCM currently does not know how many licenses will be available for retail dispensaries on the December Queue and will not know until it has a clearer idea of how many licenses will be awarded to November Queue applicants and how many more dispensaries the State's cannabis market can sustain.

Because plaintiffs allege that defendants deprived plaintiffs of their opportunity to receive one of a limited number of available licenses (*see,*

*e.g.*, JA 22; Br. 53-54), it is not possible for a court to determine whether plaintiffs will suffer a cognizable injury until defendants know how many licenses will be available. For instance, if OCM determines after the November Queue is fully processed that the current cannabis market cannot accommodate further dispensaries, it could make no licenses available for applicants on the December Queue. In that case, plaintiffs' denial of a license will be unrelated to the Cannabis Law's "extra priority" category and will instead be because plaintiffs did not apply for the November Queue.

On the other hand, if OCM determines that the market can accommodate substantially more licenses than previously expected (due to an increase in the amount of cannabis being cultivated, successful efforts to close illicit dispensaries, or other factors), it is possible that plaintiffs will receive licenses outright. And enough applicants on the December Queue may accept OCM's offer to withdraw their applications and request refunds to meaningfully change plaintiffs' positions in the queue. To be sure, it is also possible that OCM will make available to December Queue dispensary license applicants a number of licenses relatively similar to the 450 that were previously announced. But at this

27

time, defendants do not know—and *cannot* know—how many licenses will be available.

Accordingly, this Court should conclude that plaintiffs' claims are not yet ripe. As a matter of constitutional ripeness, plaintiffs cannot demonstrate that that they will actually suffer a concrete injury. Rather, the risk that they will be deprived of an equal opportunity for a license is purely conjectural. Indeed, even based on OCM's prior announcement that 450 dispensary licenses would be available to December Queue applicants, plaintiffs' claim of injury turned on the supposition that defendants would eventually double or triple the number of available licenses. (*See* Br. 53-54.) Now that no one, including defendants, knows how many dispensary licenses will be available, plaintiffs' alleged injuries are even more speculative.

As a matter of prudential ripeness, plaintiffs' claim would be better adjudicated in the future. *Walsh*, 714 F.3d at 689. First, plaintiffs' claim is not presently fit for resolution because whether plaintiffs will suffer any constitutional injury is contingent on future events and might not ever occur. These future events include OCM's issuance of dispensary licenses to qualified November Queue applicants, the total number of

which is unknown; the decisions of some December Queue applicants to withdraw their applications; the award of additional licenses to cannabis cultivators and processors in the state, which would create a need for additional retail dispensaries; public demand for legal cannabis relative to the number of dispensaries licensed through CAURD and the November Queue; and OCM's calculation of the number of dispensary licenses available for the December Queue.

Second, plaintiffs will not suffer hardship if this Court and the district court wait to adjudicate this case once the number of December Queue licenses is determined. Plaintiffs' positions in the December Queue, including their positions if they continue to be treated as "extra priority" applicants, are already known. *See supra* p. 9. Accordingly, there is no risk that plaintiffs will be subjected to any alleged unconstitutional protectionism until their applications would first be reviewed under that higher "extra priority" number they were assigned. Because December Queue applications will not be reviewed until after the November Queue is complete and OCM announces how many licenses will be available for the December Queue, there is no risk of plaintiffs

29

suffering a legally cognizable injury if this case is held until plaintiffs' claim becomes ripe.

## B. The Dormant Commerce Clause Does Not Apply to Interstate Commerce of Products Like Cannabis That Congress Has Criminalized

Even aside from the threshold issues with plaintiffs' claim, plaintiffs are not entitled to preliminary injunctive relief because they failed to demonstrate a likelihood of success on the merits of their dormant Commerce Clause claim. That is because, as the district court correctly concluded, the dormant Commerce Clause does not protect the national market for products that Congress has prohibited through criminal laws.

### 1. Congress did not intend for the interstate market in adult-use cannabis to enjoy the protections of the dormant Commerce Clause.

The Commerce Clause of the U.S. Constitution provides Congress with the power to regulate commerce "among the several States." U.S. Const. art. I, § 8, cl. 3. The "negative" implication of the Clause, referred to as the "dormant Commerce Clause," prohibits states from enacting laws "that discriminate[] against or unduly burden[] interstate commerce." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 287 (1997). The

dormant Commerce Clause's "fundamental objective" is "preserving a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors." *Id.* at 299. The purpose of the dormant Commerce Clause, then, is to avoid "the evils of 'economic isolation' and protectionism, while at the same time recognizing that incidental burdens on interstate commerce may be unavoidable when a State legislates to safeguard the health and safety of its people." *City of Philadelphia v. New Jersey*, 437 U.S. 617, 623-24 (1978).

Congress has the power to remove industries from the dormant Commerce Clause's protection by "consent[ing] to the unilateral imposition of unreasonable burdens on commerce." *Sporhase v. Nebraska ex rel. Douglas*, 458 U.S. 941, 960 (1982). "Where Congress has proscribed certain interstate commerce, Congress has determined that that commerce is not in the national interest. Where such a determination has been made by Congress, it does not offend the purpose of the Commerce Clause for states to discriminate or burden that commerce." *Pic-A-State PA, Inc. v. Commonwealth*, 42 F.3d 175, 179 (3d Cir. 1994); *see also California v. Zook*, 336 U.S. 725, 728 (1949) ("There is no longer any

question that Congress can redefine the areas of local and national predominance.").

In such circumstances, Congress's "intent and policy" to remove a national market from the dormant Commerce Clause's protection must be "expressly stated." *Sporhase*, 458 U.S. at 960 (quoting *New England Power Co. v. New Hampshire*, 455 U.S. 331, 343 (1982)). However, a law need not mention the Commerce Clause, economic protectionism, discrimination, or the ability to limit or exclude other states' citizens from a particular market in order to "expressly state" Congress's intention. Thus, in *Prudential Insurance Co. v. Benjamin*, 328 U.S. 408, 429 (1946), the Supreme Court concluded that the McCarran Act "[o]bviously" expressed Congress's intent to authorize states to impose differential tax burdens on out-of-state insurance businesses when the law stated only that "silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States" and that the "business of insurance . . . shall be subject to the laws of the several States." *Id.* (quoting McCarran Act, Pub. L. No. 79-15, § 2, 59 Stat. 33, 34 (1945)).

32

Here, Congress has expressly stated its intention to remove the adult-use cannabis market from the protections of the dormant Commerce Clause by making any national market illegal. Namely, under the Controlled Substances Act, it is unlawful to "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1). And marihuana products have been classified as a schedule I prohibited drug since the enactment of the Controlled Substances Act in 1970. *See* 21 U.S.C. § 812.[7]

As the Supreme Court recognized in *Gonzales v. Raich*, "the marijuana market is an unlawful market that Congress sought to eradicate. . . . It has long been settled that Congress' power to regulate commerce includes the power to prohibit commerce in a particular commodity." 545 U.S. 1, 19 n.29 (2005). In other words, Congress has

---

[7] The Department of Justice has proposed rescheduling cannabis as a schedule III controlled substance. *See* Dep't of Justice, *Justice Department Submits Proposed Regulation to Reschedule Marijuana* (May 16, 2024), https://www.justice.gov/opa/pr/justice-department-submits-proposed-regulation-reschedule-marijuana. However, that Executive Branch action would not *decriminalize* cannabis but rather reflect the executive's changed understanding of whether cannabis products have a currently accepted medical use in the United States. *See* 21 U.S.C. § 812(b)(1)(B), (b)(3)(B).

33

expressly stated its intent that there be *no* lawful market in cannabis, and thus a national cannabis market does not enjoy the constitutional protection of the dormant Commerce Clause. Indeed, it is difficult to imagine Congress more clearly announcing that states are free to burden the national cannabis market in whatever way they see fit than by Congress criminalizing any actions to participate in such a market. Congress has thus spoken expressly to state that interstate commerce in cannabis "is not in the national interest" and is not protected by the dormant Commerce Clause. *Pic-A-State PA*, 42 F.3d at 179.

Plaintiffs disagree, relying largely on the First Circuit's opinion in *Northeast Patients Group v. United Cannabis Patients & Caregivers of Maine*, 45 F.4th 542 (1st Cir. 2022) ("*NPG*"). (*See* Br. 32-43.) In that case, the First Circuit struck down a Maine law requiring all officers and directors of licensed medical marihuana dispensaries to be Maine residents. 45 F.4th at 544, 558. That decision is both distinguishable from the present case and, to the extent its reasoning is applicable, wrongly decided.

### 2. *NPG* is distinguishable.

*NPG* is inapplicable to the present case because *NPG* concerned a regulation of the medical-use cannabis industry. *See* 45 F.4th at 544. Throughout its majority opinion, the First Circuit gave substantial weight to Congress's enactment of the Rohrabacher-Farr Amendment in 2015 (and in each appropriations act thereafter), which forbids the Department of Justice from using any appropriations funds "to prevent any of [the States] from implementing their own laws that authorize the use, distribution, possession, or cultivation of medical marijuana." *Id.* at 548 (quoting Consolidated Appropriations Act of 2022, Pub. L. No. 117-103, § 531, 136 Stat. 49 (2022)); *see also id.* at 547, 549, 551, 553-56 (discussing the significance of the Rohrabacher-Farr Amendment to the court's analysis).

Through this amendment, the First Circuit reasoned, Congress "has acknowledged the existence of a market in medical marijuana" and that "this market may continue to exist in some circumstances free from federal criminal enforcement and thus subject only to state regulation." *Id.* at 553. The court described medical marijuana as unlike "other goods that Congress has deemed contraband," where Congress "may be

35

understood to have criminalized a national market with no expectation that an interstate market would continue to operate." *Id.* Because Congress has "taken affirmative steps to thwart efforts by federal law enforcement to shut down that very market," *id.*, the court concluded that Congress had not expressly criminalized a national market in medical marihuana and thus did not place the medical marihuana industry beyond the reach of the domestic Commerce Clause's protections.

In contrast to medical marihuana, Congress has been unequivocal in its criminalization of adult-use cannabis for non-medical purposes. Congress has never prevented the Department of Justice from using its funding to prosecute individuals who manufacture, distribute, or dispense cannabis for non-medical purposes. Although individual members of Congress have introduced measures to insulate the adult-use cannabis industry from federal prosecution, Congress as a whole has rejected those efforts.[8] And, in fact, Congress's yearly inclusion of the Rohrabacher-Farr Amendment in appropriations bills, which excepts

---

[8] *See, e.g.*, Aris Folley, *House GOP Strips Language Aimed at Protecting Banks from Cannabis Crackdowns*, The Hill (June 13, 2024), https://thehill.com/business/budget/4721100-house-gop-strips-language-aimed-at-protecting-banks-from-cannabis-crackdowns.

*only* medical marijuana from DOJ enforcement, implicitly reiterates Congress's intent to enforce the law against interstate commerce of adult-use cannabis. *See, e.g.*, *Guo v. U.S. Dep't of Justice*, 422 F.3d 61, 64 (2d Cir. 2005) (applying principle of expressio unius est exclusio alterius). Thus with respect to adult-use cannabis apart from medical use, Congress "may be understood to have criminalized a national market with no expectation that an interstate market would continue to operate." *NPG*, 45 F.4th at 553.

Plaintiffs argue (Br. 36-37) that Congress has effectively sanctioned the adult-use cannabis market in an analogous manner to the Rohrabacher-Farr Amendment because Attorney General Merrick Garland was briefly questioned during his confirmation hearings about whether he would enforce the Controlled Substances Act against people in states that had legalized cannabis, and he opined that such enforcement was not the best use of DOJ's limited resources.

Plaintiffs err for multiple reasons. First, the questions asked by an individual legislator do not reflect the reasoning of the legislature as a whole and are thus insufficient to suggest Congress's sanctioning of a national adult-use cannabis market despite its criminal prohibition. *Cf.*

37

*United States v. O'Brien*, 391 U.S. 367, 384 (1968) ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork."); *Slattery v. Hochul*, 61 F.4th 278, 293 (2d Cir. 2023) (collecting cases). Second, the confirmation of Attorney General Garland would at most reflect the approval of the Senate, which is the only chamber that confirms presidential appointments. There is thus no basis to conclude that the Attorney General's confirmation after a brief comment about cannabis rises to the level of "tak[ing] affirmative steps to thwart efforts by federal law enforcement to shut down" the medical marihuana market that the Rohrabacher-Farr Amendment represented in *NPG*, 45 F.4th at 553.

### 3.  *NPG* is wrongly decided.

The reasoning of *NPG* is incorrect and should not be followed by this Court in any event. The First Circuit improperly concluded that the existence of an "established, *albeit illegal*, interstate market" for cannabis means that the market must be subject to the dormant Commerce Clause. 45 F.4th at 547 (quoting *Gonzales*, 545 U.S. at 18). But the relevant question under the dormant Commerce Clause is not whether a

38

market for a product exists, but rather whether Congress has indicated that preserving that national market serves the public interest. As Judge Gelpi explained in his dissent in *NPG*, "the law presumes the public interest is best served by maintaining an unencumbered 'national market for competition' in legal goods and services. However, it makes little sense to retain this presumption when Congress has explicitly acted to make the market in question illegal." *Id.* at 559 (Gelpi, J., dissenting) (citation omitted); *see also Pic-A-State PA*, 42 F.3d at 179 ("Where Congress has proscribed certain interstate commerce, Congress has determined that that commerce is not in the national interest.").

In the Controlled Substances Act, Congress expressed the view that a national market for cannabis was *not* in the public interest and therefore criminalized the acts that would produce a national cannabis market. Congress thus intended that *no one* would be allowed to enter the market for cannabis, which Congress has outlawed. Indeed, any state action aimed at protecting the parity on which individuals enter the illicit market in question would run contrary to Congress's purpose by facilitating entrance to a national market Congress expressly criminalized.

The First Circuit's opinion also incorrectly concluded that the Controlled Substances Act did not clearly express Congress's intent to exclude interstate commerce in adult-use cannabis from the protections of the dormant Commerce Clause. According to the First Circuit, "[n]othing on the face of the CSA purports to bless interstate discrimination in the market for medical marijuana." *NPG*, 45 F.4th at 554. But the Controlled Substances Act does not need to mention interstate discrimination to expressly state its aim. *See supra* p. 32. The First Circuit identified the McCarran Act, discussed in the Supreme Court's decision in *Prudential Insurance Co. v. Benjamin*, as a "notable instance[] of Congress blessing such interstate discrimination." *NPG*, 45 F.4th at 554. But the First Circuit did not identify anything "on the face" of the McCarran Act that "purport[ed] to bless interstate discrimination." And, indeed, nothing in the McCarran Act mentioned interstate discrimination. *See supra* p. 32.

Congress's passage of the Controlled Substances Act, like the McCarran Act considered in *Benjamin*, is sufficiently clear in expressing its intent to deny interstate commerce in adult-use cannabis the protections of the dormant Commerce Clause. Congress expressly intended to

40

prohibit any interstate market in controlled substances and deemed them contrary to the public interest. That is sufficient to remove the adult-use cannabis industry from the dormant Commerce Clause's protections. Indeed, it would defy logic to expect Congress to pass legislation specifically allowing discrimination in an interstate market where, as here, Congress has manifested its intent to prohibit *any* interstate market for that product whatsoever.[9]

The First Circuit's decision should not be followed for the additional reason that applying the dormant Commerce Clause to a product that is federally illegal would create absurd results that undermine the health and safety of the public. A ruling by this Court that the dormant Commerce Clause applies to interstate commerce in adult-use cannabis would prohibit New York from passing laws and regulations to prevent the importation and sale of adult-use cannabis produced in other states. *See, e.g., Dean Milk Co. v. City of Madison*, 340 U.S. 349, 352-56 (1951); *cf. Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 350-54

---

[9] Plaintiffs also rely on two district court cases that likewise concluded that the Controlled Substances Act did not specifically state that states could enact preferential laws for state residents. (Br. 46.) These cases are mistaken for the reasons outlined above.

(1977) (regulation prohibiting shipments of apples from bearing state variety and grade labels violated dormant Commerce Clause). But because cannabis is federally illegal, cannabis products are not subject to the federal Food and Drug Administration's product standards, labeling requirements, or inspections that ensure the safety and relative uniformity of foods and drugs being bought and sold in the national market. Accordingly, preventing a state from restricting the importation of cannabis from other states would deprive the people of uniform federal government protection from adulterated or unsafe products.

Moreover, cannabis remains largely or completely illegal in many states.[10] As a result, cannabis or cannabis products from those states will not be subject to *any* regulation in how they are produced, manufactured, tested, or labeled. *See* N.Y. Canbs. § 78; 9 N.Y.C.R.R. §§ 125.7-125.14, 128.1-128.7 (setting standards for testing and tracking of New York cannabis products). Nor will products and facilities in those states be regularly inspected to ensure adherence to health and safety regulations. *See* 9 N.Y.C.R.R. §§ 125.12, 133.3 (detailing site visits, inspections, and

---

[10] *See* Nat'l Conf. of State Legis., *State Medical Cannabis Laws* (June 4, 2024), https://www.ncsl.org/health/state-medical-cannabis-laws.

investigations in New York). Products from these unregulated sources are more likely contain harmful bacteria, heavy metals, and other contaminants dangerous to consumers.[11] States like New York that have legalized adult-use cannabis must be able to prohibit the importation or sale of cannabis from unregulated markets in order to ensure that cannabis products being sold are subject to appropriate regulations and inspections, thereby protecting the safety of the public. Applying the dormant Commerce Clause to cannabis would thwart such state efforts.

Plaintiffs contend that this Court should not consider the harmful effects described above because their case is not specifically about "cannabis products crossing state lines." (Br. 8, 47.) But the question before this Court is whether the dormant Commerce Clause applies to the interstate adult-use cannabis *industry*. *See, e.g.*, *Or. Waste Sys., Inc. v. Dep't of Envt'l Quality*, 511 U.S. 93, 98 (1994) (dormant Commerce Clause is concerned with "the interstate flow of articles of commerce"). If applicable, the dormant Commerce Clause would prohibit both the

---

[11] *See, e.g.*, Ashley Southall, *What's in New York's Illicit Cannabis: Germs, Toxins and Metals* (Dec. 1, 2022), https://www.nytimes.com/2022/12/01/nyregion/cannabis-bacteria-pesticides-illegal-dispensary.html; (*see also* JA 402-04).

restriction of importing cannabis across state lines and the requirement (found in New York's law) that cannabis sold within the state be grown and processed within the state. In both cases, the states are free to regulate because the federal Controlled Substances Act expresses congressional intent to exclude the adult-use cannabis market from the dormant Commerce Clause's protection.

### 4. Plaintiffs' remaining arguments are without merit.

Plaintiffs' remaining arguments in favor of applying the dormant Commerce Clause to adult-use cannabis are unpersuasive. First, plaintiffs argue that not applying the dormant Commerce Clause to the cannabis industry would reverse the standard presumption that state protectionism is not permitted absent congressional approval. (Br. 39.) Not so. Here, Congress has expressly stated its intent, through the Controlled Substances Act, that there be no interstate market for cannabis or other controlled substances. When Congress makes participation in an interstate market a crime, it broadcasts to the public that people are not entitled to participate in that interstate market at all, much less on equal terms under the constitutional protections of the dormant Commerce Clause.

44

Plaintiffs next suggest that "a protectionist cannabis licensing program does nothing to advance the goal of the Controlled Substances Act." (Br. 39.) But whether New York and Congress share a goal is irrelevant. The question is whether Congress expressed an intent to remove the interstate trade in adult-use cannabis from the dormant Commerce Clause's protections. When Congress declared interstate trade in adult-use cannabis unlawful, it did exactly that. And any state protectionist law does further the Controlled Substances Act's goal by preventing a more robust, interstate market in cannabis from forming and growing.

Plaintiffs also argue that the purpose of the dormant Commerce Clause is to prevent trade wars, which could happen in the adult-use cannabis industry. (Br. 41-42.) That may be so, but it is left to Congress to determine whether it is in the national interest to protect an interstate market in a particular good or whether the risk of a trade war over that good is acceptable. *See Sporhase*, 458 U.S. at 960; *Zook*, 336 U.S. at 733; *Pic-A-State PA*, 42 F.3d at 179. And Congress has chosen in several instances to exempt markets from the dormant Commerce Clause despite risk of a resulting trade war. *See, e.g.*, *Benjamin*, 328 U.S. at 429. So too

here. It is unsurprising that when Congress has decided that no market for a good should exist at all, Congress is unconcerned about the prospect of trade war over the outlawed product.

Plaintiffs next assert (Br. 43-44) that the Seventh Circuit "indicat[ed] that the dormant Commerce Clause applies to cannabis" in *Finch v. Treto*, 82 F.4th 572 (7th Cir. 2023). The Seventh Circuit did no such thing. In *Finch*, the court concluded that plaintiffs' requested relief had become moot and that equitable considerations prevented unwinding Illinois's licensing program. 82 F.4th at 578-79. The court had no occasion to consider the applicability of the dormant Commerce Clause and expressly denied doing so. *Id.* at 577-78.

In sum, the district court did not abuse its discretion in concluding that the dormant Commerce Clause does not apply to the interstate trade of federally prohibited goods. Plaintiffs thus cannot demonstrate a likelihood of success on the merits of their claim.

## C.  New York's Cannabis Licensing Comports with the Dormant Commerce Clause

Because the district court concluded that the dormant Commerce Clause does not apply to a national market that Congress has expressly

46

outlawed, it did not need to reach defendants' alternative argument that New York's cannabis licensing is consistent with the dormant Commerce Clause. If this Court concludes that the dormant Commerce Clause applies to federally prohibited markets, it should affirm the district court's decision on the alternative ground that plaintiffs have not demonstrated a likelihood of success on the merits because New York's licensing scheme is constitutional.

If a state law clearly discriminates against out-of-state goods or economic actors protected by the dormant Commerce Clause, the law must be narrowly tailored to advance a legitimate local purpose. *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 518 (2019). A law may be "clearly discriminatory" against out-of-state economic actors in three ways: (1) by discriminating against interstate commerce on its face, (2) by having a discriminatory purpose, or (3) by discriminating in effect. *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 48 (2d Cir. 2007). A law discriminates if it applies "differential treatment" to "in-state and out-of-state economic interests that benefit the former." *Id.* at 47 (citation omitted). To demonstrate discrimination, a plaintiff must "identify an[] in-state commercial interest that is favored, directly or indirectly, by the

challenged statutes at the expense of out-of-state competitors." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 169 (2d Cir. 2005) (cleaned up).

In contrast, if a law only "incidentally burdens interstate commerce," it is subject to a permissive balancing test "and will be struck down if the burden imposed on interstate commerce clearly exceeds the putative local gains." *Town of Southold*, 477 F.3d at 47; *see also Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). This permissive test, known as the *Pike* balancing test, acknowledges that it is "unavoidable" that state laws will interfere with interstate commerce whenever a state "legislates to safeguard the health and safety of its people." *City of Philadelphia*, 437 U.S. at 623-24. An incidental burden on interstate commerce will be found to exist only if a law "impose[s] a burden on interstate commerce that is qualitatively or quantitatively different from that imposed on intrastate commerce." *Town of Southold*, 477 F.3d at 50 (citations omitted).

Neither of the requirements challenged by plaintiffs discriminates facially, in purpose, or in effect, and both survive the *Pike* balancing test.

48

### 1. New York Cannabis Conviction

The requirement that applicants for "extra priority" have a conviction under New York's prior criminalization of cannabis does not discriminate against out-of-state economic interests on its face, in its purpose, or in effect. When New York passed the MRTA, it did so in recognition of the harm done by its prior laws criminalizing marihuana, including their selective enforcement and the collateral consequences such as incarceration and lack of employment opportunities caused by a criminal marihuana conviction. N.Y. Canbs. § 2; (*see also* JA 327-30). The State thus sought to ameliorate those injuries by granting anyone harmed by New York's prior criminalization of marihuana a slight advantage in the licensing process for adult-use cannabis, thereby allowing harmed individuals to benefit economically from New York's new, lawful cannabis market. The State's purpose of rectifying the harm caused by its own prior laws and enforcement bears no relationship to the protectionism that runs afoul of the dormant Commerce Clause.

Nor does New York's conviction requirement discriminate on its face. The Cannabis Law and regulations fulfill their remedial purpose without inquiring whether the individual applying for a license currently

49

lives in New York or, indeed, has *ever* lived in New York. Any individual applying for a license, regardless of their state of residence, will be eligible for extra priority if they were convicted of a New York cannabis offense and will be ineligible if they did not. Put another way, plaintiffs would not qualify for "extra priority" if their majority-owners, who were convicted of cannabis offenses under California law (JA 112-13), moved to New York and became state residents, even though plaintiffs would then be considered in-state economic actors for purposes of the dormant Commerce Clause. *See Pryor*, 425 F.3d at 169. And a business whose majority owner was convicted under New York law will qualify for "extra priority" even if that owner lives in California (like plaintiffs' majority owners) despite that business being an out-of-state competitor in the dormant Commerce Clause's view. *See id.* New York's laws thus bear no resemblance to the laws that have been invalidated in other dormant Commerce Clause challenges to cannabis licensing schemes, all of which have either required that owners of the business seeking a license live in the licensing state or have given preference to such resident-owned businesses. *See NPG*, 45 F.4th at 544, 546; *NPG, LLC v. City of Portland*, 2020 WL 4741913, at *2 (D. Me. Aug. 14, 2020); *Toigo v. Dep't of Health*

50

& *Senior Servs.*, 549 F. Supp. 3d 985, 988 (W.D. Mo. 2021); *Lowe v. City of Detroit*, 544 F. Supp. 3d 804, 806 (E.D. Mich. 2021); (*see also* Br. 33-40, 46 (citing same)).

The New York conviction requirement also does not discriminate in effect. At the very least, plaintiffs have not met their burden of demonstrating such discrimination by proffering relevant evidence, as is required to receive a preliminary injunction. *See Mazurek*, 520 U.S. at 972; *JBR, Inc.*, 618 F. App'x at 33. Before the district court, plaintiffs did not offer any evidence demonstrating that New York's requirement will have a discriminatory effect by favoring in-state economic interests over out-of-state economic interests. Instead, plaintiffs relied on the mere assertion that the conviction requirement will disproportionately favor applicants who are New York residents. (*See* JA 114 (relying solely on complaint's allegations to show discrimination).)

Plaintiffs are wrong and, at a minimum, have not met their burden. An individual need not be a current resident of New York to have a marihuana-related conviction under state law. Individuals may have been convicted of a New York marihuana-related offense while previously living in the state, attending college there, commuting to New York for

51

work, visiting New York on vacation, or passing through one of New York's international airports or other transit facilities where people and bags are subjected to drug searches. (JA 327.) And because an applying business also receives extra priority if the owner's *relative* has a conviction, a qualifying business may be owned by an individual who has never even set foot in New York. Accordingly, it is far from clear that the conviction requirement will have the effect of favoring businesses owned by *current* New York residents over other businesses. At the very least, plaintiffs have not met their burden of demonstrating discrimination for purposes of a preliminary injunction.

At most, then, the conviction requirement is an incidental burden on interstate commerce. And under the *Pike* balancing test, the New York conviction requirement is constitutional because any incidental burden on interstate commerce does not clearly exceed local benefits. It is not clear that there is *any* incidental burden on interstate commerce at all: an incidental burden on interstate commerce is a burden that "exceed[s] the burden on intrastate commerce," and thus, at a minimum, the challenged law "must impose a burden on interstate commerce that is qualitatively or quantitatively different from that imposed on intrastate

commerce." *Town of Southold*, 477 F.3d at 50 (citations omitted). Here, the burden on a person who has not been convicted of a New York marihuana offense is exactly the same whether the person resides in New York or out of state: namely, the person either does not receive "extra priority" in the random ordering of its application, or the person must go into business with an individual who has such a conviction. But even if some incidental burden on interstate commerce existed, it would be minor in comparison to the local public benefit of addressing the severe collateral consequences of New York's prior marihuana laws and enforcement. *See* N.Y. Canbs. § 2; (JA 327-30).

### 2. Community Disproportionately Impacted

The requirement that an applicant must have resided in a community disproportionately impacted by cannabis prohibition to qualify for "extra priority" also does not violate the dormant Commerce Clause. The law does not discriminate on its face, in its purpose, or in effect. Crucially, OCM grants extra priority to an applying business whose owner lived in a community disproportionately impacted by cannabis anywhere in the country. (JA 307-09, 322-26.)

Plaintiffs nevertheless argue that the CDI requirement violates the dormant Commerce Clause by having a discriminatory effect on out-of-state residents. Namely, plaintiffs argue that the types of proof OCM requires to show residency in a CDI favored New York applicants (Br. 15, 28) and that OCM does not provide enough information for out-of-state residents to know whether they lived in a CDI (Br. 16-17). As an initial matter, plaintiffs lack standing to challenge either requirement because they do not (and cannot) allege that they will be injured by them. Plaintiffs uploaded acceptable proof of their residency in a CDI by providing California driver's licenses and other documents verifying their California addresses. (JA 308-09.) And plaintiffs were both able to certify that their majority owners resided in CDIs in Los Angeles for the requisite length of time by relying on guidance issued by the City of Los Angeles regarding the city's disproportionately impacted areas. (JA 325; *see also* JA 112-13 (plaintiffs relying on City of Los Angeles's designations).) In any event, plaintiffs' arguments lack merit.

First, contrary to plaintiffs' assertion, OCM does not require documents from New York State to qualify for a license. OCM's website listed 19 categories of documents that could be uploaded to demonstrate

residency, including driver's licenses, state or federal tax filings, leases, and pay stubs. (JA 307-08, 314, 324.) Although OCM's list used New York State documents as examples for some categories, OCM accepts analogous documents issued by other states as well. (JA 308-09.) In any event, OCM's list of acceptable documents includes a catch-all provision labeled "[a]ny other proof of residency subject to Office approval" under which applicants could submit documents issued by another state. (JA 314.)

Second, OCM provides sufficient information for applicants to demonstrate that they resided in a CDI in a state outside of New York. OCM has provided detailed guidance on how applicants can demonstrate that areas of other states are CDIs sufficient to qualify for "extra priority." (JA 322-24.) In addition, as plaintiffs themselves acknowledge, there are numerous publicly available documents and databases indicating whether communities around the country have been disproportionately impacted by cannabis criminalization. (Br. 17; *see also* JA 304-05, 325-26.) In light of OCM's detailed instructions and the availability of lists and databases identifying CDIs across the country, there is no basis to believe that a prospective license applicant would be unable to demonstrate that they lived in an out-of-state CDI that would qualify for

"extra priority" under New York's licensing scheme. Here again, plaintiffs have offered no evidence to demonstrate that OCM's available guidance will have a discriminatory effect in who receives cannabis licenses.

Accordingly, plaintiffs have failed to demonstrate that OCM's CDI requirement discriminates in violation of the dormant Commerce Clause, or even that it incidentally burdens interstate commerce. And, even if plaintiffs could demonstrate such an incidental burden, it would survive under the *Pike* test. At most, the CDI requirement obligates individuals who lived in a CDI in another state to follow OCM's instructions for determining that their community was a CDI or find and use one of the available tools produced by other states and nonprofits. That minor inconvenience does not "clearly exceed[] the putative local gains" achieved by ensuring that individuals most harmed by New York's prior criminalization of marihuana have a chance of sharing in the economic benefits of the State's adult-use cannabis market. *Town of Southold*, 477 F.3d at 47.

Because plaintiffs failed to demonstrate that New York's licensing regulations or practices violate the dormant Commerce Clause, they have

56

likewise failed to demonstrate a likelihood of success on the merits sufficient for a preliminary injunction. This Court should therefore affirm the district court's decision.

## POINT II

### PLAINTIFFS FAILED TO ESTABLISH THAT THEY WOULD SUFFER IRREPARABLE INJURY ABSENT A PRELIMINARY INJUNCTION

Plaintiffs did not establish before the district court that they would suffer irreparable harm absent a preliminary injunction, and nothing in their brief to this Court provides a basis to conclude otherwise now. The likelihood of irreparable injury absent a preliminary injunction is "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (per curiam) (alteration in original) (citation omitted). Plaintiffs' harm must be "actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Pryor*, 481 F.3d at 66. Plaintiffs have shown no such harm.

Plaintiffs primarily argue that a violation of the dormant Commerce Clause is *per se* irreparable harm. (Br. 49-50.) To be sure, the violation of a constitutional right may be an irreparable injury

57

warranting imposition of a preliminary injunction. However, as this Court has recognized, if plaintiffs "fail[] to demonstrate a likelihood of success on their . . . constitutional claims, their asserted harm is not of a constitutional dimension." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 294 (2d Cir. 2021). In that case, plaintiffs "fail to meet the irreparable harm element simply by alleging an impairment" of a constitutional right. *Id.* Thus because plaintiffs failed to demonstrate a likelihood of success on the merits, *see supra* pp. 19-57, the district court correctly concluded that they had likewise not demonstrated a likely irreparable injury from an alleged constitutional violation.

Moreover, even if plaintiffs *could* demonstrate that they are likely to suffer a constitutional deprivation that is itself an irreparable injury, plaintiffs have not met their burden of demonstrating that such harm is actual and imminent. Prior to May 10, 2024, OCM had announced that 450 dispensary licenses would be available for applicants on the December Queue. Yet even with "extra priority," plaintiffs' highest positions in the Queue were 816 and 949 respectively. (JA 528.) OCM would almost certainly not have reviewed either application before the available licenses were already awarded, and in any event, OCM would

58

not have reviewed plaintiffs' applications "imminently." After the Board's May 10 change in policy, it is even more uncertain whether plaintiffs' applications will ever be reviewed even with their more favorable "extra priority" rankings. And because OCM will not review any December Queue applications until it has reviewed and processed the nearly 1,800 applications in the November Queue, there is little to no chance of OCM reviewing plaintiffs' applications in the near future. As a result, plaintiffs cannot demonstrate that an irreparable injury is imminent absent immediate injunctive relief.

Plaintiffs' other alleged irreparable injuries are equally unavailing. First, plaintiffs claim (at 51-52) that absent a preliminary injunction, the Board will issue all available licenses and moot this case. But as explained above, OCM will not begin reviewing the December Queue for a significant period of time because it must first process nearly 1,800 applications on the November Queue. Moreover, as defendants represented in an earlier filing to this Court, pursuant to a final judgment instructing that plaintiffs are entitled to licenses, defendants can make two additional licenses available irrespective of the licenses available for the December Queue. *See* Def. Opp. to Mot. to Expedite at 2, ECF No. 23.

59

Second, plaintiffs cannot demonstrate an irreparable injury from a delay in entering the cannabis market. (*See* Br. 55.) As the district court recognized, at the time plaintiffs moved for a preliminary injunction, there were approximately 70 dispensaries opened after receiving CAURD licenses. (SA 29.) Today, that number is 141.[12] There are hundreds more CAURD licensees in the process of opening their dispensaries. (JA 395.) And there are 1,799 microbusiness and dispensary applicants on the November Queue who, if qualified, will receive licenses before plaintiffs regardless of the outcome of this case. In short, there is no possibility that plaintiffs will enjoy the "first mover" advantages that other courts have considered in granting preliminary injunctions. (*See* Br. 55-56.)

Third, plaintiffs are not entitled to a preliminary injunction based on the alleged irreparable injury of being completely excluded from New York's cannabis market. (Br. 53.) Because plaintiffs' applications will not be reviewed in the near future, plaintiffs cannot demonstrate that their exclusion from the market is imminent. Nor can they demonstrate that such exclusion is likely because it is not yet clear how many licenses will

---

[12] *See Dispensary Location Verification* (2024), https://cannabis. ny.gov/dispensary-location-verification.

be available for December Queue applicants. Nor is there reason to believe that the December Queue will be the only opportunity for businesses to apply for dispensary licenses. The district court did not clearly err when it similarly discounted this risk. (*See* SA 29.)

Moreover, even if plaintiffs had demonstrated that they may suffer any of the irreparable injuries described above absent a preliminary injunction, a preliminary injunction is nevertheless unwarranted because plaintiffs unreasonably delayed moving for temporary relief. As the district court recognized (*see* SA 29-30), plaintiffs' lengthy delay in bringing suit demonstrates "at least a reduced need for such drastic, speedy action" as a preliminary injunction. *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985); *see also Hirschfeld v. Bd. of Elections*, 984 F.2d 35, 39 (2d Cir. 1994) (court "would not generally entertain willfully delayed eleventh hour motions for preliminary relief"); *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) ("A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm."); *Oakland Trib., Inc. v. Chron. Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir.

1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm.").

Here, plaintiffs delayed bringing suit for more than a year after initial publication of the adult-use dispensary licensing regulations (JA 418), more than eight months after OCM released revised versions of those regulations (JA 419), and over four months after those regulations were adopted and OCM issued guidance documents explaining the licensing requirements in detail (JA 419). Plaintiffs brought suit only after the adult-use licensing application window had closed and OCM was days away from beginning to process applications. (JA 419.) This is precisely the type of "eleventh hour motion[] for preliminary relief" that this Court has not countenanced because any irreparable injury is primarily a result of plaintiffs' own delay. *See Hirschfeld*, 984 F.2d at 39.

Plaintiffs argue that they did not delay bringing this suit because they were unaware of New York's regulations until October 2023. (Br. 26, 28, 58-59.) As an initial matter, plaintiffs rely on an affidavit of Jeffrey Jensen as their sole evidence to support this contention. (*See* Br. 26-28, 58.) But that affidavit was not before the district court when it was considering plaintiffs' motion for a preliminary injunction. Rather, it was

submitted in opposition to a separate motion to dismiss after the district court had denied plaintiffs' motion for a preliminary injunction and plaintiffs had appealed to this Court. (*Compare* JA 563-67 (Jensen affidavit sworn February 13, 2024 and filed February 14, 2024), *with* SA 3-33 (order denying preliminary injunction issued February 2, 2024).) The district court did not clearly err in its factual findings when it did not credit facts plaintiffs had not offered or supported with evidence.

In any event, the district court would have acted well within its discretion in discounting plaintiffs' alleged lack of knowledge about OCM's regulations because plaintiffs' minority owner and counsel in this case has been litigating whether the Cannabis Law's conviction requirement satisfies the dormant Commerce Clause since September 2022 in connection with a separate business. *See, e.g.*, Complaint ¶ 15, 18, 23, *Variscite NY One, Inc. v. State of New York*, No. 22-cv-01013 (N.D.N.Y. Sept. 26, 2022), ECF No. 1. Moreover, plaintiffs' owners were reasonably expected to apprise themselves of the applicable laws and regulations that would apply to their prospective business. Their apparent failure to do due diligence regarding New York's cannabis regulations for over a

year, doing so only when the window to apply for adult-use licenses had already opened, is not a valid excuse for their delay in filing.

Likewise, to the extent plaintiffs allege that they could not have brought suit until they were incorporated on November 30, 2023 (Br. 28, 58-59), plaintiffs do not, and cannot, demonstrate that this constitutes a justifiable delay. When OCM issued proposed adult-use regulations in 2022, prospective dispensary owners were on notice that they would need to be prepared to apply for licenses in the relatively near future. All the more so when the Board finally adopted regulations in September 2023 and the application window was announced. Plaintiffs decided to form corporate entities with only a handful of days left in the application window, more than a year after the regulations were proposed and months after the application window was announced. Plaintiffs' alleged irreparable injury is thus due to their owners' own unreasonable actions and does not warrant the extraordinary remedy of a preliminary injunction.

# POINT III

## PLAINTIFFS FAILED TO ESTABLISH THAT THE BALANCE OF EQUITIES TIPS IN THEIR FAVOR

The district court did not abuse its discretion in concluding that the balance of equities tips in defendants' favor. The uncontroverted record evidence demonstrates that the consequences to third parties and the public of a preliminary injunction far outweigh any risk of injury to plaintiffs absent relief. The Supreme Court has warned that "courts of equity should pay particular regard [to] the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (citation omitted). Plaintiffs' requested preliminary injunction would grind New York's nascent cannabis industry to a halt and threaten the financial stability of thousands of participants in that industry.

First, an injunction would harm provisional CAURD licensees and adult-use license applicants on the November Queue. The majority of provisional CAURD licensees hold leases with monthly rental payments, and many have invested money in renovating their spaces. (JA 395-96.) OCM estimates that provisionally licensed CAURDs have payable expenses over $295 million. (JA 396-97.) An injunction would prevent these provisional CAURDs from receiving final licenses that would

permit them to open their dispensaries. Accordingly, a preliminary injunction would leave hundreds of licensees without any possibility of recouping their substantial expenses and would be financially ruinous for operators who are unlikely to be able to access capital to sustain their businesses without any source of revenue. (JA 396-97.) Likewise, the 1,799 applicants on the November Queue were required to apply with proof of control over a property, and a preliminary injunction would leave these applicants paying monthly rent indefinitely while being unable to make money through cannabis sales, threatening their financial solvency. (JA 400-01.)

Plaintiffs accuse the district court of committing clear error in its analysis of the harms CAURD licensees would face if a preliminary injunction were granted because "[a]pellants did not ask the court to enjoin CAURD applicants whose dispensaries were open." (Br. 61-62.) But the potential injuries to provisional CAURD licensees outlined above and credited by the district court relate to dispensaries that have not yet opened. These licensees have expended substantial amounts of money preparing their dispensaries to open and must pay monthly expenses like rent, insurance premiums, and other business costs regardless of

66

whether their dispensaries are open. A preliminary injunction would prevent them from opening, resulting in provisional CAURD licensees' costs continuing to soar while they are unable to earn any money.

Plaintiffs also argue that the district court mistakenly denied a preliminary injunction with respect to adult-use licenses on the basis of harms that would be suffered by CAURD licensees. (Br. 61.) The district court did no such thing. It considered the harms that both provisional CAURD licensees and adult-use applicants would suffer if plaintiffs' requested preliminary injunction were granted. (SA 32.) In any event, the harms CAURD licensees would face overlap with potential injuries to adult-use applicants on the November Queue who, like CAURD licensees, have leased premises for their businesses. Accordingly, the documented evidence of the harms CAURD licensees would face sheds light on the similar harms that would befall adult-use applicants.

Second, a preliminary injunction would harm other adult-use applicants on the December Queue. A preliminary injunction would leave these individuals in indefinite limbo over the status of their businesses. (JA 400-01.) A preliminary injunction would be particularly unjust for the more than 800 applicants on the December Queue who received more

67

favorable positions in the queue than plaintiffs' "extra priority" numbers. (*See* JA 528 (listing plaintiffs' most favorable positions in the December Queue as 816 and 949 respectively).) These businesses would have their applications reviewed for licensure before plaintiffs even if plaintiffs were granted "extra priority" in the queue. A preliminary injunction would create undue uncertainty for hundreds of businesses about their futures and expose their owners to the types of harms described above faced by CAURD licensees and applicants on the November Queue.

Third, a preliminary injunction would harm the 277 licensed cannabis growers in New York, who grew their most recent cannabis crop with the expectation that approximately 1,000 dispensaries would be open in 2024. (JA 398.) These cultivators produced over 100,000 pounds of cannabis in 2023 and require a sufficient number of dispensaries to purchase their crop. (JA 398.) Many licensed producers are limited to a single harvest per calendar year, making it critically important to their livelihood to secure a return on their investment once their product is ready for sale. (JA 398-99.) An injunction would prove a devastating financial blow to growers who live off the once-a-year post-harvest sale of their product and have cascading effects across the supply chain. (JA

399.) And if growers cannot make money off their current harvest of cannabis, many are likely to choose not to grow cannabis next season, destabilizing the cannabis market and limiting the number of processors and dispensaries that the Board can license. (JA 399.)

Plaintiffs argue (at 64) that these cultivators will not suffer harm because there are 70 retail dispensaries open. Those currently open dispensaries will not purchase the entire amount of cannabis grown in anticipation of 1,000 dispensaries being open. Nor are direct sales to the public (*see* Br. 65) sufficient to replace the demand of commercial retailers.[13] And in light of drastic financial costs that prior injunctions of the cannabis industry caused to growers, another injunction could convince cultivators to leave the cannabis market entirely due to the resulting uncertainty.

Fourth, the requested injunction would harm cannabis industry employees and would likely force licensees to lay off staff, or cause difficulty in recruiting and retention with the cloud of uncertainty of an injunction. (JA 397-98.)

---

[13] In any event, the Cannabis Grower Showcase program plaintiffs reference has now closed and cannot easily be restarted.

69

Fifth, an injunction would harm property owners and landlords. With over 1,000 retail storefronts expected to be licensed in 2024, plus several hundred producer licenses for cultivators, processors, distributors, and microbusinesses, prospective cannabis businesses have spent months scouting for properties and negotiating leases. (JA 401-02.) And because of zoning restrictions for cannabis dispensaries, licensees have been willing to pay significant premiums for property. (JA 402.) Thus even if property owners find alternative renters, it will likely come at significant loss.

Plaintiffs argue that landlords would not be injured by an injunction of only the December Queue because these applicants were not required to secure leases to apply. (Br. 63.) That misunderstands the argument. Even for property owners who do not have an existing tenant in the cannabis industry, dispensaries represent lucrative potential lessees, particularly with the state's commercial real estate market reeling after the COVID-19 pandemic. (JA 401.) A preliminary injunction would prevent businesses on the December Queue from moving forward with preparations to open their dispensaries, including securing leases for commercial property.

70

Sixth, a preliminary injunction would harm members of the public by allowing the illicit cannabis market to thrive. Licensed dispensaries displace illegal stores. (JA 402-04.) And illegal dispensaries are a threat to the public. These stores do not adhere to public health and safety regulations and sell cannabis that may contain contaminants or harmful additives. (JA 403.) Absent a sufficient number of licensed dispensaries across the state, illicit stores will continue to thrive, and members of the public may be more likely to knowingly or unknowingly purchase cannabis from these unlicensed stores, exposing them to danger. (JA 404.)

Finally, a preliminary injunction would deprive the State of tax revenue, which is intended to be used to fund education, public health initiatives, and enforcement against unlicensed cannabis activities. (JA 404-05.)

A preliminary injunction would thus be ruinous for participants in New York's cannabis industry, property owners, and the public. The district court did not abuse its discretion in concluding that a preliminary injunction was unwarranted.

# CONCLUSION

The decision of the district court should be affirmed.

Dated: Albany, New York
      July 8, 2024

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Appellees

By:   */s/ Alexandria Twinem*
    ALEXANDRIA TWINEM
    Assistant Solicitor General

BARBARA D. UNDERWOOD
  *Solicitor General*
JEFFREY W. LANG
  *Deputy Solicitor General*
ALEXANDRIA TWINEM
  *Assistant Solicitor General*
    *of Counsel*

The Capitol
Albany, New York 12224
(518) 776-2042

72

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Alexandria Twinem, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 13,512 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

*/s/ Alexandria Twinem*