24-384-cv
*Variscite NY Four, LLC v. New York State Cannabis Control Board*

# United States Court of Appeals
# for the Second Circuit

AUGUST TERM 2024

No. 24-384-cv

VARISCITE NY FOUR, LLC, VARISCITE NY FIVE, LLC,
*Plaintiffs-Appellants,*

*v.*

NEW YORK STATE CANNABIS CONTROL BOARD, NEW YORK STATE
OFFICE OF CANNABIS MANAGEMENT, TREMAINE WRIGHT, FELICIA
REID, FKA CHRISTOPHER ALEXANDER,
*Defendants-Appellees.*

ARGUED: DECEMBER 19, 2024
DECIDED: AUGUST 12, 2025

Before:     LIVINGSTON, Chief Judge, JACOBS, and
            CALABRESI, Circuit Judges.

Plaintiffs-Appellants sought licenses to operate marijuana

dispensaries in New York, and challenge the state's licensure

procedure as violative of the dormant Commerce Clause.   Under the

challenged laws, applicants for dispensary licenses have superior

1   odds of obtaining a license if they (or their close relatives) have a

2   conviction for a marijuana-related offense under New York law.

3        The U.S. District Court for the Northern District of New York

4   (Narducci, *J.*) denied preliminary relief on the ground that the

5   dormant Commerce Clause does not apply to markets that Congress

6   has criminalized.

7        New York argues that its scheme does not violate the dormant

8   Commerce Clause because its purpose is restorative justice, not

9   economic protectionism; that in any event, the Clause does not bear

10  upon its licensure scheme because marijuana is a federally illegal

11  drug, *see* 21 U.S.C. § 812(c)(Schedule I)(c)(10); and that Plaintiffs-

12  Appellants have no justiciable challenge.

13       We hold that Plaintiffs-Appellants have standing to challenge

14  certain of New York's licensing practices under the dormant

15  Commerce Clause, and that their suit is ripe; that the dormant

16  Commerce Clause applies and Congress has given New York no clear

17  permission to enforce protectionist marijuana licensing laws; and that

1    New York's prioritization of applicants with convictions under New

2    York law is a protectionist measure that cannot stand.

3              **VACATED** and **REMANDED**.

4              Chief Judge Livingston dissents in part in a separate opinion.

5

6

7                                    JEFFREY M. JENSEN, Jeffrey M.
8                                    Jensen, PC, Beverly Hills, CA,
9                                    *for Plaintiffs-Appellants*.

10

11

12                                   ALEXANDRIA TWINEM (Barbara
13                                   D. Underwood and Jeffrey W.
14                                   Lang, *on the brief*), for Letitia
15                                   James, Attorney General of the
16                                   State of New York, Albany,
17                                   NY, *for Defendants-Appellees*.

1    DENNIS JACOBS, *Circuit Judge*:

2          The plaintiffs, LLCs that are majority-owned by California

3    residents, have applied for licenses to operate marijuana dispensaries

4    in New York.   They challenge the state's licensure procedure as

5    violative of the dormant Commerce Clause.   The state argues that

6    this case is nonjusticiable, and that the plaintiffs' challenge fails on the

7    merits.

8          New York law provides that any person may apply "for a

9    license to cultivate, process, distribute, deliver or dispense"

10   marijuana in New York "for sale."   However, the line is long, and

11   New York gives special priority to anyone who:

12         (a) is a member of a community disproportionately impacted

13         by the enforcement of cannabis prohibition;

14         (b) has an income lower than eighty percent of the median

15         income of the county in which the applicant resides; *and*

16         (c) was convicted of a marihuana-related offense prior to

17         [March 31, 2021], or had a parent, guardian, child, spouse, or

18         dependent, or was a dependent of an individual who, prior to

4

1    [March 31, 2021], was convicted of a marihuana-related

2    offense."

3    NY Canbs. § 87(3) (emphasis added).   The third requirement is

4    implemented by a regulation that defines a "marihuana-related

5    offense" as one arising under *New York's* former marijuana

6    prohibitions.   That is, to qualify for priority review, applicants (or

7    their close relatives) must have a conviction *under New York law*,

8    specifically.   All other offenders end up at the back of the line.

9        New York argues (in summary): [1] that its scheme does not

10   violate the dormant Commerce Clause because its purpose is

11   restorative justice, not economic protectionism; [2] that in any event,

12   the Clause does not bear upon its licensure scheme because marijuana

13   is a federally illegal drug, *see* 21 U.S.C. § 812(c)(Schedule I)(c)(10); and

14   [3] that these plaintiffs' have no justiciable challenge.

15       The U.S. District Court for the Northern District of New York

16   (Narducci, *J.*) denied preliminary relief on the ground that the

17   dormant Commerce Clause does not apply to markets that Congress

18   has criminalized.

5

1    That was error.   The dormant Commerce Clause prohibits

2    state protectionism unless Congress clearly authorizes specific

3    protectionist laws.   The only thing Congress has clearly authorized

4    by criminalizing marijuana is federal prosecution for the

5    manufacture, distribution, and possession of marijuana.   Congress

6    has given New York no clear permission to favor its residents over

7    others whose businesses skirt the federal drug laws.   Under

8    traditional dormant Commerce Clause principles, New York's

9    prioritization of applicants with convictions under New York law is a

10   protectionist measure that cannot stand.   Since the district court

11   premised its denial of preliminary relief on its conclusion that New

12   York's marijuana laws could not violate the dormant Commerce

13   Clause, we vacate and remand.

14                                    **I.**

15   New York is one of the many states that have recently

16   "legalized adult use of marijuana" under their state law.   *United*

17   *States v. Francis*, 77 F.4th 66, 73 (2d Cir. 2023).   New York's Marijuana

18   Regulation & Taxation Act ("Cannabis Law"), enacted in 2021,

6

1    "legalize[d] adult use cannabis and regulate[d] its production,

2    manufacturing, distribution, and sale in New York."   *Variscite NY*

3    *Four, LLC v. New York State Cannabis Control Bd.*, No. 1:23-cv-01599

4    (AMN/CFH), 2024 WL 406490, at *2 (N.D.N.Y. Feb. 2, 2024); *see* N.Y.

5    Canbs. §§ 1, 3, 61-89.   The Cannabis Law establishes the Cannabis

6    Control Board and Office of Cannabis Management (the entity

7    defendants here).   *See* N.Y. Canbs. §§ 7-11.

8         New York has twice instituted application programs for retail

9    cannabis dispensary licenses.    First, from August through

10   September 2022, New York accepted applications under the

11   Conditional Adult-Use Retail Dispensary ("CAURD") Application

12   Program.    *See Variscite NY One, Inc. v. New York ("Variscite One")*, 640

13   F. Supp. 3d 232, 234 (N.D.N.Y. 2022), *reconsideration denied*, 2023 WL

14   1420662 (Jan. 31, 2023).   As a practical matter, only New Yorkers

15   could apply--qualifying applicants needed, among other things, "a

16   significant presence in New York"; to be "incorporated or otherwise

17   organized under the laws of New York"; or to be "majority . . .

7

1    owne[d]" by "residents of New York."   9 N.Y.C.R.R. § 116.1-.9 (as

2    effective August 3, 2022); *see Variscite One*, 640 F. Supp. 3d at 235.

3         In September 2022, Variscite One--a corporation with the same

4    "minority owner" as the appellants here, Appellants' Br. 27--sought a

5    preliminary injunction "restraining [New York officials] from issuing

6    any cannabis licenses under the [CAURD] application program" for

7    certain geographic areas.    *Variscite One*, 640 F. Supp. 3d at 234

8    (citation modified).    Variscite One challenged the presence or

9    residency requirement as violative of the dormant Commerce Clause.

10   *See id.*   The U.S. District Court for the Northern District of New York

11   (Sharpe, *J.*) agreed and in November 2022 granted Variscite One a

12   preliminary injunction.   *See id.* at 244.   The *Variscite One* litigation

13   settled thereafter.   In August 2023, other plaintiffs also obtained a

14   preliminary injunction restraining CAURD, this time on state law

15   grounds.   *See Carmine Fiore v. N.Y. State Cannabis Control Bd.*, No.

16   907282-23, slip op. at 1 (N.Y. Sup. Ct. Aug. 18, 2023).

17   Notwithstanding these barriers, New York has not shuttered

1    CAURD, and the state has managed to issue hundreds of licenses

2    under the program.    *See Variscite NY Four*, 2024 WL 406490, at *3.

3          Amid the challenges to CAURD, New York's Cannabis Control

4    Board in September 2023 adopted regulations for a new application

5    program that would be open to New Yorkers and out-of-state

6    applicants alike: the Adult Use application program.    The state split

7    the Adult-Use applicants into two pools, with a separate number of

8    licenses available to applicants in each pool.    The first application

9    pool (the "November Pool") was for applicants who could

10   "demonstrate proof of control" over a location for their dispensary.

11   JA522.    New York closed the November Pool on November 17, 2023.

12   Given the short turnaround between the announcement of the Adult

13   Use Application Program and the closing of the November Pool, it

14   stands to reason that applicants who could demonstrate proof of

15   control of a dispensary location by the November Pool deadline

16   would largely be those who had previously applied in the--dubious--

17   CAURD program.

1      All other applications were part of the second pool (the

2   "December Pool").   Of them, those who had secured locations could

3   apply for Adult Use licenses.   Those who did not yet have control of

4   a location could apply for a "provisional" Adult Use license, which

5   afforded additional time to secure a location.   New York closed the

6   December Pool on December 18, 2023.

7      Adult Use applicants understood they were competing for a

8   scarce good.   At the time the Adult Use application windows closed,

9   New York anticipated awarding only 250 dispensary licenses to

10  November Pool applicants and 450 to December Pool applicants.   To

11  determine the order of review--and (by extension) which of the

12  thousands of applicants could realistically obtain one of the few

13  licenses--New York randomly assigned applicants positions on the

14  November or December review queue (respectively, the "November

15  Queue" and the "December Queue").[1]

---

[1] We refer below to the November or December "Pool" when
discussing the group of applicants, and to the November or
December "Queue" when discussing the order in which New York
plans to review applications.

1    But the Adult Use program gave certain applicants a leg up.

2    Pursuant to the Cannabis Law and its implementing regulations, New

3    York must give an application "Extra Priority" if an applicant or its

4    majority owner (a) is a member of a community disproportionately

5    impacted by cannabis prohibition, (b) has an income lower than 80%

6    of the median income of the county in which the applicant resides,

7    *and* (c) either was convicted of a marijuana-related offense under New

8    York law prior to New York's decriminalization of marijuana or has

9    a close relative who was so convicted.    N.Y. Canbs. § 87(3)); 9

10   NYCRR § 121.1(k).    The Adult Use application program

11   implemented this requirement by assigning to any applicant who

12   claimed eligibility for Extra Priority *three* random positions in the

13   November or December Queue--that is, triple the chance at an early

14   slot.    New York would review an applicant's claim of entitlement to

15   Extra Priority when it reached that applicant's earliest queue position.

16                                   **II.**

17       Plaintiffs-Appellants Variscite NY Four, LLC ("Variscite Four")

18   and Variscite NY Five, LLC ("Variscite Five," and together with

                                    11

1  Variscite Four, "Variscite") applied for provisional Adult Use

2  Licenses in the December Pool.   Each claimed Extra Priority.   Their

3  majority owners lived for a number of years in "communities

4  disproportionately impacted by cannabis prohibition" in Los

5  Angeles; and the owners' incomes are lower than 80% of the median

6  income of Los Angeles County, where they reside.   However, these

7  owners boast marijuana convictions under California (not New York)

8  law, and thus fail to satisfy the third of the conjunctive Extra Priority

9  requirements.   *See* N.Y. Canbs. § 87(3)); 9 NYCRR § 121.1(k).

10  Because both Variscite Four and Variscite Five claimed Extra

11  Priority, each received three December Queue positions: 816, 2121,

12  and 3812 for Variscite Four; and 949, 2153, and 4147 for Variscite Five.

13  But New York has represented that without Extra Priority, for which

14  they do not qualify, Variscite Four and Variscite Five will inevitably

15  forfeit at least their most favorable positions in the December Queue.

16  On the same day that Variscite Four and Variscite Five

17  submitted their applications, they commenced this suit against New

18  York's marijuana regulators, alleging that the Adult Use program

12

1  preferred New Yorkers in violation of the dormant Commerce

2  Clause.    Three days later, Variscite moved for a temporary

3  restraining order and a preliminary injunction stopping New York

4  from issuing: (1) Adult Use licenses (to November or December

5  applicants) and (2) additional CAURD licenses.    *Variscite NY Four*,

6  2024 WL 406490, at *1.    After a hearing, the district court denied the

7  motion on February 2, 2024.    *Id.*    Variscite timely appealed.

8         New York has represented that, two months after Variscite

9  noticed this appeal, New York elected "to review all 1,799

10  microbusiness and dispensary applicants" from the November Pool

11  and "issue licenses to all qualified applicants."    N.Y. Br. 9-10.    This

12  displaced New York's announced plan to issue only 250 November

13  Pool licenses.    In turn, New York rescinded its previous projection

14  that 450 dispensary licenses would be available to December Pool

15  applicants such as Variscite.    New York represents that it plans to

16  complete its review of the November Queue before turning to the

17  December Queue.    The state will "share additional information

18  about the number of licenses it intends to issue from the December

13

1    queue once review of the November queue is farther along." *Id.* at

2    11.    But it is not looking good: the state is offering refunds of the

3    application fee to December Pool applicants who, after this

4    experience, may now wish to withdraw their applications.

5        Further complicating this picture, on December 12, 2024, New

6    York Supreme Court, Albany County preliminarily enjoined New

7    York from "processing any other *provisional* [adult-use license]

8    applications"--*i.e.*, December Pool applications by applicants who

9    had not secured locations for their dispensaries.    *Organic Blooms, LLC*

10   *v. N.Y. State Cannabis Control Bd.*, No. 904497-24, slip op. at 13 (N.Y.

11   Sup. Ct. Dec. 17, 2024) (emphasis added).    New York represents that

12   this preliminary injunction currently prevents it from processing

13   Variscite's license applications, as Variscite seeks only such

14   "provisional" licenses.

15                    **III.**

16       New York contends that this dispute is nonjusticiable because:

17   (1) Variscite lacks standing to challenge licensing under (a) the

18   CAURD program or (b) the November Pool of the Adult Use

14

1    program, since Variscite--which applied in the December Pool--did

2    not apply to CAURD or in the November Pool; and (2) Variscite's

3    constitutional challenges to the December Queue's Extra Priority

4    regime have, since the time of the district court decision, become

5    unripe because of the diminished chances of Variscite ever receiving

6    an Adult Use license from the December Pool.   We consider these

7    justiciability arguments *de novo*.   *Lacewell v. Off. of Comptroller of*

8    *Currency*, 999 F.3d 130, 140 (2d Cir. 2021).   For the reasons that

9    follow, this controversy is justiciable in part.

10         Standing to Challenge CAURD Applications.   Article III of the

11   Constitution limits federal court jurisdiction to cases in which the

12   plaintiff can show standing, *i.e.* "that she has suffered, or will suffer,

13   an injury that is concrete, particularized, and actual or imminent;

14   fairly traceable to the challenged action; and redressable by a

15   favorable ruling."   *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (citation

16   modified).   "At the preliminary injunction stage, . . . the plaintiff

1   must make a clear showing that she is likely to establish each element

2   of standing." *Id.* at 58.

3        Ordinarily, to establish standing to challenge an allegedly

4   discriminatory program, a plaintiff must make application. *Do No*

5   *Harm v. Pfizer Inc.*, 126 F.4th 109, 118 (2d Cir. 2025). "But a plaintiff

6   need not go through the motions of formally applying when that

7   would be a 'futile gesture.'" *Id.* (quoting *Int'l Bhd. of Teamsters v.*

8   *United States*, 431 U.S. 324, 365-66 (1977)). It is enough to

9   "demonstrate that they are able and ready to apply, but a

10   discriminatory policy prevents them from doing so on equal footing."

11   *Id.*

12        Neither Variscite Four nor Variscite Five can allege that it was

13   able and ready to apply to the CAURD program. They are LLCs that

14   were first organized no earlier than November 30, 2023, after the

15   CAURD application window closed in September 2022.

16        Variscite has not demonstrated standing to restrain the

17   issuance of CAURD licenses without itself having applied for one.

18   Variscite's sole objection is that issuing those licenses would violate

16

1    the Cannabis Law's directive that "the initial adult-use cannabis retail

2    dispensary license application period shall be opened for all

3    applicants at the same time."   NY Canbs. § 10(19).   But "Article III

4    standing requires a concrete injury even in the context of a statutory

5    violation."   *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021)

6    (quoting *Spokeo, Inc. v. Robins*, 578 U. S. 330, 341 (2016)).   Suits for

7    injunctive relief premised on avoiding future harm must allege at

8    least "a risk of future harm."   *Id.* at 435.

9         Variscite has not attempted to demonstrate that it is affected by

10   the issuance of CAURD licenses.   Presumably Variscite considers

11   CAURD applicants to be its competitors in the New York marijuana

12   market, but Variscite has not argued on appeal how the CAURD

13   program harms it even in this respect.   Variscite therefore has not

14   established its standing to challenge that program.

15        <u>Standing to Challenge November Pool Applications.</u>

16   Variscite asserts that its application in the December Pool gives it

17   standing to challenge the whole Adult Use application program,

18   including applications from the November Pool.    Moreover,

17

1    Variscite argues that the division of Adult Use applications into

2    November and December Pools was itself a burden on out-of-state

3    applicants that violated the dormant Commerce Clause, and that the

4    Adult Use program should be treated as a single program, so that

5    Variscite has standing to enjoin the issuance of any Adult Use license.

6        New York responds that the Adult Use program's November

7    and December Pools represent discrete application programs.

8    Because Variscite did not apply in the November Pool, New York

9    argues, Variscite lacks standing to challenge the issuance of

10   November Pool licenses.  Indeed, Variscite was scarcely able and

11   ready to apply in the November Pool, as Variscite Four and Variscite

12   Five were not organized until roughly two weeks after it closed.

13       New York is correct that the November Pool and December

14   Pool were discrete.  Applicants understood as much for at least a

15   month before the November Pool closed.  By no later than October

16   17, New York had announced the criteria for the November Pool,

17   including both its deadline and the requirement that applicants

18   already have control over premises for a dispensary.   The November

18

1    Pool and December Pool have a separate number of licenses available

2    to applicants, so that each applicant competes for a license only

3    against the other applicants in their pool.   The November Pool and

4    December Pool are therefore separate programs.

5        Because the November Pool and December Pool are distinct,

6    New York argues that Variscite--which applied only for December

7    Pool licenses--lacks standing to challenge November Pool licenses,

8    just as Variscite lacks standing to challenge CAURD licenses.   New

9    York claims that "the way in which the November Queue was

10   ordered for review and the awarding of licenses does not affect when

11   or whether [Variscite] receive[s] cannabis licenses on the separate

12   December Queue."   N.Y. Br. 23.   Consequently, New York argues,

13   the November application window does not injure Variscite in its

14   parallel competition for December licenses.

15       Not so.   In arguing that Variscite's challenge to the *December*

16   Pool is unripe, New York asserts that it "does not know how many

17   licenses will be available for retail dispensaries on the December

18   Queue and will not know until it has a clearer idea of *how many licenses*

19

1    *will be awarded to November Queue applicants* and how many more

2    dispensaries the State's cannabis market can sustain."   *Id.* at 26

3    (emphasis added).   Thus, Variscite's claims concerning *December*

4    licenses are said to be unripe precisely because New York may issue

5    too many *November* licenses--that is, New York's improper award of

6    up to nearly 1,800 November Pool licenses would reduce Variscite's

7    odds of obtaining a December license.   That threat of harm

8    distinguishes Variscite's challenge to November Pool licenses from its

9    challenge to CAURD licenses.

10          Nevertheless, Variscite lacks standing to challenge the

11   November Pool licensing scheme in its entirety.   *See Brokamp v.*

12   *James*, 66 F.4th 374, 389 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 1095 (2024).

13   "[S]tanding is not dispensed in gross."   *Id.* (quoting *Lewis v. Casey*,

14   518 U.S. 343, 358 n.6 (1996)).   Variscite posits no way that the

15   awarding of Extra Priority to certain November Pool applicants

16   injures Variscite.   No matter the order within the November Queue,

17   every November Pool application will still be reviewed before review

20

1    of Variscite's December Pool applications.    Variscite therefore

2    cannot challenge the internal ordering of the November Queue.

3    Variscite does, however, have standing to challenge the fact

4    that the November Pool will be processed before the December Pool.

5    Variscite contends that the barrier to entering the November Pool--

6    control over property in New York by an early deadline--itself

7    violated the dormant Commerce Clause.    Variscite plausibly

8    explains that this barrier was engineered to filter for former CAURD

9    applicants, and thus for New Yorkers.    On this theory, Variscite's

10    inability to apply in the November Pool was chiefly because Variscite

11    is not owned by New Yorkers.    Variscite has standing to make that

12    narrow argument.

13    <u>Ripeness Challenge to December Pool Applications.</u>    New

14    York (rightly) does not contest Variscite's standing to challenge the

15    Extra Priority regime for the December Queue.    Instead, New York

16    argues that Variscite's challenge to the issuance of December Pool

17    licenses is constitutionally and prudentially unripe.

1    "To be justiciable, a cause of action must be ripe--it must

2    present a real, substantial controversy, not a mere hypothetical

3    question." *Vill. Green at Sayville, LLC v. Town of Islip*, 43 F.4th 287, 293

4    (2d Cir. 2022) (citation omitted).   Ripeness has both a constitutional

5    and a prudential dimension.   Article III requires the parties to have

6    "a live controversy affecting [a party's] rights." *Cotton v. Noeth*, 96

7    F.4th 249, 256 (2d Cir. 2024).   "This aspect of the ripeness doctrine

8    overlaps with the standing doctrine," and usually a determination

9    "that a plaintiff has Article III standing is enough to render its claim

10   constitutionally ripe." *In re Methyl Tertiary Butyl Ether (MTBE) Prods.*

11   *Liab. Litig.*, 725 F.3d 65, 110 (2d Cir. 2013); *see also Nat'l Org. for*

12   *Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013) ("Often, the

13   best way to think of constitutional ripeness is as a specific application

14   of the actual injury aspect of Article III standing.").   The prudential

15   ripeness doctrine "allows a court to determine that the case will be

16   better decided later." *Revitalizing Auto Cmtys. Env't Response Tr. v.*

17   *Nat'l Grid USA*, 10 F.4th 87, 100 (2d Cir. 2021) (citation omitted).   "In

18   determining whether a claim is prudentially ripe, we ask whether the

22

1    claim is fit for judicial resolution and whether and to what extent the

2    parties will endure hardship if decision is withheld."   *Id.* (citation

3    omitted).   "In general, the more the matter to be placed before the

4    court involves a pure issue of law, unaffected by factual

5    considerations, the less the concern that judicial review might" be

6    premature.   *Lab. Council for Latin Am. Advancement v. U.S. Env't Prot.*

7    *Agency*, 12 F.4th 234, 253 (2d Cir. 2021).

8          Variscite's challenge to the Extra Priority regime in the

9    December Queue is both constitutionally and prudentially ripe.

10          As to constitutional ripeness, the December Queue is still there,

11    and Variscite's place on it was determined in part by the Extra Priority

12    regime.   It is not clear on the record today how long Variscite will

13    wait before New York reviews December Pool applications, or

14    whether New York will be able to review Variscite's provisional

15    license application.   But until New York dissolves the December

16    Queue or purges all provisional applications from it, there is an

17    Article III "live controversy" between Variscite and New York.   *Cf.*

18    *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 118 (2d Cir. 2025) (recognizing

23

1    that a plaintiff has Article III standing to challenge "a discriminatory

2    policy [that] prevents" the plaintiff from applying to a program "on

3    equal footing").

4           New York's primary argument as to the December Queue is

5    one of prudential ripeness.   New York notes that it has changed its

6    process for reviewing the November and December Queues and now

7    might grant so many November Pool licenses that Variscite may lose

8    out on a license entirely because it did not apply in the November

9    Pool, rather than because of the Extra Priority scheme in the

10   December Queue. The risk of harm from the Extra Priority scheme is

11   said to be further diminished by the state court preliminary injunction

12   that currently prevents New York from processing provisional

13   applications like Variscite's at all.   New York asks us to wait to see if

14   it scraps the December Queue's provisional applications, before we

15   decide the merits.

16          Prudence does not require a delayed adjudication in this case.

17   The district court decided the merits of this case, and it is only said to

18   have become unripe between that disposition and this appeal.   In

24

1    such circumstances, we do not usually stay our hand as a prudential

2    matter.    For example, in *Cotton*, suit had been dismissed based on the

3    plaintiff's accumulation of "at least three strikes" under the Prison

4    Litigation Reform Act; we held that the appeal was prudentially ripe

5    even after the government conceded on appeal that the plaintiff had

6    at that point no more than a single "strike," and therefore clearly did

7    not have "at least three."    *See* 96 F.4th at 256–57.    We proceeded to

8    reach the question of whether the plaintiff had one or zero strikes

9    because: "whether [the purported strike] counts as a strike is a purely

10    legal question involving no future contingencies"; "leaving the issue

11    unresolved could impose a hardship on [the plaintiff] by affecting his

12    ability to sue in the future"; and "deciding the question would not

13    impose hardship on the State because it, like [the plaintiff], has an

14    interest in judicial efficiency and clarification of the law."    *Id.*

15        For similar reasons, Variscite's challenge to the ordering of the

16    December    Queue    is    prudentially    ripe,    notwithstanding    the

17    contingencies that New York has highlighted or created.    It is a legal

18    question whether granting Extra Priority to December Pool applicants

25

1   violates the dormant Commerce Clause, the answer to which will not

2   change, and rendering an answer would impose no hardship on the

3   State, which "has an interest in judicial efficiency and clarification of

4   the law."   *Id.* at 257.   Avoiding the question now would mean that,

5   by the time Variscite can again present the question to a court, it is

6   likely to have suffered its asserted constitutional injury of losing out

7   to a New York competitor--and at that point, it may be considerably

8   harder for a district court to craft an appropriate injunction.

9   Consequently, withholding determination "could impose a hardship

10  on [Variscite] by affecting [its] ability" to obtain judicial relief "in the

11  future."   *Id.*

12                                    * * *

13         In sum, Variscite can challenge the issuance of (a) December

14  Pool licenses, based on purported unlawful ordering within the

15  December Queue, and (b) November Pool licenses, insofar as an

16  unlawful preference is accorded to the entire November Pool--but not

17  the ordering within it.   However, Variscite has not established

18  standing to enjoin the issuance of CAURD licenses.

26

**IV.**

To obtain a preliminary injunction that "will affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *Agudath Isr. of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020) (citation omitted). When, as here, a plaintiff alleges constitutional injury, "a strong showing of a constitutional deprivation that results in noncompensable damages ordinarily warrants a finding of irreparable harm." *A.H. ex rel. Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021). Similarly, "[n]o public interest is served by maintaining an unconstitutional policy when constitutional alternatives are available to achieve the same goal." *Agudath Isr.*, 983 F.3d at 637. "Likelihood of success on the merits is therefore the dominant, if not the dispositive, factor" in awarding preliminary relief. *A.H. ex rel. Hester*, 985 F.3d at 176 (citation modified).

27

1    We review a district court's denial of a preliminary injunction

2    for abuse of discretion.  *Agudath Isr.*, 983 F.3d at 631.   However, we

3    "must assess *de novo* whether the court proceeded on the basis of an

4    erroneous view of the applicable law."  *Id.*

5    The Commerce Clause "vests Congress with the power to

6    'regulate Commerce . . . among the several States.'"  *Nat'l Pork*

7    *Producers Council v. Ross*, 598 U.S. 356, 368 (2023) (quoting U.S. Const.

8    art. I, § 8, cl. 3).   It "not only vests Congress with the power to

9    regulate interstate trade," but also "contains a further, negative

10   command, one effectively forbidding the enforcement of certain state

11   economic regulations even when Congress has failed to legislate on

12   the subject."  *Id.* (citation modified).   "[B]y its own force," the

13   Commerce Clause "restricts state protectionism."  *Tenn. Wine &*

14   *Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 518 (2019).   "[S]tate

15   laws offend the Commerce Clause when they seek to build up

16   domestic commerce through burdens upon the industry and business

17   of other States . . . ."  *Nat'l Pork*, 598 U.S. at 369 (citation modified).

18   "Today," under the Supreme Court's "modern cases," the "very core

28

1    of our dormant Commerce Clause jurisprudence" is an

2    "antidiscrimination principle" expressed through a bright-line rule:

3    "the Commerce Clause prohibits the enforcement of state laws driven

4    by economic protectionism--that is, regulatory measures designed to

5    benefit in-state economic interests by burdening out-of-state

6    competitors." *Id.* (citation modified).

7        The "fundamental objective" behind this rule is to "preserv[e]

8    a national market for competition undisturbed by preferential

9    advantages conferred by a State upon its residents or resident

10   competitors." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 299 (1997).

11   That objective applies with some irony in the context of *illicit* markets;

12   but the objective should not be conflated with the rule itself.   In the

13   context of the affirmative Commerce Clause, it is "of no constitutional

14   import" that "the marijuana market is an unlawful market that

15   Congress sought to eradicate," and not "a lawful market that

16   Congress sought to protect and stabilize." *Gonzales*, 545 U.S. at 19

17   n.29.   The same holds for the dormant Commerce Clause.

1    If federally illegal markets were constitutionally different,

2    states could shelter from the dormant Commerce Clause in any

3    market where a federal prohibition is nominal: on the books, but

4    unenforced--perhaps even a candidate for repeal.   Consider *medical*

5    *marijuana*.   Although it is criminalized at the federal level, *see* 21

6    U.S.C. § 812(c)(Schedule I)(c)(10), Congress has defunded

7    enforcement of that prohibition every fiscal year since 2015, through

8    a rider known as the Rohrabacher-Farr Amendment, *see* Consolidated

9    Appropriations Act of 2024, Pub. L. No. 118-42, § 531, 138 Stat. 25.

10   *See also Ne. Patients Grp. v. United Cannabis Patients & Caregivers of Me.*,

11   45 F.4th 542, 547-48, 551 (1st Cir. 2022).   The legal status of medical

12   marijuana differs from that of other contraband in degree, not in kind.

13   *See Ne. Patients*, 45 F.4th at 559 (Gelpí, J., dissenting).   If markets were

14   exempt from the dormant Commerce Clause so long as they were

15   illicit, the medical marijuana market would enjoy such exemption.

16   *See id.* (acknowledging this implication).   States would then be free

17   today to bake in advantages for their residents should Congress later

18   legalize the market, and protectionism would, in the end, have

30

1    "[]disturbed" a "national market for competition" through

2    "preferential advantages conferred by [the] State upon its residents or

3    resident competitors."   *Gen. Motors*, 519 U.S. at 299.

4        True, the bright-line rule of the dormant Commerce Clause is

5    subject to an exception: "Congress may use its powers under the

6    Commerce Clause to confer upon the States an ability to restrict the

7    flow of interstate commerce that they would not otherwise enjoy."

8    *New Eng. Power Co. v. New Hampshire*, 455 U.S. 331, 340 (1982).

9    However, "for a state regulation to be removed from the reach of the

10   dormant Commerce Clause, congressional intent must be

11   unmistakably clear."   *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S.

12   82, 91 (1984).   Though the statute need not "expressly state that it is

13   authorizing a state to engage in activity that would otherwise violate

14   the Dormant Commerce Clause," Congress must "clearly allow the

15   state to engage in such activity."   *Am. Trucking Ass'ns, Inc. v. N.Y.*

16   *State Thruway Auth.*, 886 F.3d 238, 245 (2d Cir. 2018).

17       The text of a mine-run criminal penalty conveys no such

18   intention.   We decline to read into myriad criminal laws "a

31

1    congressional purpose which would be only the product of this

2    Court's imagination." *California v. Zook*, 336 U.S. 725, 732–33 (1949)

3    (rejecting similarly broad-brush presumption that every federal ban

4    on interstate traffic displaces parallel state bans).   And it would be a

5    lively imagination: we would be assuming that Congress means to

6    permit protectionism as long as it is comorbid with a federal offense,

7    incentivizing the states to legalize--for just their own citizens--

8    whatever Congress forbids.

9        To privilege state protectionist legislation, Congress must do

10   more than disapprove of an interstate market: it must approve *the*

11   *protectionism itself*.   We know what that language looks like: for

12   example, "silence on the part of the Congress shall not be construed

13   to impose *any barrier* to the regulation or taxation of such business by

14   the several States."   *Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 429

15   (1946) (emphasis added) (quoting McCarran-Ferguson Act of 1945, 15

16   U.S.C. § 1011) (holding that this text sufficed).   Imposing criminal

17   penalties, without more, is insufficient.   If states enjoy a colorable

18   basis for evading the dormant Commerce Clause in any novel market

32

1    that may run afoul of a longstanding federal criminal regulatory

2    regime, a state could justify its violation of the federal Constitution on

3    the ground that its citizens are federal offenders.

4        Congress has not "clearly allowed" New York to "engage in

5    activity that would otherwise violate the Dormant Commerce

6    Clause." *Am. Trucking Ass'ns*, 886 F.3d at 245.   The only relevant

7    Congressional enactment in this case is the Controlled Substances Act

8    ("CSA"), 21 U.S.C. § 801 et seq.   Under the CSA, the "manufacture,

9    distribution, or possession of marijuana" outside of select scientific

10   studies is "a criminal offense."   *Gonzales v. Raich*, 545 U.S. 1, 14

11   (2005); *see* 21 U.S.C. §§ 812(c)(Schedule I)(c)(10), 841(a)(1).   The

12   congressional objective behind this criminal prohibition was

13   "eradicat[ing]" the "marijuana market" and "eliminating commercial

14   transactions in the interstate market in their entirety."   *Gonzales*, 545

15   U.S. at 19 & n.29.   A prohibition intended to eradicate an *inter*state

16   market is not a license for states to incubate *intra*state markets in the

17   same product.   The First Circuit--the only other Court of Appeals to

18   consider the question--is in accord.   *See Ne. Patients*, 45 F.4th at 554

33

1    ("[P]rotectionist measures necessarily . . . encourage precisely what

2    the CSA seeks to stop--trade by in-staters in the [cannabis] market.").

3        Federal bans on interstate commerce can (sometimes) implicitly

4    authorize complementary state *bans*.   *See, e.g.*, *Zook*, 336 U.S. at 727,

5    730 (upholding interstate transportation restriction that was

6    "substantially the same" as a federal one); *Pic-A-State PA, Inc. v. Com.*

7    *of Pa.*, 42 F.3d 175, 179 (3d Cir. 1994) (upholding, as

8    "complement[ary]," state ban on in-state sales of lottery interests

9    given federal ban on interstate sales of the same).   But New York has

10   not banned interstate marijuana traffic; indeed, it even gives

11   preferences in licensing to New York expatriates who obtained

12   marijuana convictions before leaving the state.

13       The dissent contends that New York's law here would

14   complement the CSA's ban on interstate marijuana traffic by

15   modestly burdening that traffic.   *See* Dissent at 7-8.   The dissent

16   reasons that if the CSA authorizes state bans on interstate marijuana

17   traffic, it necessarily authorizes lesser interferences like New York's.

18   *See id.*   The dissent concludes that it would "undermine[] the CSA's

34

1    objective" to apply the dormant Commerce Clause here because it

2    would "require New York to offer [dispensary] licenses on

3    nondiscriminatory terms" when the state would otherwise curb some

4    interstate traffic through its discriminatory licensing.   *Id.* at 8 (citing

5    *Gonzales*, 545 U.S. at 19).

6        New York disagrees that its licensing regime will have this

7    effect.   The state affirmatively contends that its preference for New

8    York offenders is "[a]t most . . . an *incidental* burden on interstate

9    commerce," N.Y. Br. 52--*i.e.*, one that is too unobtrusive to help

10   eradicate the interstate marijuana market.

11       In any event, the dissent's analysis blurs two distinct inquiries:

12   (1) which state laws the dormant Commerce Clause would prohibit

13   absent congressional action, and (2) which subset of laws the CSA has

14   exempted from that prohibition.   Absent congressional action, the

15   dormant Commerce Clause would forbid New York from enacting

16   *any* protectionist measure in the interstate marijuana market--

17   whether a total ban or a lesser restriction.   The dispositive question

18   is therefore which (if any) protectionist measures Congress has

35

1   authorized New York to enact nevertheless.   The answer cannot be

2   drawn (as the dissent draws it) from "[g]eneral propositions derived

3   from the whole sweep of the Commerce Clause," *Zook*, 336 U.S. at 733,

4   so that all regulation of interstate traffic necessarily burdens it.

5   Rather, the question "can be resolved only by careful scrutiny of the

6   particular activity regulated."   *Id.* at 734.

7        Even if the CSA authorized New York to ban, burden, or

8   punish interstate marijuana traffic, the CSA cannot, for the reasons

9   discussed, be read to bless what New York did instead: preference

10  New Yorkers when issuing dispensary licenses.   Such a preference

11  does not inhibit interstate marijuana traffic; it creates an incentive to

12  institutionalize the marijuana industry and help it flourish.   The

13  dormant Commerce Clause's rule, not its exception for conduct that

14  Congress has "clearly allowed," governs here.

15                                  **V.**

16        Under the dormant Commerce Clause, "a law that clearly

17  discriminates against interstate commerce is per se invalid unless the

18  government has 'no other means to advance a legitimate local

36

1    purpose.'"   *Rest. L. Ctr. v. City of New York*, 90 F.4th 101, 118 (2d Cir.

2    2024) (quoting *United Haulers Ass'n v. Oneida-Herkimer Solid Waste*

3    *Mgmt. Auth.*, 550 U.S. 330, 338-39 (2007)).   Discrimination "means

4    differential treatment of in-state and out-of-state economic interests

5    that benefits the former and burdens the latter."   *N.Y. Pet Welfare*

6    *Ass'n v. City of New York*, 850 F.3d 79, 89 (2d Cir. 2017) (citation

7    omitted).   A law may discriminate against interstate commerce "on

8    its face, harbor a discriminatory purpose, or discriminate in its effect."

9    *Id.* at 90.

10    <u>December Pool Applications.</u>   Variscite argues that the

11    ordering of the December Queue discriminates against out-of-staters

12    because Extra Priority is conditioned on a New York marijuana

13    conviction by March 31, 2021, when New York repealed its marijuana

14    prohibitions.   We agree.[2]

15    Extra Priority in the application queue is an economic benefit--

16    especially because New York has indicated that only those earliest in

---

[2] We accordingly need not reach Variscite's other dormant Commerce Clause objections to December Pool licensing.

37

1    the December Queue are likely to receive licenses.    If New York

2    required in-state residency as a prerequisite to Extra Priority, there

3    would be no doubt that it was discriminating against out-of-state

4    economic interests.    *See, e.g., Tenn. Wine*, 588 U.S. at 518

5    ("Tennessee's 2-year durational-residency requirement plainly favors

6    Tennesseans over nonresidents . . . .").    That is essentially the defect

7    that the *Variscite One* court identified with CAURD.    *See Variscite NY*

8    *One, Inc. v. New York*, 640 F. Supp. 3d 232, 240-41 (N.D.N.Y. 2022),

9    *reconsideration denied*, 2023 WL 1420662 (Jan. 31, 2023).

10          The Adult Use Application Program is a workaround that does

11   not work.    New York has crafted a prerequisite for Extra Priority that

12   is a proxy and correlative for applicants who were New York

13   residents in March 2021 or earlier (or whose relatives were).    This is

14   because "the usual 'legislative power of a State'" extends to "'persons

15   and property *within the limits of its own territory*.'"    *Nat'l Pork*, 598 U.S.

16   at 375-76 (2023) (quoting *Hoyt v. Sprague*, 103 U.S. 613, 630 (1881))

17   (emphasis added).    New York could not "prosecute the citizen of

18   another State for acts committed outside [New York's] jurisdiction

38

1    that are not intended to produce or that do not produce detrimental

2    effects within [New York]." *Id.* (citation modified).    Consequently,

3    New York marijuana offenders will reliably have been present in New

4    York before the state decriminalized marijuana (*i.e.*, sometime before

5    March 31, 2021).    It is fair to assume that they are New Yorkers,

6    overwhelmingly.[3]

7         It is of no moment that New York marijuana offenders are just

8    a subset of all New York offenders, and an even smaller subset of all

9    New Yorkers.    They are still New Yorkers--and not Californians.

10   The dormant Commerce Clause does not tolerate discrimination in

11   favor of a sliver of the in-state market.    Thus, *Bacchus Imports, Ltd. v.*

12   *Dias* struck down as discriminatory a Hawaii tax that advantaged

13   pineapple   wine   and   okolehao--alcoholic   beverages   produced

---

[3] *See, e.g.*, Stephen Mercer & Jessica Gabel, Shadow Dwellers: The Underregulated World of State and Local DNA Databases, 69 N.Y.U. Ann. Surv. Am. L. 639, 669 n.200 (2014) ("[D]ata released from the FBI indicates that in more than 87% of the offender hits in the database, the crime took place in the same state in which the offender provided a DNA sample.    That follows the trend that police officers have seen for ages: criminals tend to offend locally . . . ." (citation omitted)).

1    overwhelmingly in Hawaii--even though the two products

2    represented "well under one percent of the total liquor sales in

3    Hawaii."   468 U.S. 263, 268 (1984).   *Bacchus* concluded that "the

4    effect of the [law] is clearly discriminatory, in that it applies only to

5    locally produced beverages, even though it does not apply to all"

6    segments of the market.   *Id.* at 271.

7         "[D]isparate treatment of in-state and out-of-state" commercial

8    traffic "is just as much a violation of the Commerce Clause as

9    disparate treatment of in-state and out-of-state [persons]."   *Freedom*

10   *Holdings, Inc. v. Spitzer*, 357 F.3d 205, 219 (2d Cir. 2004).   Accordingly,

11   under *Bacchus*, New York's Extra Priority regime is discriminatory,

12   even though it advantages only a subset of likely New Yorkers.

13        True, the wall erected against non-New Yorkers has some

14   holes: some New York offenders may have moved elsewhere, or have

15   close relatives out-of-state who thus get derivative eligibility.   But it

16   is sufficiently obvious from the face of New York's licensing laws that

17   those eligible for Extra Priority in the December Pool will be New

18   Yorkers overwhelmingly.   The criteria themselves demonstrate that

40

1    the law's "discriminatory impact on interstate commerce was not an

2    unintended byproduct."    *Hunt v. Wash. State Apple Advert. Comm'n,*

3    432 U.S. 333, 352 (1977).    Because the discrimination here is apparent

4    from the statutory text, we do not need a more developed record

5    demonstrating the law's practical effect.

6        New York says it chose its criteria for Extra Priority to further

7    "restorative justice and social equity goals," not to privilege New

8    Yorkers.    N.Y. Br. 4.    Per New York, Extra Priority corrects for

9    marijuana criminalization, with supposedly "devastating collateral

10   consequences including mass incarceration and other complex

11   generational trauma, that inhibit an otherwise law-abiding citizen's

12   ability to access housing, employment opportunities, and other vital

13   services."    *Id.* (quoting N.Y. Canbs. § 2).    But the acknowledgement

14   that it wishes to favor that population--regardless of theory--betrays

15   the purpose: to favor New Yorkers over others.    If New York so

16   wishes to privilege that population, it may do so "as a market

17   participant"--but not "as a market regulator," which is its role here.

18   *S.-Cent. Timber Dev., Inc. v. Wunnicke,* 467 U.S. 82, 98-99 (1984).

1    Because the Extra Priority regime is discriminatory, it is

2    constitutional only if "the government has 'no other means to

3    advance a legitimate local purpose.'"  *Rest. L. Ctr.*, 90 F.4th at 118

4    (quoting *United Haulers Ass'n*, 550 U.S. at 338-39).   New York

5    acknowledges as much, but does not attempt to satisfy this "strictest

6    scrutiny," *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*,

7    520 U.S. 564, 581 (1997) (citation omitted)--even if we assume that the

8    invocation of restorative justice is a legitimate local purpose. [4]

9    Consequently, Variscite is likely to succeed on the merits of its

10   challenge to the ordering of the December Queue.

11       <u>November Pool Applications.</u>   Variscite also challenges the

12   creation of a November Pool that takes precedence over all December

13   Pool applicants.   Variscite's theory is that the November Pool was

14   created as a vehicle to preference CAURD applicants in limbo.   And

15   because CAURD applicants are, almost necessarily, New Yorkers,

---

[4] It is rarely a good sign when defenses are premised on attaching
an adjective to the word "justice."

1    Variscite argues that this maneuver violated the Dormant Commerce

2    Clause.

3         While this theory may yet have merit, the preliminary record is

4    insufficient to permit injunctive relief based on it.   The criterion for

5    accessing the November Pool is facially neutral: control of adequate

6    premises in New York for a dispensary by November 17, 2023.

7    Variscite reasons that the law is nevertheless discriminatory in its

8    purpose or effect because out-of-staters were unlikely to meet this

9    criterion.   Per Variscite, out-of-staters would have been unlikely to

10   have already acquired premises, since they were ineligible to open

11   dispensaries under CAURD.   And they had slim odds of finding

12   suitable premises before the November Pool deadline because of

13   onerous zoning restrictions.[5]

---

[5] *See, e.g.*, 9 NYCRR § 119.1(a) ("No municipality may adopt a local law which would allow an adult-use retail dispensary . . . to be: (1) on the same road and within 200 feet of the entrance of a building occupied exclusively as a house of worship; (2) on the same road and within 500 feet of the entrance of a building occupied exclusively as a school; or (3) on the same road and within 500 feet of a structure or its grounds occupied exclusively as a public youth facility . . . .").

43

1    Though Variscite's logic is sound, it has not adduced sufficient

2    evidence that the November Pool had the purpose or effect of

3    prioritizing New Yorkers.    We therefore cannot apply strict scrutiny

4    at this stage.    Instead, we apply a more lenient test: a *non-*

5    *discriminatory* law violates the dormant Commerce Clause only if it

6    imposes a burden on interstate commerce that is "'clearly excessive'

7    in relation to its local benefits."    *Rest. L. Ctr*, 90 F.4th at 107 (quoting

8    *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).    For this test,

9    where the state is not discriminating against out-of-state economic

10   interests, it *does* matter that marijuana is federal contraband: it is not

11   a "clearly excessive" burden on interstate commerce for a local law to

12   impede a national black market.    Therefore, even assuming that the

13   creation of the November Pool incidentally burdens the interstate

14   marijuana market, the burden it imposes is not "clearly excessive."

15   Consequently, Variscite has not shown that it is likely to succeed on

---

44

1    the merits of its dormant Commerce Clause challenge to the

2    November Pool.

3                                    **VI.**

4          This case is the byproduct of the federal government's unusual

5    and ambivalent regulation of marijuana.   It is hard to seriously

6    imagine states passing protectionist legislation in most federally

7    criminalized interstate markets--few state legislatures would bother

8    passing laws to favor their local hitmen.     In this strange

9    circumstance, where a layperson might think that marijuana is

10   actually legal in New York, we nevertheless apply a familiar rule:

11   state protectionism is forbidden unless Congress says otherwise--and

12   Congress has not said otherwise.

13         For the foregoing reasons, the district court erred in concluding

14   that Variscite was unlikely to succeed on the merits of its dormant

15   Commerce Clause challenge to the ordering within the December

16   Queue.   The district court further erred by assessing the remaining

17   preliminary injunction factors under the assumption that Variscite

18   would not suffer a constitutional injury.   *See Variscite NY Four, LLC*

45

1    *v. New York State Cannabis Control Bd.*, No. 1:23-cv-01599 (AMN/CFH),

2    2024 WL 406490, at *13 (N.D.N.Y. Feb. 2, 2024).    We therefore

3    VACATE the district court's decision denying Variscite's motion for

4    a preliminary injunction and REMAND for further proceedings

5    consistent with this opinion.