*Variscite NY Four, LLC v. New York State Cannabis Control Board*, No. 24-384

1  DEBRA ANN LIVINGSTON, *Chief Judge*, dissenting:

2  If (1) the "fundamental objective" of a judicially implied doctrine is to
3  "preserv[e] a national market," *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 299 (1997),
4  (2) Congress has the "undoubted power" to override the doctrine's application, *S.*
5  *Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 769 (1945), and (3) Congress has
6  sought to "eradicate" a certain national market, *Gonzales v. Raich*, 545 U.S. 1, 19
7  n.29 (2005), do the doctrine's protections apply to that market? The obvious
8  answer is the correct one.

9  The majority and I agree on each of these three premises. *See* Maj. Op. at 29,
10 31, 33. We are also in agreement that "[f]ederal bans on interstate commerce
11 can"—at least "sometimes"—"implicitly authorize complementary state bans,"
12 including in markets where the state continues to permit *intra*state commerce. *Id.*
13 at 34 (emphasis omitted).[1] Of course, a state ban on *inter*state commerce in a
14 market where the state permits *intra*state commerce is a perfectly protectionist

---

[1] Specifically, the majority cites *Pic-A-State PA, Inc. v. Pennsylvania*, 42 F.3d 175 (3d Cir. 1994), as an example of a case in which a "[f]ederal ban[] on interstate commerce . . . implicitly authorize[d] [a] complementary state ban[]." Maj. Op. at 34 (emphasis omitted). *Pic-A-State* involved similar federal and state prohibitions on the interstate sale of lottery interests. *See* 42 F.3d at 177–78. And the Third Circuit concluded that because the state prohibition "complement[ed] the federal statute," it "d[id] not violate the dormant Commerce Clause." *Id.* at 180. It reached this conclusion even though the state continued to permit the intrastate sale of its own lottery tickets. *See id.* at 177.

1   state law—the chief evil the dormant Commerce Clause generally guards against.

2   *See Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023).  Thus, we agree

3   that federal criminalization of a market—at least "sometimes"—renders the

4   dormant Commerce Clause inapplicable to perfectly protectionist state laws in

5   that market. Maj. Op. at 34.  We also agree that nondiscriminatory state laws that

6   "incidentally burden[]" illegal markets *always* survive dormant Commerce Clause

7   scrutiny.  *Id.* at 44.

8   Starting from the right premises, however, the majority ultimately draws

9   one wrong—and obviously wrong—conclusion.  It concludes that the dormant

10  Commerce Clause nonetheless continues to bar partial state restrictions on

11  federally illegal interstate commerce that amount to something more than an

12  incidental burden and something less than perfect protectionism.[2]  In my view,

13  that is neither a "bright-line rule" nor a sensible one.  *Id.* at 29, 31.  When Congress

14  criminalizes a market—and, by definition, seeks to "eliminat[e] commercial

---

[2] The majority opinion might also be read to suggest that the dormant Commerce Clause's application hinges not on the state law's actual protectionist purpose or effects, but on whether the state "affirmatively contends" that its law is or is not protectionist.  Maj. Op. at 35.  A state's arguments on appeal, however, cannot possibly be so dispositive.  If Congress has rendered the dormant Commerce Clause inapplicable to certain state laws, a state cannot inadvertently resurrect the doctrine—and override congressional intent—by mischaracterizing its law's purpose or effects.  What matters, rather, must be the law's true nature.  And here, the majority concludes that New York's licensing scheme is facially discriminatory against non-New Yorkers and therefore protectionist.  *See id.* at 40.

2

transactions in the interstate market"—I would presume that it authorizes states to enact their own laws that aid that objective, whether by banning, restricting, or burdening those transactions. *Gonzales*, 545 U.S. at 19. And I certainly would not interpret a doctrine implied from the Commerce Clause—an affirmative grant of power to Congress—to *require* states to enact laws that promote the very interstate commerce Congress wants to eradicate. Accordingly, I respectfully dissent.[3]

## I.

The Supreme Court has long recognized that Congress may exercise its "plenary" power over interstate commerce, *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 75 (1824), to override the dormant Commerce Clause and "permit the states to

---

[3] I agree with the majority that Variscite NY Four, LLC and Variscite NY Five, LLC's (collectively, "Variscite") challenge is justiciable at least with respect to the December Queue, and I would thus reach the question whether the dormant Commerce Clause applies. I disagree, however, with one aspect of the majority's analysis: in my view, the doctrine of mootness, not ripeness, offers the appropriate framework for assessing constitutional justiciability. New York, to be sure, frames its argument that this Court lacks jurisdiction in terms of constitutional ripeness. Yet New York's primary contention is that "intervening circumstance[s] ha[ve] deprived the plaintiff of a personal stake in the outcome of the lawsuit." *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 719 (2022) (alterations accepted and internal quotation marks omitted). And "[i]t is the doctrine of *mootness* . . . that addresses whether" this has occurred. *Id.* This distinction is important because while the plaintiff bears the initial burden of establishing justiciability "at the time the action commences," *Carney v. Adams*, 592 U.S. 53, 59–60 (2020) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000)), the defendant "bears the burden to establish that a once-live case has become moot," *West Virginia*, 597 U.S. at 719. And "[t]hat burden is 'heavy where, as here" the defendant argues primarily that their "voluntary conduct" (e.g., the reallocation of licenses from December to November applicants) has deprived this Court of jurisdiction. *Id.* (internal quotation marks omitted). New York cannot avoid this burden merely by casting its mootness arguments in ripeness terms. Thus, while the majority ultimately reaches the correct result—that Variscite's December Queue challenge is constitutionally justiciable—it should have reached this result by applying the doctrine of mootness.

3

regulate . . . commerce in a manner which would otherwise not be permissible," *S. Pac. Co.*, 325 U.S. at 769. This power is "undoubted," *id.*, and "unquestionabl[e]," *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 572 (1997). To exercise it, Congress must "clearly express[]" its "intent." *Hillside Dairy Inc. v. Lyons*, 539 U.S. 59, 66 (2003). But it "need not expressly state that it is authorizing a state to engage in activity that would otherwise violate the [d]ormant Commerce Clause." *Am. Trucking Ass'ns, Inc. v. N.Y. State Thruway Auth.*, 886 F.3d 238, 245 (2d Cir. 2018). Such a requirement would of course be absurd in the context of illegal markets. When Congress has made clear it wishes to eradicate a national market, we should not "expect [it] to speak out of both sides of its mouth." *Ne. Patients Grp. v. United Cannabis Patients & Caregivers of Me.*, 45 F.4th 542, 559 (1st Cir. 2022) (Gelpí, J., dissenting).

Rather, in assessing whether a federal criminal law authorizes state laws that might otherwise violate the dormant Commerce Clause, courts have focused on whether the state laws "aid[]," *Ne. Patients Grp.*, 45 F.4th at 556 (internal quotation marks omitted), or "complement[]," *Pic-A-State PA, Inc. v. Pennsylvania*, 42 F.3d 175, 180 (3d Cir. 1994), the federal proscription. *See also California v. Zook*, 336 U.S. 725, 729 (1949) ("[W]hether Congress has or has not expressed itself, the

4

1    fundamental inquiry, broadly stated, is the same: does the State action conflict

2    with national policy?"). At bottom, this inquiry is one of "congressional intent."

3    *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 91 (1984). And an obvious

4    corollary to the principle that a federal criminal prohibition suggests Congress

5    welcomes complementary state laws is that Congress would not want states to be

6    *required* to enact laws that undermine its objectives.

7         The majority appears broadly to agree with this approach. *See* Maj. Op. at

8    34. And it acknowledges that complementary state bans aid federal bans on

9    interstate commerce. *Id.* Common sense suggests the same is true of state

10   restrictions—short of bans—on interstate commerce. As relevant here, any state

11   restriction on interstate commerce in marijuana—for example, prohibiting

12   investment by an out-of-stater in a state's retail market—seems plainly to aid the

13   Controlled Substances Act's ("CSA") objective of "eradicat[ing]" or "eliminating"

14   interstate marijuana transactions "in their entirety." *Gonzales*, 545 U.S. at 19 & n.29.

15        The majority, however, concludes otherwise. According to the majority,

16   "protectionist measures necessarily . . . encourage precisely what the CSA seeks to

17   stop—trade by in-staters in the [cannabis] market." Maj. Op. at 34 (quoting *Ne.*

18   *Patients Grp.*, 45 F.4th at 554). This is wrong in two respects.

First, it miscomprehends the relevant baseline for our analysis. Neither party has challenged New York's decision to permit an *intra*state marijuana market. That decision thus has no bearing on whether New York's restriction on *inter*state commercial transactions aids Congress's objective of eliminating such transactions. Our analysis must focus only on the *challenged aspects* of New York's licensing scheme.

Second, contrary to the majority's suggestion, the CSA's ultimate objective is not "to stop [] trade by *in-staters*," *id.* at 34 (emphasis added) (quoting *Ne. Patients Grp.*, 45 F.4th at 554); it is to "eliminat[e] commercial transactions in the *inter*state market," *Gonzales*, 545 U.S. at 19 (emphasis added). This is for good reason. While Congress has the power to regulate some purely intrastate activity, this power derives from its authority "[t]o regulate Commerce . . . *among* the several States." U.S. Const. art. I, § 8 (emphasis added); *see also Gonzales*, 545 U.S. at 40 (Scalia, *J.*, concurring in the judgment) ("Congress's authority to enact [the CSA's] prohibitions of *intra*state controlled-substance activities depends . . . upon whether they are appropriate means of achieving the legitimate end of eradicating Schedule I substances from *inter*state commerce." (emphasis added)). As a result, in assessing whether the challenged aspects of New York's licensing scheme aid

Congress's objective, we must focus on Congress's ultimate, constitutionally authorized objective: "eliminating . . . interstate" marijuana transactions. *Gonzales*, 545 U.S. at 19. "That the [CSA] ensnares some purely intrastate activity" to achieve this objective "is of no moment," and does not alter our focus. *Id.* at 22.

Thus, while the majority may be correct that "protectionist measures . . . encourage . . . trade by in-staters" to some extent, that is beside the point. Maj. Op. at 34 (quoting *Ne. Patients Grp.*, 45 F.4th at 554). What matters, rather, is that "protectionist measures necessarily . . . [*dis*]courage precisely what the CSA seeks to stop—trade by [*out-of*]-staters in the cannabis market." *Id.* (alteration accepted) (quoting *Ne. Patients Grp.*, 45 F.4th at 554). This is true whether the measures are perfectly or only partially protectionist. All such measures discourage interstate commercial transactions to some extent and thus aid the CSA's objective of eliminating those transactions.

On the other hand, application of the dormant Commerce Clause affirmatively undermines the CSA's objective. It compels New York to permit

more out-of-state participation in its marijuana market.[4] This Court's judgment does not touch New York's antecedent decision to allow an intrastate marijuana market; it affects only the extent to which New York must open that market to interstate commerce. And all else equal, Congress would prefer as many New York retail licenses as possible to go to New Yorkers, confining commerce within the state's borders. Applying the dormant Commerce Clause, however, would require New York to offer those licenses on nondiscriminatory terms to out-of-state applicants—inviting the very interstate commercial transactions that Congress has sought to "eliminat[e] . . . in their entirety." *Gonzales*, 545 U.S. at 19.

In sum, applying the dormant Commerce Clause to illegal markets not only prevents states from enacting laws that aid Congress's objectives; it requires states to enact laws that undermine those objectives. It is thus difficult to see how the CSA is anything but a "clear[] express[ion]" of Congress's "intent" that the dormant Commerce Clause should not apply to the market for marijuana. *Hillside Dairy*, 539 U.S. at 66.

---

[4] Perhaps, on the majority's approach, New York could also alter its licensing scheme in the other direction and *prohibit all* out-of-state participation. The majority concludes, after all, that federal bans "sometimes" authorize such perfectly protectionist state laws. Maj. Op. at 34. As discussed below, however, this result—encouraging states to evade dormant Commerce Clause scrutiny through more flagrant protectionism—would turn the doctrine on its head and cannot be reconciled with any conception of its purpose.

8

**II.**

Notwithstanding this overwhelming evidence of congressional intent, the majority concludes that Congress must "approve *the protectionism itself*" in more express terms to render the doctrine inapplicable. Maj. Op. at 32. As explained above, our precedent has never required such magic words. *Cf. Am. Trucking Ass'ns*, 886 F.3d at 245 ("Congress need not expressly state that it is authorizing a state to engage in activity that would otherwise violate the [d]ormant Commerce Clause."). Yet even if we were to impose such a requirement in the context of legal commerce, it has no place in markets Congress has criminalized. The majority appears at times to recognize as much, concluding that criminalization alone suffices to authorize (at least "some[]") perfectly protectionist state laws, Maj. Op. at 34, and (all) "incidentally burdens[ome]" ones, *id.* at 44. The dormant Commerce Clause's purpose confirms that nothing more should be required of Congress to render the doctrine wholly inapplicable to federally illegal markets.

At the outset, the dormant Commerce Clause's purpose is plainly relevant to assessing what should be required of Congress to override the doctrine's application. The doctrine itself—which lacks an express textual foundation—was inferred from the Framers' objectives in "calling the Constitutional Convention," and courts have thus routinely looked to the doctrine's purpose to interpret its

limits. *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 517 (2019) (internal quotation marks omitted). Indeed, the Supreme Court justified the need for a clear expression of congressional intent to override the dormant Commerce Clause based on "the policies underlying dormant Commerce Clause doctrine."[5] *S.-Cent. Timber Dev.*, 467 U.S. at 92. The majority thus has it backwards when it suggests that the doctrine's "objective should not be conflated with" the primary "rule"—the "'antidiscrimination principle'"—that courts have applied to implement that objective. Maj. Op. at 29 (quoting *Nat'l Pork Producers Council*, 598 U.S. at 369).

The Court has described the "fundamental objective" of the dormant Commerce Clause as "preserving a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors." *Gen. Motors Corp.*, 519 U.S. at 299. On its face, this objective is of course an odd fit for illegal markets. Even the majority acknowledges the obvious

---

[5] Specifically, the Court reasoned that requiring such clarity from Congress "reduces significantly the risk that unrepresented interests will be adversely affected by restraints on commerce." *S.-Cent. Timber Dev.*, 467 U.S. at 92. If that is the primary justification for requiring Congress to expressly authorize protectionist laws, however, the majority is not off to a good start. "[T]he Supreme Court has certainly never indicated that it is a constitutionally cognizable harm under the dormant Commerce Clause to 'adversely affect[]' out-of-state actors if their 'unrepresented interest[]' consists solely in peddling illicit goods." *Ne. Patients Grp.*, 45 F.4th at 559 n.1 (Gelpí, J., dissenting) (quoting *S.-Cent. Timber Dev.*, 467 U.S. at 92). And the majority's recognition that the dormant Commerce Clause never prohibits "incidentally burdens[ome]" laws in illegal markets suggests it agrees. Maj. Op. at 44.

10

"irony" of applying a doctrine implied from an affirmative grant of power to Congress to "'preserv[e] a national market'" that Congress does not want to exist. Maj. Op. at 29 (quoting *Gen. Motors Corp.*, 519 U.S. at 299).

Nevertheless, the majority concludes that the doctrine must apply to illegal markets—notwithstanding clear indicia of contrary congressional intent—because states could otherwise "shelter" in some such markets that are only "nominal[ly]" illegal or "candidate[s] for repeal." *Id.* at 30. The majority appears most concerned that a state could provide "advantages for their residents" in a market that Congress later legalizes, and thus "disturb[]" that future *legal* "national market." *Id.* at 30–31 (alteration accepted and internal quotation marks omitted).

As an initial matter, it is difficult to square this concern with the majority's concession that federal bans on interstate commerce can—at least "sometimes"—authorize *perfectly* protectionist state laws. *Id.* at 34. By concluding that such laws may be permissible, the majority encourages states to evade dormant Commerce Clause scrutiny through more flagrant protectionism. Yet any concern with states disturbing potential future legal markets would apply with greater force to more protectionist laws. Thus, even crediting the majority's concern, its solution only magnifies the problem.

11

In any event, I disagree with the majority that the potential future repeal of a federal prohibition provides any basis for requiring Congress to expressly authorize protectionist state legislation. For one, a "nominal[ly]" illegal market is still an illegal market—and thus one Congress does not want to exist. *Id.* at 30. Judicial intuitions about what Congress may hypothetically do in the future cannot possibly trump existing legislation as indicia of congressional intent. We should not settle for tea leaves when we can read a statute.

Moreover, even if we were to consider the possibility Congress may ultimately legalize marijuana, it is not at all clear to me that Congress would want the dormant Commerce Clause to apply before it has done so. As already discussed, application of the dormant Commerce Clause would compel a state that has elected to permit an intrastate marijuana market to open that market to interstate commerce. Yet localized markets may be invaluable to Congress as it assesses the comparative costs and benefits of legalizing marijuana—and whether to do so at the national level. One of the principal virtues of federalism is the ability for a state to "serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country." *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, *J.*, dissenting). And requiring states that permit

1   any commerce in marijuana to fully open their borders to interstate commerce

2   would mean tearing down the laboratory walls.

3   For these reasons, the possibility of future legalization does not support the

4   majority's requirement that Congress expressly authorize protectionist legislation

5   in illicit markets. The same is true with respect to the possibility of so-called

6   "knock-on effects" in *other* markets. *Ne. Patients Grp.*, 45 F.4th at 553.

7   The majority does not appear concerned with such effects, but because they

8   figured heavily in the First Circuit's analysis, I consider them here. In concluding

9   that the dormant Commerce Clause applies to the market for medical marijuana,

10  the First Circuit emphasized "the potential for protectionist state regulation to

11  stoke antagonism among the states." *Id.* at 552. It acknowledged that this risk "is

12  likely to be greatest when the market at issue is a lawful one," but it nonetheless

13  reasoned that there may be "potential for a trade war to be destructive" even when

14  "its genesis could be traced to a single state's effort to attain predominance in a

15  market that federal law deems unlawful." *Id.* at 552–53. Such a trade war, in the

16  First Circuit's view, could "escalate and have knock-on effects." *Id.* at 553.

17  At the outset, however, any such trade war would not just originate in illegal

18  markets; it would necessarily remain so confined. The dormant Commerce Clause

would continue to apply to *legal* commerce.  And as a result, if a trade war spilled over into legal markets, "the parties to that broader dispute could ask the courts to intervene."[6]  *Peridot Tree, Inc. v. City of Sacramento*, No. 2:22-cv-00289-KJM-SCR, 2024 WL 4857648, at *5 (E.D. Cal. Nov. 21, 2024).

The First Circuit's concern, then, reduces to one with the anticipated effects of a hypothetical trade war confined solely to illegal commerce.  Might the possibility of such effects justify requiring Congress to expressly authorize protectionist legislation in a market it has already expressly criminalized?  No matter how one frames the dormant Commerce Clause's purpose, the answer must be no.

To the extent the doctrine is concerned with advancing "national solidarity," *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 523 (1935), by heading off interstate conflict and resulting "Balkanization," *Tenn. Wine & Spirits Retailers Ass'n*, 588 U.S. at 517 (internal quotation marks omitted), it is difficult to imagine any meaningful

---

[6] Relatedly, to the extent one of the concerns here is that states might attempt to indirectly achieve discriminatory benefits in a legal market by enacting protectionist legislation in a related illegal market or submarket, the dormant Commerce Clause would continue to apply by reference to the broader legal market.  Thus, if a state law that applies on its face only to illegal commerce nonetheless "harbor[s] a discriminatory purpose[] or discriminate[s] in its effect" with respect to legal commerce, courts could intervene to strike down the law.  *N.Y. Pet Welfare Ass'n, Inc. v. City of New York*, 850 F.3d 79, 90 (2d Cir. 2017).  This case presents no such concerns, however, as the market for marijuana is both well-defined and wholly illegal, and Variscite has not argued that New York's licensing scheme has a discriminatory purpose or effect with respect to any legal commerce.

threat to the "succe[ss]" of the "Union," *id.* (internal quotation marks omitted), arising from "rivalries and animosities," *Granholm v. Heald*, 544 U.S. 460, 473 (2005), in markets for federally illicit goods—markets that at least a majority of the states' representatives in Congress have agreed should not exist. *See also* The Federalist No. 7, at 63 (Alexander Hamilton) (Clinton Rossiter ed., 1961) (warning that state protectionism could "lead to outrages, and these to reprisals and wars"). And to the extent the doctrine is concerned more with realizing the economic benefits of "free trade," *Bos. Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 335 (1977), and unencumbered "national market[s]," *Gen. Motors Corp.*, 519 U.S. at 299, the answer could not be any clearer: if Congress wants to eradicate a national market, it does not want that market to be "preserv[ed]," *id.*, let alone to "prosper[]," *H. P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 535 (1949). *See also* The Federalist No. 11, at 89 (Alexander Hamilton) (Clinton Rossiter ed., 1961) (touting the economic benefits of "unrestrained intercourse between the States"). Rather, Congress welcomes impediments to illegal interstate commerce. And it certainly would not want states to be forced to remove them. Accordingly, the dormant Commerce Clause's purpose provides no basis for requiring Congress to expressly authorize protectionist legislation in federally illegal markets.

\* \* \*

In sum, criminalization of a market is a sufficiently "unambiguous[] express[ion]" of congressional "intent" to override the dormant Commerce Clause's application. *Hillside Dairy*, 539 U.S. at 66. And neither precedent nor policy requires further clarity from Congress. It bears emphasizing, however, that courts do not have the last word on this issue. Congress could of course enact legislation prohibiting state regulations that discriminate against out-of-state investment in marijuana markets, or it could achieve the same result by legalizing marijuana. The limited question we must resolve is what default presumption best furthers Congress's intent when it criminalizes a market.

As I understand the majority opinion, it adopts a presumption that criminalization renders the dormant Commerce Clause inapplicable (1) sometimes to perfectly protectionist laws, (2) never to imperfectly protectionist laws, and (3) always to incidentally burdensome laws. And to override this presumption, the majority requires Congress to simultaneously criminalize and bless protectionist legislation in a market. That approach cannot be reconciled with either common sense, congressional intent, or the dormant Commerce Clause's purpose. All three, rather, favor a presumption that when Congress criminalizes a market, it

1   does not want the dormant Commerce Clause's protections to apply.  I respectfully

2   dissent.